1              UNITED STATES DISTRICT COURT

2         EASTERN DISTRICT OF NEW YORK (BROOKLYN)

3  GILEAD SCIENCES, INC.,

                          Case No. 1:25-cv-01469-RER-RML

4           Plaintiff,

5  v.                   Brooklyn, New York

                          April 18, 2025

6  CITY PLUS CARE PHARMACY INC.,  3:00 p.m.

  d/b/a, Heal The World

7  Pharmacy,

8           Defendant.

9

10        TRANSCRIPT OF STATUS CONFERENCE HEARING

       BEFORE THE HONORABLE RAMON E. REYES, JR.

          UNITED STATES DISTRICT COURT JUDGE

11

12  APPEARANCES:

  For the Plaintiff:         Geoffrey Potter, Esq.

13                    Anna Blum, Esq.

                    Patterson Belknap Webb & Tyler, LLP

14                    1133 Ave of the Americas

                    New York, NY 10036

15

  For the Defendant:         Patrick D. Tobia, Esq.

16                    Satish Poondi, Esq.

                    Trenk Isabel Siddiqi & Shahdanian P.C.

17                    290 W Mt. Pleasant Avenue

                    Suite 106

18                    Livingston, NJ 07801

19

  Also Appearing:            Lori Mayou, Gilead

20

  Clerk:                    JT

21

  Court Recorder:            Electronic Sound Recording

22

23

24

25

1    Transcription Service:        Chris Hwang
                                   Abba Reporting
2                                  PO Box 223282
                                   Chantilly, Virginia   20153
3                                  (518) 302-6772

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24    Proceedings recorded by electronic sound recording;
      transcript produced by transcription service.

25

1     (Call to order at 3:00 p.m.)

2          THE CLERK:  Civil cause for motion hearing in 25-CV-

3     1469, Gilead Sciences Inc., et al. v. City Plus Care Pharmacy

4     Inc., et al.

5          Counsel for Plaintiffs, please state your name for

6     the record?

7          MR. POTTER:  Good afternoon, Your Honor, it's a

8     pleasure to be back before you.  As you know, my name is

9     Jeffrey Potter.  I'm joined by my colleague Anna Blum and also

10    Deputy General Counsel of Gilead Lori Mayou (phonetic).

11         THE COURT:  Mr. Waters is letting you to speak today,

12    Mr. Potter?

13         MR. POTTER:  Mr. Waters is in Asia today --

14         THE COURT:  Okay.

15         MR. POTTER:  -- so it is my pleasure to try to fill

16    his very big shoes.

17         THE COURT:  All right, good afternoon.

18         THE CLERK:  Counsel for Defendants?

19         THE COURT:  Who's on for the Defendants?

20         THE CLERK:  Sorry.

21         MR. MOON:  Mark Moon.  Along with me is on behalf of

22    the Defendant City Plus Care Pharmacy and the individual

23    Defendants along with me is Satish Poondi, (indiscernible)

24    Crosby for Pro Hac Vice, as well as Pat Tobia.

25         THE COURT:  Good afternoon.

1          MR. MOON:  Good afternoon.

2          THE COURT:  Thank you for calling in or whatever you

3    call it, Zooming in.

4          MR. MOON:  Uh-huh.

5          THE COURT:  Whatever it is.  When I saw the motion

6    from the Defendants to unfreeze, I thought it was a good time

7    to get together and talk about a couple things, that being one

8    of them.

9          But first, is there any need to keep the seal on the

10   whole case or can we lift the seal and only seal those

11   particular submissions that have whatever confidential or

12   personal information, things like that?

13         Mr. Potter, what do you think about that?

14         MR. POTTER:  Your Honor, we have no objection to

15   unsealing the case.  I don't think it will hinder us from

16   moving forward with the case.

17         Also, I think it makes it easier for all the

18   practitioners when we can access the electronic docket.

19         THE COURT:  It makes it easier for the Court.  And

20   that's really the reason why I was asking because we've been

21   getting submissions by email and having to file them ourselves

22   and it's a cumbersome process.

23         MR. POTTER:  Along -- didn't mean to interrupt you,

24   Your Honor.  Along these lines, we didn't know about this

25   hearing until yesterday afternoon.  So we made a submission at

1   8:30 this morning.  I just wanted to be sure that it had gotten

2   to Your Honor.

3          THE COURT:  It did.

4          MR. POTTER:  Thank you.

5          THE COURT:  Mr. Moon, what do you think about

6   unsealing and only keeping those portions of the record sealed

7   that have any, you know, confidential or other information that

8   needs to be sealed?

9          MR. MOON:  Yeah, the Defendants have no objection or

10  to that.

11         THE COURT:  Okay.  I think what we will do then is

12  unseal the case, but ask the parties to go through the record

13  and see what -- if -- what if anything needs to remain under

14  seal and then make a submission in a week letting us know what

15  you think needs to remain sealed and we'll re-seal it if you

16  will, okay?

17         How are we going to go forward, folks?  We got a

18  lot -- we've got a lot of issues to figure out.  I know we have

19  the contempt hearing that's been scheduled.

20         MR. POTTER:  Well, we have the -- Your Honor, I think

21  what we have is a preliminary injunction hearing --

22         THE COURT:  The preliminary injunction hearing,

23  excuse me, yes.

24         MR. POTTER:  That's been scheduled, but we did

25  make -- bring an order for additional cause for contempt, which

1    is of really urgent moment.  These counterfeits have the

2    potential of causing serious injury or death.  We have had

3    extreme issues as Your Honor's aware of with the counterfeit

4    HIV medication.

5          And even in the best case scenario, these counterfeit

6    drugs were taken from someone who's HIV positive.  And so, the

7    effects on those patients can be grave.  And the effects on the

8    community can be grave because if you don't take your HIV

9    medicine before you die, you become contagious.

10         And we don't have any of the information that we need

11   to know where the Defendants' counterfeits came from.  They're

12   required by law to keep pedigrees, yet they've produced no

13   pedigrees.  We have no information at all by their admission of

14   dozens and dozens I think it's almost 70 bottles, but it's

15   quite clear that that's only the tip of the iceberg because

16   we're missing years of data, the recent months, and prior years

17   of data.

18         So we have no idea what the volume of sales are, but

19   that's not what we care most about.  It's not pinning down the

20   volume of the sales.

21         We'd like to know what patients had received these

22   drugs, so we can warn the patient.  We need to know the source

23   of these counterfeits.

24         If they're manufactured by the Defendants in this

25   case, great, tell us that.  If they bought them from somebody

1    else, we want to know who they bought them from so we can go

2    back and stop it.  It's putting the community at risk.

3            And I don't think until we found that out, there's

4    really anything more to say in this case.  I mean, that is the

5    hurdle that we have to get through.  This is a matter of public

6    health and safety.  This is not a case that Gilead certainly

7    wanted to bring.  It was forced upon it because a patient got a

8    bottle of counterfeit pills and we wanted to protect the

9    community.

10           And to spend any time on anything else before we've

11   gotten that really just critical health and safety information,

12   I think is the wrong focus of resources.

13           For the Defendants to be writing briefs and looking

14   for old parking tickets and old credit card bills and things to

15   try to make some case about assets is just a distraction and a

16   waste of time because they need to put their energy in their

17   small pharmacy and tell us where this medicine came from.

18           And until that's done, they need to be held in

19   contempt and there needs to be some sort of penalty.  I want

20   the information.  I don't want a penalty, but I don't think at

21   this point we're now one month away from the seizure and we

22   have no more information than we did before the seizure except

23   that we found counterfeits in the store.

24           We found a counterfeit not only on the shelves, but

25   as Your Honor has seen from the declarations, we found one in a

1    bag on its way to be delivered to a patient.

2         So this is very serious.  And that we haven't gotten

3    the pedigrees, we haven't gotten the information for these

4    bottles is the critical component.

5         And really what needs to be addressed today, what the

6    penalty will be if we don't receive this information

7    immediately, we're not looking for a motion to compel.  They've

8    already been ordered to do it.

9         This is about what coercive measure should the Court

10   take in order to finally get them to comply with the Court's

11   order.  Thank you.

12        THE COURT:  Let me ask you, Mr. Potter, you mentioned

13   the pedigrees.  Is there any -- putting pedigrees aside, is

14   there any way of re-creating over time through records that the

15   pharmacy should have kept how many bottles and to whom and all

16   that?

17        MR. POTTER:  Yeah, every pharmacy has a computer

18   where it keeps the records of the drugs that it dispensed.

19   It's required by law to keep those records.  Every pharmacy has

20   it.

21        If they're a legitimate pharmacy, they should be able

22   to tell us the names, addresses, and medication that they

23   dispensed to everyone for every drug.  We don't want all that

24   information just for the Gilead medication.  And that will tell

25   us on those who have gotten it.  And frankly now that 30 days

1    has passed, it's probably been consumed and we failed on that

2    end.

3              And but it at least give us -- should -- if they

4    legitimately put -- kept that information, which they should,

5    that'll give us a universe of bottles, and then, we need to go

6    to the other end of their system.

7              They went out and purchased those bottles.  They sent

8    money to those people.  They got invoices.  And they received

9    pedigrees that will show us where those bottles came from and

10   trace it back to Gilead if they're legitimate.  And if they're

11   not legitimate and we see the pedigrees, we'll see it'll go

12   somewhere else.

13             We'll get the serial numbers of the bottles from

14   that.  We'll know.  Hopefully, we'll be able to tell from that

15   whether they were dispensed to other patients.

16             We don't know what happened here.  I mean, when we

17   see these things, as you know, a lot of people have been

18   sentenced recently in New York City to long prison terms for

19   buying HIV anti-viral medication from patients.

20             And what they were doing was taking this medicine,

21   removing the labels, and then, selling it to other patients.

22   They would buy it from the patients for a few dollars and then

23   get thousands of dollars from the government or insurance when

24   they dispensed it.  That's the scheme and it's a dangerous

25   scheme, because it, one, takes medicine away from a sick

1    person.

2         And two, sometimes those bottles have been opened.

3    The pills have been contaminated.  Sometimes the pills are

4    expired.  And sometimes it's different pills that are in the

5    bottle.

6         And none of those are good scenarios.  They have to

7    have this information.  They can't function as the pharmacy

8    without keeping it.  And the fact that they've chosen not to

9    give it to us is why we're here today.

10         MR. POONDI:  Your Honor, if I can address some of

11    that.  I know Mr. Potter's had a lot to say, but if I can

12    address some of that, I'd request, Your Honor.

13         THE COURT:  Please do.

14         MR. POONDI:  Again, Your Honor, this is Satish

15    Poondi.  So I think a big problem here, Your Honor, is that for

16    whatever reason, Gilead just doesn't want to pick up the phone.

17    We offered multiple times because we have provided information.

18    And if it is their understanding that they needed something

19    other than what we provided, we have provided what we can

20    provide, which is in our, you know, possession.

21         THE COURT:  But what does that mean --

22         MR. POONDI:  Sure.

23         THE COURT:  -- we have provided what we can provide?

24         MR. POONDI:  Yeah.

25         THE COURT:  What's -- what have the lawyers done to

1    make sure that the client is producing everything that it has

2    because frankly when I see an indication in text messages from

3    a person associated with the pharmacy whether an owner or not,

4    that he got the Biktarvy, but then we don't have the records

5    backing that up, that's a little bit of a red flag, don't you

6    think?

7            MR. POONDI:  Sure, Your Honor.  So what we -- let me

8    start by discussing what we have provided.  We have provided

9    billing reports that, you know, go back from March of 2022

10   through March of 2025.  And it's a time period that we make

11   because that was what Gilead had in their order.

12           And those billing records show that the pharmacy

13   billed, not necessarily dispense, but billed for a total of

14   5,250 tablets.

15           We have provided it for the drugs, the Gilead

16   products that the pharmacy had in stock.  And specifically,

17   that was the Biktarvy.

18           And the report, the billing report that we provided

19   showed that there was 4,320 tablets billed; DESCOVY, 630

20   tablets; dry bill 300 tablets, added that up from just a Gilead

21   perspective, it's 5,250 tablets.

22           We have also provided spreadsheets from two separate

23   wholesalers.  Cardinal/Kinray (phonetic), as well as McKesson

24   (phonetic).

25           Both of those wholesalers are manufacturer authorized

1    wholesalers, authorized trading partners.  Their reports that

2    came from Cardinal Kinray as well as McKesson shows the

3    purchases by invoice, by drug, by date, et cetera.  And that

4    showed that there were 2,700 tablets of Biktarvy that was

5    purchased from either Cardinal or McKesson, 360 tablets

6    purchased for of DESCOVY, 210 tablets purchased of Stribel

7    (phonetic).  A total of 3,270 of the tablets that came from one

8    of these two sources.  And that is information that Gilead has.

9              In addition, we also provided -- the pharmacy was

10   able to find one invoice that had three bottles of Biktarvy

11   that came from another pharmacy that they purchased from.  It

12   dispenser to dispenser purchase, which was Pisa (phonetic)

13   Pharmacy.  That invoice was also provided to Gilead.

14             If from what I could -- and again, Mr. Potter, he

15   said a lot of things, but I think if he's asking we want the

16   names of the patients, we'd of course provide that.

17             But they didn't -- yeah, we tried to attempt to see

18   what exactly they needed, but dispensing the billing reports

19   that we provided does include the date of the submission, the

20   claim submission, the name of the medication, the amount of

21   quantity.

22             So all that information is in there.  And if

23   they -- if the issue is, hey, we want the name of the patient,

24   certainly, we'll provide that.  That's, you know, but again,

25   we're trying to communicate with them, unfortunately chose not

1  to.

2       We'll get into the, you know, compensatory damages

3  and all those issues, but I just wanted to push back on this

4  narrative that the pharmacy hasn't produced one iota of

5  information.

6       THE COURT:  I don't think he said that.  He didn't

7  say one iota.  He said the pharmacy hasn't produced everything

8  that it should have.

9       And your explanation indicates to me that that's in

10  fact the case because I didn't do the -- do all of the math,

11  but there were about at least 2,000 pills that were left out

12  that there's nothing that's been produced about, not where they

13  came from, not who they went to, no pedigrees.  And I don't

14  even think you have the pedigrees for the other pills or all of

15  them anyway.

16       So there's a lot that the pharmacy should have that

17  it hasn't produced.  And that's -- I think that's what Mr.

18  Potter is talking about at least with respect to these 5,250

19  tablets.  And I think he's indicating that there's perhaps more

20  that we haven't seen anything about.

21       MR. POONDI:  I mean --

22       THE COURT:  And that's problematic.

23       MR. POONDI:  And I recognize that, Your Honor, but

24  you know, with respect to the productions, we're only able to

25  produce what the pharmacy records have.

1          And in terms of the 1,980 -- about 2,000 tablets,

2     Your Honor, you know, those are based off of billing records.

3     Those are not necessarily dispense records.

4          We believe there may be clerical errors on that part

5     of it in the operations of the pharmacy, but you know, it

6     appears that the purchases came primarily from Cardinal and

7     McKesson.  And that is all that they have.

8          THE COURT:  So the bottle that was on the shelf in

9     the bag ready to go out, that came from Cardinal or McKesson?

10         MR. POONDI:  Well, Your Honor, there's no way to

11    correlate the bottles to where it came from, the pharmacy.

12    There's no pharmacy that would be able to do that but --

13         THE COURT:  This -- if you get something from a

14    legitimate wholesaler, there has to be a pedigree.  There has

15    to be a tracking of the lot number and of the -- this -- you

16    could easily figure that out whether it came from Cardinal or

17    McKesson or not.

18         I assume it was seized.  So Mr. Potter may have it,

19    but --

20         MR. POTTER:  We produced the photographs.

21         THE COURT:  Or the photographs.

22         MR. POTTER:  It's attached to our papers.

23    They're -- by their own account as Your Honor pointed out 2,000

24    pills that they can't even account for.  And we'll put aside

25    whether the purchases they claim from authorized distributors

1    are legitimate or not.  It's the 2,000 pills that we're

2    focusing on here.  That's a lot of counterfeits.

3         And Your Honor, just to make clear, it is 100 percent

4    normal for pharmacies selling counterfeits to buy some product

5    from authorized distributors to use that as an excuse if

6    they're asked where their products come from or if they're

7    audited by a pharmacy benefit manager, they need to show

8    purchases.

9         So they always have some purchases from authorized

10   distributors.  It's how you keep these themes going.  It is not

11   exculpatory the fact that they have some purchases from

12   authorized distributors.

13        You're talking about medicines that cost at the

14   wholesale level $3,000 a bottle.  Those 2,000 pills are a

15   large, large sum of money here.  And those are only the ones

16   that they're willing to admit to because we have months of

17   records that are missing.

18        So we don't know what the total universe is, but I

19   don't think it matters what the size is.  I think that what

20   matters here is we have not seen the production of information

21   they must have.

22        There -- you know, this is a teeny pharmacy.  This is

23   not a factory with thousands of people.  This pharmacy is very,

24   very small.  And they -- there are very few people in it.

25   These medicines didn't slip in and slip out.  They know where

1     it is and are strategically choosing to not tell us.

2              MR. POONDI:  Your Honor, first of all, I, you know,

3     there's a lot speculation on Mr. Potter's part that -- and you

4     know, he's certainly free to speculate as much as he wants, but

5     in terms of what they have and what they don't have, frankly,

6     Mr. Potter's offices and Gilead's in a much better position

7     because they're the ones who went in and they obviously seized

8     records.  They seized everything from phones to laptops to

9     computers, et cetera.

10             So if there's documents that are there that were not

11    producing according to Mr. Potter, you know, he's got to give

12    us something just because we've provided what the pharmacy has.

13             And that is in terms of the McKesson and Cardinal

14    purchases, as well as the Pisa purchases.  And Your Honor, to

15    answer your question, I would, if I had to speculate, my answer

16    would be that the three bottles that Mr. Potter is discussing

17    are probably related to the purchase from Pisa Pharmacy because

18    the invoices on Pisa were for also three bottles.  And that Mr.

19    Potter and Gilead do have that record that relates to the

20    purchase, the pharmacy purchase.

21             THE COURT:  And so, I just want to be clear on the

22    procedure.  So you got this -- you received -- the Defendants

23    received from Mr. Potter and his colleagues -- well, they went

24    and they did their seizure and they asked for information.

25             Did you -- did the lawyers go down and open up the

1    computer -- whatever was left, talk to the client, say where is

2    this, where is that, get me this, get me that?  Or did he

3    just -- did you just leave to the clients to give you whatever

4    they had without revealing any confidence?

5           Because when I was trained to do a document

6    production as a second year associate, I remember distinctly

7    being sent to Bank of America to go through their file

8    cabinets.  This was back when things -- not everything was on a

9    computer.  Frankly, not that long ago, but so did you do that

10   or did you just leave it up to them to say get us what you got?

11          MR. POONDI:  No, Your Honor, we didn't just get say

12   get, you know, just give us what you got.  We didn't physically

13   go into the pharmacy, but just give Your Honor background, I am

14   a pharmacist myself, licensed for the last about 20 years now.

15          And so, I'm familiar with working -- I work on the

16   bench for many years before I became an attorney.  So the

17   different software reports that we needed, we asked them for

18   specific reports for specific information from their

19   wholesaler.

20          And, again, this isn't also the first time that our

21   firm has been involved in these -- in this Gilead case.  This

22   is our I think fourth case that we're dealing with in one shape

23   or another.

24          And so, we did, you know, go through with the client

25   the specific types of documents that we would need in order to

1    put together a response that met the requirements under the

2    order.

3            THE COURT:  Okay, I thought there were three.  I

4    thought this was Gilead 3.  There's a fourth?

5            MR. POONDI:  No, we had -- we've been involved in

6    three other pharmacies that have been in similar situations --

7            THE COURT:  Oh, okay.

8            MR. POONDI:  -- over the last four years or so.

9            THE COURT:  Okay.  All right.

10           MR. POTTER:  Your Honor, I don't -- just to shut down

11   a certain area of inquiry, this so-called Pulsa Pharmacy, its

12   licensed expired, went out of business in 2021.  The invoice

13   that purports to be with them is dated on its face October

14   16th, 2024.

15           They have had hundreds of sales between October and

16   the time of the seizure.  The idea that those bottles would be

17   the ones in the bag and going out the door, remember this is a

18   product that wholesales for $3,000 that sat there for months is

19   just not plausible.

20           Or that out of all those sales, the bottle we got

21   from the complainant and the few that were left over came from

22   Pulsa is just not a plausible explanation for this.

23           And nor does that of course answer for the thousands

24   of bills that we have no information on that, have been

25   consumed and dispensed and sent out to patients.

1          Obviously, we'll get the patient records.  Hopefully,

2     people will still have bottles or pills and we can look at

3     those.

4          But at the end of the day, we are going to need the

5     Defendants to tell us where they got it from.  There's no way

6     they don't know.

7          THE COURT:  What I'm thinking is, and Mr. Poondi if

8     you want to add anything else, please I'm all ears, but what

9     I'm thinking is that before holding anyone in contempt, or

10    entering a preliminary injunction, I give the Defendants one

11    more opportunity to I was trying to come up with a colorful

12    saying like come clean or something like that, but I don't want

13    to prejudge, not prejudging anything here so -- because I don't

14    know what happened.

15         But give them another opportunity to produce

16    everything that they should have in very short order in a

17    matter of couple weeks.

18         And then, if Mr. Potter, you and your colleagues are

19    not satisfied with what you get, give you the opportunity of

20    taking their depositions.

21         And after that, if you feel that there is need for a

22    hearing on contempt that, you know, they're either hiding

23    something or there's something there that they haven't

24    produced, whether it be, whether intentionally or by mistake,

25    and they should be held in contempt, you can let me know and

1    we'll have a hearing and we'll deal with that in addition to

2    preliminarily enjoining them from whatever it is.

3              Would that be good enough, Mr. Potter?

4              MR. POTTER:  Well, we have a preliminary injunction

5    hearing coming up.  Our papers are due this Friday in, you

6    know, our reply papers.

7              And Anna, what is the date of the hearing?

8              MS. BLUM:  It's scheduled for May 15.

9              THE COURT:  15th, yeah, I thought so.

10             MR. POTTER:  So, you know, we would hope that we

11   could get these documents right away, so we could take

12   appropriate action.  If they bought it from someone, then that

13   seller is still out there selling and they need to be stopped.

14   Let's be straight about this.

15             And for them to -- if they -- frankly if they're the

16   counterfeiters and they stopped and they tell me, they said I

17   can sleep at night, but if they're not the counterfeiters and

18   are buying from someone else, then we need to know about that

19   this.

20             And this is a long time to expose people to this.  I

21   don't understand how they could have something more important

22   going on over the last 30 days than to get us this information

23   whether, you know, it would start with an affidavit about where

24   they buy from, who they bought from other than their alibis.

25             You know, where did these medicines come from?  Why

1    don't they have the -- why don't they have the information

2    here?  This should be of great urgency to them.

3           And it seems not.  It's, oh, you know, too bad so

4    sad.  I can't understand why this isn't more of a priority and

5    why this isn't something that we're going to see before we put

6    in our reply papers next week, why this can't be done next

7    week.

8           They want to -- yeah, in the normal course, you want

9    to get a -- if you didn't receive your pedigree from a trading

10   partner, let's see them, let's see their communication to the

11   trading partners.  Give us the pedigrees.  Let's see it come

12   from those entities where they bought the missing thousand

13   pills.  Where did they come from?

14          You know, let's see them make that request for

15   pedigrees.  You know, they haven't paid for those pills.  Let

16   them show us the payment records.

17          THE COURT:  Ms. Blum, I'm sorry, when is the hearing,

18   the preliminary injunction hearing?

19          MS. BLUM:  I believe, Your Honor, it's on May 15th at

20   10:00 a.m.

21          THE COURT:  Yeah, that's not -- that's what I thought

22   too, but it's not -- it is not showing up in my calendar, but

23   that might not be -- that might be because my calendar is

24   inaccurate.  All right, so thank you.

25          MS. BLUM:  Your Honor, it's May 14th, I misspoke.

1          THE COURT:  Well, it's not showing up there either.

2     I don't know why.

3          THE CLERK:  Judge, if I may, it -- on our end from

4     ECF, it looks like the show cause hearing is scheduled for the

5     23rd of April at 10:30 a.m., which is what I also have, which

6     is next Wednesday.  And that's what I have in our calendar.  So

7     if we want to change that, we should --

8          THE COURT:  Yes, 20 -- yes.

9          THE CLERK:  -- address that.

10         THE COURT:  Oh, I see that.  Okay, here's what we're

11    going to do.

12         Before we do that, Mr. Poondi, do you want to add

13    anything?

14         MR. POONDI:  Yeah, I know my colleagues have

15    something that they would like to bring up as well, Your Honor.

16    But the only thing I just want to get one pushback on this

17    narrative that they're not taking this seriously.  They're not,

18    you know, of course they're taking this seriously, Your Honor.

19    All of their assets are frozen.  They can't go and buy milk or

20    groceries today, right?  So of course they're taking this

21    seriously.

22         They are providing -- and again of course, we'll go

23    back as to Court's direction and try and see if there's

24    anything additional that we can provide.  We'll provide a list

25    of patient names.  If that's what Gilead is asking for, we'll

1      of course provide that.

2              But to the extent the records aren't there, they're

3      not certainly going to make up records.  And they're certainly

4      not going to create records for Gilead's satisfaction.

5              But we will of course go back and try and turn every

6      rock (indiscernible) to see if there's anything additional that

7      can be provided, but yes, they are taking this seriously.  You

8      know, we all understand public health issues that Mr. Potter is

9      talking about.  Me personally as a pharmacist, I get it.

10             But at the same time, from my client's perspective,

11     they're also taking it seriously because they don't have money

12     that they can use to put gas in a car.

13             So, yes, they are taking this serious, Your Honor.

14     And I do want to impress that on the Court as well.  And I

15     think Mr. Moon, Mr. Tobia may want to add to that.

16             MR. TOBIA:  Yes, Your Honor, this is Mr. Tobia.  I

17     just want to address what we filed this week, which was a

18     request to have assets unfrozen again because they were frozen

19     100 percent.  Everything that these people have is frozen, they

20     can't do anything.  And under the case law, I think --

21             THE COURT:  But can we table that for a second?  I

22     was going to get to that.

23             MR. TOBIA:  Yes, absolutely, yes.

24             THE COURT:  I want to deal with the other issues

25     first.  So what we're going to do is we are going to adjourn

1    the preliminary injunction hearing from the 23rd or the show

2    cause hearing from the 23rd to May 14th at 10:00 a.m.

3              And by April 30th, the Defendants are going to make a

4    supplemental production of everything under the sun.

5              And Mr. Potter, I would request that you send them a

6    letter by Monday identifying everything that you expect them to

7    have and produce and the period that you expect them to search

8    for their records.

9              Just so it's clear, they will make that production by

10   the 30th of April or explain -- so to say and/or explain in an

11   affidavit why they do not -- what the -- what search they

12   performed and why they do not have whatever it is that they're

13   required to maintain under law or otherwise.

14             If you want to take their depositions thereafter, if

15   you're unsatisfied with what they produce, then you can do that

16   through the 9th of May.  It's the following week.

17             And we will have our show cause hearing on the 14th

18   at 10:00 a.m.  We'll talk about whether people should be held

19   in contempt, whether we should have a preliminary injunction.

20   The Defendants will attend that hearing.

21             And please, Mr. Poondi, explain to your clients that

22   they really need to do the best they can to produce whatever

23   they have.  It's in their interest to do that.

24             MR. POTTER:  Your Honor, it might assist these very

25   good attorneys with their clients if you put on the record what

1    is possible in terms of contempt that it's not only a monetary

2    fine, but imprisonment is an option available to the Court to

3    impress upon them the importance of getting the answers.

4            THE COURT:  If their conduct satisfies the standard

5    for holding someone in criminal contempt, that can happen.

6    It's a high standard, but what is the saying?  All

7    (indiscernible) are off something like that.  So they need to

8    satisfy their obligations.

9            Now this issue of unfreezing the assets, you've had

10   the opportunity to read the Defendant's submission.  Excuse me,

11   the Plaintiff's submission this morning, yes?

12           MR. TOBIA:  Yes, Your Honor.

13           THE COURT:  Pretty fairly compelling, no?

14           MR. TOBIA:  Your Honor, this is Mr. Tobia.  On first

15   read, yes, Your Honor, it is compelling, but when you drill

16   down and actually look at the case law and what's gone on here,

17   I don't think it is as compelling and let me just briefly

18   explain why.

19           What Gilead is basically asking in his papers, it's

20   opposition, is to be secured beyond what the cases talk about,

21   a product calculation.  They raise issues about statutory fines

22   and attorneys' fees and, you know, multiple -- and positions of

23   statutory fines.  That does not appear to be the standard under

24   the cases.

25           We're at the temporary restraining order stage.  And

1    they have of course come into Court and they're shelling of

2    some merit to their case.

3          However, they froze every asset under the sun of our

4    clients to where our clients cannot live.  And not only that,

5    but based upon the small amount of Gilead product that sold at

6    this pharmacy, our clients estimate it's 5 percent or less, our

7    pharmacy can't operate at all.  They can't pay any of the

8    suppliers.  They can't make payroll.  They can't pay rent.

9          They're going to go out of business imminently.  You

10   know, originally when I spoke to Mr. Waters and we talked about

11   the releasing 35,000, we were discussing it on a short-term

12   basis of a few weeks.

13         It's now been three or four weeks.  They have no

14   money personally or for the pharmacy.  So we're not asking that

15   they get off the hook here.  What we've offered a profit

16   calculation and to put money into Court.  We're certainly

17   amenable to Your Honor looking at that number and telling us

18   that it has to be a different number, but have 100 percent

19   freezing their assets to where they can't buy groceries, they

20   can't do anything.  They can't run the store.

21         I just think, again, I think that's over compensating

22   Gilead at this stage of the case.  We're really talking about

23   they've made an effort our clients to produce.

24         We understand that the Court and Gilead is not

25   satisfied with that production yet, but that still, Your Honor,

1    respectfully I don't -- they mean is that you can -- well,

2    we're asking that they not be completely shut down.  They need

3    some relief from that order.  Again, they're willing to put

4    money into Court to protect Gilead, but within reason under the

5    cases.

6           I think you're talking about just for compensatory

7    damages, which is the profit calculation not for punitive

8    damages or attorneys' fees or statutory fines.

9           Gilead also today for the first time raises the issue

10   of going back more than three years, going back six years.

11   That's not what the order to show cause said.  That's not for

12   the records Gilead asked for.

13          So, again, I understand and we're taking this very

14   seriously, but the other side of this is that you do have

15   people on the other side regardless of how this case turns out,

16   that in the meantime, have no money to live.  They have no

17   money for food, they have no money for anything.

18          So we need some consideration here on some release of

19   assets in some way, shape, or form that's going to protect

20   Gilead, but also allow these people to live between now and the

21   return date.  So that's what we're asking the Court to consider

22   here.

23          THE COURT:  Mr. Potter?

24          MR. POTTER:  Yes.  The statements we heard I'd like

25   to address two-fold.  First, I'd like to start with the factual

1    statement.  There is under the case law great detail in what

2    someone needs to put forward to make that showing.

3         And we do not think that they've come even close to

4    that in terms of showing need.  It is our understanding that

5    they have multiple businesses that have not been frozen, that

6    they have other sources of income that have not been frozen.

7         There are not affidavits saying that they are not

8    getting money from other sources.  They have an operating

9    pharmacy.  There is money coming into the cash register.  There

10   is no showing of unpaid bills or inability to pay.

11        The evidence that was put forward were some

12   antiquated traffic tickets and on old bill, all of which

13   existed before we released the $35,000 to them.

14        The knowing the amount that should be frozen can't be

15   calculated until we know what the sales are and what the

16   counterfeits are and what they sold it for.  That's why that

17   should have been their first priority and should be their first

18   priority.

19        When they come back and show us what their full sales

20   are and what their profits are and this is their burden to do

21   it, then we can go ahead.  We can go ahead and, you know, then

22   we can go ahead and do a calculation.

23        I have a proposal that I think might address these

24   concerns.  What we do is we take the funds that have been

25   frozen, direct the banks to pay those funds into an interest

1  bearing account with the Clerk of the Court.  And then, the

2  banks will unfreeze those accounts.

3          And then, they have their continuing business.  They

4  can continue to do their business.  And the new money that

5  comes in will accumulate in those accounts and that would

6  eliminate the problem on an ongoing basis.

7          That would be -- that would allow them to achieve

8  what they want to achieve.  And it would guard the funds

9  because they would be in the safest place with the Clerk of the

10 Court.

11         And then of course, if they're successful in the

12 future in showing that these fund should not have been

13 restrained, those funds will be available to them and they can

14 get them back.

15         So we can prepare an order that directs the

16 courts -- that directs the banks to do that.  We've done this

17 with many defendants in the other Gilead cases.

18         And then, that way with their ongoing pharmacy we

19 know about and in the businesses they failed to disclose to us

20 or the Court, they will be able to continue those.

21         THE COURT:  How much was restrained?  What is the

22 total value of what was restrained?  Do we know?

23         MR. MOON:  Over a million.

24         MR. TOBIA:  Well, it's --

25         MR. MOON:  1.2 million.

1          MR. TOBIA:  This is Mr. Tobia.  Originally, Your

2    Honor, we just had the bank accounts that we were dealing with

3    when we took -- when we did the partial release of funds.

4          Those accounts, I think there was 112,000 in the

5    pharmacy accounts.  I have charts here somewhere.  I think

6    Hamza, the son, had about 50 -- maybe 52 or 3,000 in two

7    different accounts.

8          And then, I'd have to if you give me a second, I can

9    pull the chart out.  The father I think in total was probably

10    about 150- or 60,000.

11          MR. MOON:  On the bank accounts.

12          MR. TOBIA:  From the bank accounts.  That did not

13    include at that time, Your Honor, anything regarding the

14    brokerage account, which we're now told has a million dollars

15    in it.

16          Mr. Potter can tell us because I -- again, I'm going

17    to say in all honesty don't have clarity on whether that

18    account was frozen or not, but if Mr. Potter knows whether the

19    brokerage account, there's a two Schwab accounts whether they

20    were frozen.

21          If they weren't frozen, then they're available to us.

22    We're under the impression that they were frozen although we've

23    never -- we don't have clarity on that.

24          So, basically, about $150,000 was frozen in bank

25    accounts, possibly a million in brokerage accounts.  And what I

1    would say is --

2              THE COURT:  So.

3              MR. TOBIA:  I'm sorry, Your Honor.  I'm done.

4              THE COURT:  No, go ahead, go ahead.

5              MR. TOBIA:  You know, I was going to say is I think

6    even if the Schwab accounts were frozen, I think that what Mr.

7    Potter's proposing is not unreasonable, but I don't think it

8    should include the full amount of the Schwab accounts, the

9    brokerage accounts.

10             What was frozen in the bank accounts is one thing.

11   I'm not sure why we would be freezing the brokerage account

12   again, based on the (indiscernible).

13             And we have, for whatever it's worth, Your Honor, our

14   clients at this stage are -- have put forth a proposal that is

15   detrimental to them in the sense that they can't account for 38

16   to 40 percent of these drugs with records.

17             So we in our pet calculation have taken the full

18   burden of that and calculated a profit on that 40 percent

19   because we can't justify it right now.

20             So there is nothing beyond that universe.  We've

21   accounted for everything that we can account for in that

22   $80,000 calculation, which is why even, you know, when freezing

23   the bank accounts to the, you know, having the $150,000 put

24   into the Court registry, well, that may not be a problem.  That

25   would more than compensate for the calculation of profits that

1    we put forward.

2         I think anything beyond that, we would ask Your Honor

3    to temper because I really do think it would be overreaching in

4    terms of securing anything more than that.  We're not adverse

5    to working with Mr. Potter's proposal.  Actually, I think it's

6    a reasonable solution to this.

7         I just think the amount he's asking for if it

8    includes the brokerage accounts is excessive.

9         MR. POTTER:  Your Honor, there's nothing excessive

10   about it.  Not at all.  Their total volume of Gilead products

11   is in the millions of dollars.  We've gotten no proof that any

12   of it's authentic.  Some of it might be.  Some of it might not

13   be, but if it was, I would have expected we would receive some

14   proof.

15        This idea that, you know, this extraction, this is

16   not based on anything real.  We have no numbers.  They have not

17   produced to us.  We don't know their most recent sales.

18        The limitations period is six years.  We go back to

19   those six years, we're going to see and we believe we're going

20   to see millions of dollars of sales of Gilead products.  The

21   amount frozen will not come close to actual damages or

22   statutory damages.

23        MR. MOON:  Your Honor?

24        MR. POTTER:  If they make the production --

25        MR. MOON:  Your Honor.

1          MR. POTTER:  -- they can have -- they can withdraw

2     they the money will be available if they make the production

3     and are able to show that in fact too much money has been

4     restrained that can get given back to them.  We know from

5     experience as soon as the account is unfrozen, the funds will

6     be dissipated.

7          MR. MOON:  Your Honor --

8          MR. POTTER:  You know, if they want to put up -- if

9     have a bond that wants to put up == a bank that wants to put up

10    a letter of credit or a bond, both things we know to be

11    impossible for them to get, obviously, we would accept that.

12         But the reality is these funds are appropriately

13    frozen, need to be frozen, need to be continued to be frozen.

14    And what we've offered them is a legitimate way to deal with

15    their ongoing businesses.

16         They have credit cards.  Nobody is hungry.  We don't

17    see any applications for public assistance.  We don't see any

18    applications for food stamps.  We don't see anything from

19    anyone saying they aren't able to meet their ordinary expenses

20    other than a conclusionary statement.

21         And the only bills that they can show us, which

22    they're required to put forward are old parking tickets.

23         MR. MOON:  Your Honor, may  I --

24         MR. POTTER:  This is not an appropriate hoeing.  They

25    haven't made it.  We have made an offer to them.  They don't

1    have to accept it, but we think that that is an elegant way to

2    put this issue behind us and move forward.

3          We're happy to continue to discuss it with them if

4    they're not prepared to accept it now, but that's our offer.

5          MR. MOON:  Your Honor, may I address something?  So

6    we keeping hearing that I think that there is a misconception

7    about the burden at this stage of this litigation.

8          I think that the Court even looks at Judge Donnelly's

9    ruling in the Safe Chain litigation, she ruled that basically

10   assets freeze -- the asset seizure order and the freeze order

11   is considered a temporary restraining order.

12         And even in her decision, she has stated that after a

13   part obtains a TRO, the adverse party may appear and move to

14   dissolve and modify the order.  The burden is on the parties

15   seeking the restraint to show that it is justified.

16         So this idea that we have to justify that, you know,

17   we have to prove at this stage of the litigation before the

18   preliminary injunction hearing has even occurred is

19   inconsistent with what's been ruled by this Court involving

20   Gilead cases.

21         In addition, Your Honor, I think that the -- we have

22   produced numbers in the calculation to show that even if all of

23   the quote unquote unaccounted medications are given, we do not

24   concede at this time.  It's too early to make that final

25   finding of fact.

1          But even if we concede at the time, the profits on

2     those would have been approximately $80,000.  And based upon

3     the reimbursement claim from insurance records as well as the

4     number of pills that were dispensed that appear to be not to be

5     contested.

6          So we have come up with what we think is the right

7     amount to secure for what they're entitled to compensatory

8     damages.  Now to the extent that is -- the calculation is not

9     after it, we don't see anything to say what is.

10         So we've come up with -- we've come up with an

11    including records to show where we're getting the number from.

12    We have not seen anything to conflict with that except their

13    argument that, well, we can get treble damages or we can get

14    other statutory damages or we're entitled to attorneys' fees,

15    which is not what the asset freeze orders and are meant to do.

16    They're supposed to be equitable remedies.  And what they're

17    talking about are legal damages, which are not the same.

18         So while we put forth evidence, even though again, at

19    this stage, I don't believe it is the Defendant's burden, they

20    are -- they have not basically provided us with anything to say

21    why our numbers are wrong other than we think they can get more

22    under the statute and as far as attorneys' fees go.

23         MR. POONDI:  And Your Honor, this is Mr. Poondi.  If

24    I could just add on to what Mr. Moon said.  You know, this

25    claim that it's millions and millions and millions that they

1      profited from Gilead products simply isn't true.

2              And you know, to the extent Gilead believes

3      otherwise, we ask him to produce why they believe that.  What

4      we have provided is a claim by claim by claim by claim summary

5      for the Gilead products, each of which shows how much the

6      pharmacy was paid for that particular claim.

7              And again, Mr. Potter says let's go back six years.

8      Let's go back eight.  The three years is what was asked for in

9      the order.  We were asked in the order to go back three years.

10     We went back from March '22 to March of '25.

11             And that number claim by claim by claim, which has

12     been provided to Gilead, and they have, is $617,102.72 that was

13     actually paid.  That obviously doesn't include the cost of

14     goods from Kinray and Cardinal, but the amount paid was

15     617,000.

16             The cost of goods that Cardinal and McKesson charged

17     was a little bit over $400,000, $404,401.49.  That is how we

18     calculated the $80,000 because we then took the profit from the

19     what the insurance paid versus the cost of goods.

20             And again, to Mr. Moon's point, we took the entire

21     1,980 tablet deficiency and we -- in favor of Gilead presumed

22     that all of that came from some unauthorized wholesaler.  Not

23     proven and not conceded, but for the purposes of the

24     calculations presumed that.  And then, we took the percentage

25     of that -- of the total percentage of drugs purchased and we

1    came -- arrived at the 80,000.

2              Now Gilead doesn't seem to have a formula.  It seems,

3    well, we think a million's great.  1.2 would be great.  Let's

4    just do a 1.2 million and we'll -- there's no basis.  There's

5    no formula.

6              This is a formula, by the way, that had been used in

7    other cases with Gilead.  We did not come together on this

8    formula on our own.  It's been something that we did in other

9    cases that we were a party to with Gilead in this litigation.

10             THE COURT:  Were the brokerage accounts frozen, Mr.

11   Potter?

12             MR. POTTER:  Yes, the ones we know of.  They were

13   disclosed.  We froze them, but then they were later disclosed

14   in supplemental disclosures.  There have been so many piecemeal

15   disclosures by them.  The brokerage accounts are frozen.

16             And Your Honor, I don't know if you want to hear it,

17   but the -- just playing the statement if you don't know what

18   the count of bottles are, you can't do a calculation.  And we

19   haven't gotten productions that show us what the count of

20   bottles are.

21             MR. MOON:  We have given the count of bottles.

22             MR. POTTER:  We are saying that information is

23   incorrect.  The three years was for production to find the

24   counterfeiter, not for the calculation of damages.  That was to

25   come not on an urgent basis because sales made three years ago

1    we didn't think would be informative to stop an ongoing crime,

2    but what we were looking for was what we could stop then.  That

3    was the reason for the emergency production.

4           They're going to talk about their profits.  It's the

5    whole statute of limitation period.  The three years has

6    nothing to do with it.  It has to do with what they need to do

7    in a short period of time urgently.

8           Our damages go back to six years.  We're entitled

9    under the federal cases that we cite to their profits.  To

10   assume their profits when dealing with a counterfeit drug are

11   the same as when dealing with an authentic drug is plain silly.

12          But since we don't know the number of bottles,

13   whatever measure of profits we do, we don't know how to apply

14   it.  We don't know the old bottles and we don't know the most

15   recent ones, which should have been easiest for them to get and

16   produce to us.

17          But for some reason, that information was chosen not

18   to be given to us.  So we don't know the number of bottles.  We

19   don't know the profits that are involved here.

20          And had they made the production that was required

21   from them by the Court, we would be in a different position to

22   do it.

23          There is a second basis for the asset freeze.  And

24   that is under the state CPLR, which can also be enforced and

25   has been enforced in anti-counterfeiting cases in the Eastern

 1    District of New York.

 2            There, it goes to the likelihood of the assets being

 3    wrongfully lost to be dissipated by the Defendant.

 4            And we have, if we're going to make that argument,

 5    substantial information of structured funds going overseas in

 6    large quantities regularly.

 7            We have the hiding of the documents.  We have the

 8    lack of the information and much more than one typically has

 9    when making out that case.

10            So either way, whether and those would be for all

11    damages, whether statutory, punitive, or attorneys' fees or

12    whether it's in profits, either way, there is no basis to

13    unfreeze the funds.

14            And while it is the Plaintiff's burden to move

15    forward on the TRO and on the preliminary injunction, once an

16    asset freeze has been entered, the courts say it's the

17    defendant's burden to show what their profits are, to show what

18    the number of products are and what they cost them.

19            The burden at that point in the case law shifts.

20    That's what we're talking about in terms of the burden has not

21    been met here.

22            The solution we have, they have an ongoing business.

23    If they want to continue the ongoing business, we have

24    suggested we end the freezes on all the accounts.  The funds

25    are protected by the clerk of the Court in an interest bearing

1    account.

2          And if in the future, they feel they have the grounds

3    because they made the productions they're required to do to

4    show that the amount frozen is incorrect, they can renew that

5    and we know where the funds are, can be returned to them.  I

6    think that that is the most elegant way to deal with their

7    stated concern.

8          Otherwise, it can wait until the preliminary

9    injunction hearing when we are supposed to have the

10   information.

11         MR. MOON:  Your Honor, 175.  That's the number, 175

12   bottles.  Mr. Potter says I don't know, I don't know, I don't

13   know.  The documents that were produced clearly show 175

14   bottles.  That's the number, 175 bottles that were dispensed

15   between March 1st, 2022 and March 25th, 2025.

16         MR. MOON:  And Your Honor, in addition, if there

17   were -- they have all this evidence that establishes a

18   likelihood that these assets are going to dissipate under the

19   New York attachment law, isn't the requirement has always been

20   that those -- that evidence is produced at the application

21   time.

22         The idea that they're sitting here saying that

23   they're holding back on this evidence that they have goes

24   against all premise of how the patent works.  They're trying to

25   co-mingle both the remedies that between the federal court at

1    the (indiscernible).

2             THE COURT:  Mr. Poondi, the 175 bottles, what did the

3    pharmacy pay for them?

4             MR. POONDI:  So.

5             THE COURT:  Do we know?

6             MR. POONDI:  We do, Your Honor.  So what was paid for

7    from -- so again, between March 1st and March 25th of 2025, and

8    I'm counting for three drugs, Biktarvy --

9             MR. POTTER:  Before you give that information.

10            MR. POONDI:  Yes.  Hold on, Mr. Potter, please let me

11   finish.  Between the Biktarvy, Decovey, and the Stribel, we

12   produced the billing records for all three of those drugs from

13   March 1st to March 25th.

14            There's a total of 5,250 tablets that were billed

15   between March 1st, 2022 and March 25th, 2025.  That amounts to

16   a 175 bottles.

17            We know what they purchased from Cardinal and

18   McKesson and we've also produced the invoices -- the records

19   relating to those purchases.

20            And that comes out to $404,401.69.  The 175 bottles,

21   the -- what was paid to the pharmacy is 617,102.72.

22            MR. POONDI:  Could you tell us the number of bottles

23   dispensed in March and the number of bottles dispensed in

24   February?

25            Ms. Blum, can I confirm with you that we have no

1        record for any dispensations in those months?

2                MS. BLUM:  That's correct. .

3                THE COURT:  And but even with that, I'm not sure how

4        the numbers work out to $80,000.

5                MR. POONDI:  Yes, Your Honor.  So what we did was we

6        looked at the amount that was paid by insurance between March

7        1st and March 25th, the 617.

8                We then looked at the cost of goods that, you know,

9        was paid to McKesson and Cardinal.  That was $404,000.

10               So when you subtract that --

11               THE COURT:  So that's 200?

12               MR. POONDI:  212,000, Your Honor.  60 percent of the

13       profit you've already accounted from buying from undisputed

14       authorized manufacturers.

15               We said, all right, let's take the remaining 40

16       percent.  And presume 100 percent of that 40 percent was bought

17       from an unauthorized source.

18               So we took that, multiplied 40 percent to the benefit

19       of Gilead and we multiplied the 200,000 times 40 percent.  And

20       it comes out to $80,188.

21               THE COURT:  Okay.  But you don't know March and April

22       of 2025, is that what you're saying, Ms. Blum?

23               MR. POONDI:  I -- we didn't get April

24       (indiscernible).

25               MR. POTTER:  February, March, or April.

1          THE COURT:  February, March, or April.  All right,

2     look --

3          MR. POTTER:  And we don't know the three years before

4     because we're entitled to freeze profits for the entire six

5     year period.

6          We just don't have the numbers to do this.  We have

7     given them an option that will allow them to move forward.  I

8     don't know why they don't want to take it.  I think you should

9     ask the parties to confer about that.

10         THE COURT:  And just I agree, but just to finish this

11    off, the brokerage accounts which have been frozen have about a

12    million dollars, correct?

13         MR. POTTER:  That's what they've told us, yes.

14         THE COURT:  All right, okay.  I think in today's

15    market, were we to unfreeze those brokerage accounts and

16    something -- the value in those brokerage accounts would very

17    quickly diminish.

18         I mean, it's going to diminish whether or not it's

19    frozen or not, but let's keep -- let's try to keep that as long

20    as possible so when the markets re-correct, they'll be some

21    value there.

22         I'm going to leave it up to you folks to negotiate

23    unfreezing a partial unfreezing order on the bank accounts that

24    have approximately I think it's 150,000 in them.

25         I don't think the showing has been sufficient that

1    this is the only source of money they have to live and, you

2    know, but you should talk to Mr. Potter, try to come up with

3    something else.

4            I think, you know, placing some portion into -- of

5    those accounts into the Court's registry is a good suggestion.

6    I also think, you know, to allow the pharmacy to continue to

7    operate, if that one of the accounts is their operating

8    account, you know, they should be able to tap into that to

9    purchase more drugs legitimately and sell them to their clients

10   who need them.

11           So continue to talk about it.  And if you can't

12   resolve it, come back to me.

13           MR. POTTER:  Thank you, Your Honor.

14           THE COURT:  All right, so that should be everything,

15   yes?

16           MR. MOON:  You know, how long do we get to --

17           UNIDENTIFIED SPEAKER:  One second, Your Honor.

18           UNIDENTIFIED SPEAKER:  Your Honor, give us a second.

19           MR. POONDI:  Your Honor, if we could just -- we

20   understand the Court's position on the -- on -- and of course,

21   we welcome to the ability to confirm with Gilead.  And we have

22   tried to do that.

23           Our concern, as you know, Your Honor, is given the

24   fact that our clients don't have access to any of this right

25   now, is you know, to try and set a timeline by which the

1   parties can try and confer.  And if we're hopefully able to

2   resolve it, yes, that's great, but we can't -- keeping an open

3   ended question certainly, you know, has an impact on our --

4          MR. POTTER:  We'll have a proposal to you in writing

5   by tomorrow morning.  So you'll have something to work with,

6   but to set this -- and we anticipate that this will be

7   completed -- well, excuse me.  Tomorrow is Saturday, then we

8   have Easter.  So you'll have it on Monday.

9          But to assume that this is going to be, you know,

10  completed before they produce the documents we've been waiting

11  for for a month would be inappropriate, I think, for the Court

12  to order.

13         But we are going to work on getting this completed by

14  Monday.  I mean, we will give you a full blown order that if

15  you agree to it, we can give it to the Court.  The Court can

16  enter it and then, it will be sent to the banks.  We'll allow

17  it to be sent the banks by both parties.  And the banks tend to

18  act very quickly.  So this could be something that could be

19  taken care of as soon as Monday, Tuesday of this week.

20         MR. POONDI:  And I do appreciate that, sir, but you

21  know, and hopefully you know, it'll be something reasonable

22  that the parties can work out, but --

23         THE COURT:  If you're unable to resolve it, you come

24  back by Wednesday, because I am out Thursday through the

25  following Tuesday.  I'm reachable, but I'm very willing to e-

1    sign something for you if you can come to an agreement.

2            But if you can't and it's clear that you're not able

3    to do it, let me know by Wednesday.

4            UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

5            UNIDENTIFIED SPEAKER:  Judge, thank you very much.

6            UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

7            THE COURT:  Okay.  All right, thank you, folks.  Have

8    a great weekend.  Thank you for your time.

9            UNIDENTIFIED SPEAKER:  Thank you, Your Honor.  Thank

10   you for your time.

11       (Proceedings concluded at 4:09 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**CERTIFICATE**


I, Chris Hwang, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.




/s/ *Chris Hwang*
_____        April 28, 2025

Chris Hwang                   Date

Court Reporter