**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---------------------------------------------------------------

GILEAD SCIENCES, INC., *et al.*,    :
                                                        :
                                 Plaintiffs,    :          Case No. 25-cv-1469 (RER) (RML)
                                                        :
v.                                                    :
                                                        :
CITY PLUS CARE PHARMACY INC. D/B/A    :
HEAL THE WORLD PHARMACY, *et al.*,    :
                                                        :
                                 Defendants.    :
                                                        :

---------------------------------------------------------------

**PLAINTIFFS' MEMORANDUM OF LAW**
**IN SUPPORT OF MOTION FOR CASE-ENDING SANCTIONS**
**<u>AGAINST THE INDIVIDUAL DEFENDANTS</u>**

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................1

LEGAL STANDARD ..........................................................................................3

ARGUMENT .......................................................................................................6

I.  The Individual Defendants Committed Intentional, Pervasive, and Egregious
    Fraud on This Court .........................................................................................6

    A.  All Three Individual Defendants Repeatedly Lie About Their Finances
        and Bank Records, Preventing Gilead from Tracing Their Counterfeiting ............7

        1.  Each of the Defendants Responds to the Asset Freeze Order by
            Grossly Lying About Their Domestic Assets ...............................................8

        2.  Gilead Discovers the Individual Defendants' Undisclosed Overseas
            Assets ....................................................................................................10

        3.  The Individual Defendants Continue to Hide Their Overseas
            Assets and Continue to Lie About It ...........................................................11

        4.  Just Before the Instant Motion Was Due, the Individual Defendants
            Engage in More Blatant Gamesmanship .....................................................14

    B.  All Three Individual Defendants' Lies About Their Family's Ownership
        of and Control of the Pharmacy ...........................................................................16

        1.  The Chaudharys Retain Counsel on Behalf of the Pharmacy and
            Represent They Have the Authority to Have Pharmacy Funds
            Transferred to Qaiser's Personal Bank Account .........................................16

        2.  Counsel Produces Pharmacy Documents and Affirmatively
            Represents that Qaiser Chaudhary Is the Owner of the Pharmacy
            and Nabila Is Not .....................................................................................17

        3.  In an Attempt to Avoid Contempt and Secure the Release of
            Additional Funds, Qaiser Swears to the Court that He Is the Owner
            of Heal the World, and His Wife Was Never an Owner ...........................18

        4.  The Court Orders the Chaudharys to Either Produce Documents or
            Submit a Sworn Affidavit Saying Why They Do Not Have
            Documents Required by Law .....................................................................19

        5.  On the Day of Reckoning, Qaiser Suddenly Testifies that He Never
            Owned the Pharmacy, that Nabila Used to Own the Pharmacy, and
            that Nobody Can Produce the Pharmacy's Records .................................20

6.      The Individual Defendants' Lies About Their Ownership of the Pharmacy Were Used for a Litigation Advantage and Constitute Fraud on this Court ..................................................................................21

C.     All Three Individual Defendants Repeatedly Lie About and Refuse to Produce the Family Email Address They Shared with the Pharmacy ..................23

1.      The Individual Defendants Maintain They Never Used the Gmail Account for Personal Reasons and Have No Way to Access the Account ..................................................................................23

2.      Seized Records and the Testimony of the Individual Defendants' Own Counsel Prove that the Individual Defendants Are Lying ...............24

D.     Each of the Individual Defendants Tells Obvious, Easily Disprovable Lies About Their Cell Phones in Order to Justify Their Refusal to Search for or Produce a Single Document ..................................................................................28

1.      Hamza Chaudhary's Openly Perjurious Testimony that His Seized Texts Were Not, In Fact, His ..................................................................28

2.      Hamza Invents a New, Equally Obvious Series of Lies About His Cell Phone in His Discovery Responses ..................................................31

3.      In Their Verified Individual Discovery Responses, Qaiser and Nabila Also Tell Obvious Lies About Their Cell Phones (and Hamza's) ..................................................................................32

E.     Hamza's Additional Acts of Fraud Upon this Court: His Lies at Deposition and Witness Tampering ..................................................................33

1.      Hamza's Perjurious Testimony Regarding His Role at Heal the World Pharmacy ..................................................................................34

2.      Hamza's Perjurious Testimony Regarding Others at the Pharmacy ..........34

3.      Hamza's Perjurious Testimony About the New Mercedes that the Pharmacy Decided to Buy for Him in His Role as "Cashier" ..................36

4.      Hamza's Perjurious Testimony Regarding His Involvement With Other Pharmacies – Including a Pharmacy Transferring Large Numbers of Patients with Prescriptions for BIKTARVY ..........................38

5.      Hamza's Witness Tampering and Spoliation ............................................39

F.     Qaiser's Additional Acts of Fraud Upon this Court: His Lies at Deposition and Refusal to Answer Questions ..........................................................................41

1.      Qaiser's Lies to Cover Up Additional Payments from Heal the World ........................................................................................41

2.      Qaiser's Refusal to Testify as to Basic Facts About the Case ...................44

II.     The Court Should Enter Case-Ending Sanctions ...............................................45

CONCLUSION.................................................................................................................50

**Page(s)**

**Cases**

*Almeciga v. Ctr. for Investigative Reporting, Inc.*,
185 F. Supp. 3d 401 (S.D.N.Y. 2016)............................................................................3, 4, 47

*Altschuler v. Samsonite Corp.*,
109 F.R.D. 353 (E.D.N.Y. 1986) ..............................................................................................5

*Bobal v. Rensselaer Polytechnic Inst.*,
916 F.2d 759 (2d Cir. 1990).....................................................................................................5

*Bower v. Weisman*,
674 F. Supp. 109 (S.D.N.Y. 1987) ...........................................................................................4

*Cerruti 1881 S.A. v. Cerruti, Inc.*,
169 F.R.D. 573 (S.D.N.Y. 1996) .........................................................................................4, 49

*Elsevier Inc. v. Memon*,
97 F. Supp. 3d 21 (E.D.N.Y. 2015) ..........................................................................................5

*Ford v. Am. Broad. Co.*,
101 F.R.D. 664 (S.D.N.Y. 1983), *aff'd*, 742 F.2d 1434 (2d Cir. 1984)..................................50

*Gilead Sciences, Inc. et al. v. Safe Chain Solutions LLC et al.*,
No. 21-cv-4106 .........................................................................................................................7

*Guggenheim Capital, LLC v. Birnbaum*,
722 F.3d 444 (2d Cir. 2013)......................................................................................................5

*Hargove v. Riley*,
2007 U.S. Dist. LEXIS 6899 (E.D.N.Y. Jan. 31, 2007) ........................................................49

*Jones v. Niagara Frontier Transp. Auth.*,
836 F.2d 731 (2d Cir. 1987)......................................................................................................3

*Kupferman v. Consol. Research & Mfg. Corp.*,
459 F.2d 1072 (2d Cir. 1972)....................................................................................................3

*McMunn v. Mem'l Sloan-Kettering Cancer Ctr.*,
191 F. Supp. 2d 440 (S.D.N.Y. 2002)...............................................................................3, 5, 29

*Merck Eprova AG v. Gnosis S.P.A.*,
2010 U.S. Dist. LEXIS 38867 (S.D.N.Y. Apr. 20, 2010).........................................................5

*Miller v. Time-Warner Commc'ns, Inc.*,
  1999 U.S. Dist. LEXIS 14512 (S.D.N.Y. Sept. 22, 1999) .......................................49

*Morales v. Fisher*,
  Nos. CV-91-1018, CV-91-1068, 1991 U.S. Dist. LEXIS 5764 (E.D.N.Y. Apr.
  23, 1991) .......................................................................................................................3

*N.Y. Credit & Fin. Mgmt. Grp. v. Parson Ctr. Pharm., Inc.*,
  432 F. App'x 25 (2d Cir. 2011) ...................................................................................3

*Nat'l Hockey League v. Metro. Hockey Club, Inc.*,
  427 U.S. 639 (1976) (per curiam) ...............................................................................4

*Nycomed US, Inc. v. Glenmark Generics Ltd.*,
  2010 U.S. Dist. LEXIS 82014 (E.D.N.Y. Aug. 11, 2010) ...........................................5

*Penthouse Int'l, Ltd. v. Playboy Enters., Inc.*,
  663 F.2d 371 (2d Cir. 1981) ........................................................................................4

*Reilly v. Natwest Mkts. Grp. Inc.*,
  181 F.3d 253 (2d Cir. 1999) ........................................................................................5

*Scholastic, Inc. v. Stouffer*,
  221 F. Supp. 2d 425 (S.D.N.Y. 2002), *aff'd*, 81 F. App'x 396 (2d Cir. 2003) ..........4

*SEC v. Smith*,
  798 F. Supp. 2d 412 (N.D.N.Y. 2011), *aff'd*, 710 F.3d 87 (2d Cir. 2013) ................4

*Shangold v. Walt Disney Co.*,
  2006 U.S. Dist. LEXIS 748 (S.D.N.Y. Jan. 12, 2006), *aff'd*, 275 F. App'x 72
  (2d Cir. 2008) .............................................................................................................49

*Shangold v. Walt Disney Co.*,
  275 F. App'x 72 (2d Cir. 2008) ...................................................................................4

*Skywark v. Isaacson*,
  1999 U.S. Dist. LEXIS 23184 (S.D.N.Y. Oct. 14, 1999) .....................................48, 49

*West v. Goodyear Tire & Rubber Co.*,
  167 F.3d 776 (2d Cir. 1999) ........................................................................................4

*Zimmerman v. Poly Prep Country Day Sch.*,
  2012 U.S. Dist. LEXIS 78816 (E.D.N.Y. June 5, 2012) .........................................3, 4

**Statutes**

21 U.S.C. § 360eee-1(d)(1)(A)(iii) ...........................................................................20, 23

**Other Authorities**

Fed. R. Civ. P. 37......................................................................................................5

Plaintiffs Gilead Sciences, Inc. and Gilead Sciences Ireland UC, (together, "Gilead" or "Plaintiffs"), by and through undersigned counsel, respectfully submit this memorandum of law in support of its motion for case-ending sanctions against Defendants Nabila Chaudhary, Qaiser Chaudhary, and Hamza Chaudhary (together, the "Individual Defendants" or "Chaudharys").

## **INTRODUCTION**

This case is about counterfeit HIV medicine that was dispensed to innocent patients in this District, and that the undersigned counsel found sitting on the shelves of Heal the World Pharmacy (the "Pharmacy") in Queens. Gilead brought this action and sought urgent, immediate injunctive relief to stop the sale of these dangerous fake medicines, and to immediately obtain the information necessary to track down and shut down the source of the counterfeits. But from the inception of this action, the Individual Defendants have engaged in a pattern of intentional misconduct and deceit, aimed at preventing Gilead and the Court from discovering the source of the counterfeits and the core facts about the case.

That pattern of intentional litigation malfeasance would be more than enough to justify case-ending sanctions, but this case is extraordinary in the wanton, defiantly open manner in which the Individual Defendants have practiced their fraud on this Court. The Individual Defendants cannot be trusted to truthfully disclose the most basic of facts, even in formal, under-oath testimony: first they admit they own the Pharmacy, control its finances, and can produce its records on demand – and then, after months of litigation, they turn around and say they do not own the Pharmacy, that they sold the Pharmacy years ago, and have zero access to any of its documents or information. They use the Pharmacy's email address to communicate with their counsel in this litigation, but mysteriously lose their ability to access those emails when ordered to produce them by this Court. They admit their assets were frozen while they were in the

middle of transferring their family's wealth from Pakistan to the United States, but when ordered to disclose those assets are suddenly unable to come up with so much as an account number for their Pakistani banks. The Individual Defendants' deposition transcripts are a mess of grossly evasive answers and obvious lies: some lies that they made up on the spot, some lies that they told to try to cover up their earlier lies, and some lies that they practiced beforehand – as evidenced by the text messages sent to a co-conspirator openly directing him to lie to whatever lawyer contacted him about the case. The Individual Defendants' fraud on this Court is extensive and egregious, and in many instances it is exceedingly thinly veiled. Their behavior evinces a total lack of respect for this Court's authority and the civil judicial process, and a clear commitment to keep lying, keep denying, and keep grossly violating this Court's orders for as long as they are allowed to do so.

The Individual Defendants' fraud on the Court is particularly grave because of the nature of this case. The Individual Defendants' lies are in service of covering up a conspiracy to dispense counterfeit HIV medicines. Gilead caught the Defendants red-handed dispensing counterfeits: this case arose when a whistleblower alerted Gilead that they had received counterfeit HIV medicine from the Pharmacy, and, at the execution of the Seizure Order, Dkt. No. 17, Gilead's counsel found counterfeit HIV medicine in a bag awaiting patient pickup. The Defendants' refusal to comply with this Court's orders and to disclose basic facts regarding their purchase and sale of these "medicines," including their refusal to disclose pedigree documents that they are *required by law* to keep that would show the origin of these medicines, frustrates Gilead's ability to shut down this counterfeiting scheme and protect patients. The Individual Defendants' litigation misconduct should be weighed in light of the real-world stakes of this case.

Even in the sordid narratives that comprise the fraud-on-the-court caselaw, this case stands out. Principles of equity and the integrity of this Court demand the imposition of the severest sanctions, and legal precedent commands the same. The Individual Defendants have intentionally undermined the very basis of our civil justice system, and the Court should enter the sanction of striking their pleadings and entering default judgment against them.

## LEGAL STANDARD

A party who "lies to the court and [its] adversary intentionally, repeatedly, and about issues that are central to the truth-finding process" perpetrates a fraud on the court. *McMunn v. Mem'l Sloan-Kettering Cancer Ctr.*, 191 F. Supp. 2d 440, 445 (S.D.N.Y. 2002). Such fraud is more than an isolated incident of perjury. *Zimmerman v. Poly Prep Country Day Sch.*, 2012 U.S. Dist. LEXIS 78816, at *77, *107–08 (E.D.N.Y. June 5, 2012) (citing *Gleason v. Jandrucko*, 860 F.2d 556, 559–60 (2d Cir. 1988)).[1] Rather, it is "some unconscionable scheme" – through falsifying evidence, impeding discovery, submitting forged or fraudulent documents, or repeating or attempting to cover-up the deceit at deposition or in court, *see id.* at *106–07 (collecting examples) – to "hinder the fact finder's fair adjudication of the case and [its] adversary's defense of the action." *See McMunn*, 191 F. Supp. 2d at 445 (quotations omitted); *see also N.Y. Credit & Fin. Mgmt. Grp. v. Parson Ctr. Pharm., Inc.*, 432 F. App'x 25, 26 (2d Cir. 2011) (summary order); *Almeciga v. Ctr. for Investigative Reporting, Inc.*, 185 F. Supp. 3d 401, 427 (S.D.N.Y. 2016). Fraud on the court "defile[s] the court itself." *Kupferman v. Consol. Research & Mfg. Corp.*, 459 F.2d 1072, 1078 (2d Cir. 1972) (citation omitted).

---

[1] *But see Jones v. Niagara Frontier Transp. Auth.*, 836 F.2d 731, 734 (2d Cir. 1987) (affirming the dismissal of a complaint based solely on the plaintiff's officer's refusal to answer relevant questions at a deposition); *Morales v. Fisher*, Nos. CV-91-1018, CV-91-1068, 1991 U.S. Dist. LEXIS 5764, at *1 (E.D.N.Y. Apr. 23, 1991) (finding that plaintiff forged pleadings and stating that "[t]his fraud on the Court is alone sufficient to dismiss plaintiff's complaints without further inquiry").

Once a party's fraud on the court is established by clear and convincing evidence, *SEC v. Smith*, 798 F. Supp. 2d 412, 422 (N.D.N.Y. 2011), *aff'd*, 710 F.3d 87 (2d Cir. 2013),[2] a court has "inherent power to . . . levy[] sanctions" to punish the party's deception and deter future misconduct by it or other litigants. *See Penthouse Int'l, Ltd. v. Playboy Enters., Inc.*, 663 F.2d 371, 386–87 (2d Cir. 1981). The Court should consider five factors when determining the appropriate sanction:

> (i) whether the misconduct was the product of intentional bad faith; (ii) whether and to what extent the misconduct prejudiced the injured party; (iii) whether there is a pattern of misbehavior rather than an isolated instance; (iv) whether and when the misconduct was corrected; and (v) whether further misconduct is likely to occur in the future.

*Almeciga*, 185 F. Supp. 3d at 435. In serious cases and where lesser sanctions are insufficient, "entry of judgment against the offending party" is appropriate and necessary. *Cerruti 1881 S.A. v. Cerruti, Inc.*, 169 F.R.D. 573, 583 (S.D.N.Y. 1996); *see also Nat'l Hockey League v. Metro. Hockey Club, Inc.*, 427 U.S. 639, 643 (1976) (per curiam) (declaring that dismissal "must be available to the district court in appropriate cases" to penalize and deter misconduct). Dismissal is particularly merited where the party's misconduct is willful, in bad faith, or grossly negligent, *see Penthouse Int'l*, 663 F.2d at 387; *see also West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999), where the actions "resulted in significant costs" to the opposing party, *Shangold v. Walt Disney Co.*, 275 F. App'x 72, 74 (2d Cir. 2008) (summary order), or where the misconduct "relates to matters in controversy in the action," *Bower v. Weisman*, 674 F. Supp. 109, 112 (S.D.N.Y. 1987). Although dismissal is "severe," a party who repeatedly lies and

---

[2] *See also Zimmerman*, 2012 U.S. Dist. LEXIS 78816, at *77 (quotation omitted); *Scholastic, Inc. v. Stouffer*, 221 F. Supp. 2d 425, 439 (S.D.N.Y. 2002), *aff'd*, 81 F. App'x 396 (2d Cir. 2003).

thwarts the discovery of material information "forfeit[s] [its] right to have [its] claim decided on the merits." *McMunn*, 191 F. Supp. 2d at 445.

In addition to issuing sanctions for fraud on the Court under its inherent authority, the Court may also award sanctions under Fed. R. Civ. P. 37. "Whether exercising its inherent power, or acting pursuant to Rule 37, a district court has wide discretion in sanctioning a party for discovery abuses." *Reilly v. Natwest Mkts. Grp. Inc.*, 181 F.3d 253, 267 (2d Cir. 1999). "'If a party … fails to obey an order to provide or permit discovery,' the district court may impose sanctions, including 'rendering a default judgment against the disobedient party.'" *Guggenheim Capital, LLC v. Birnbaum*, 722 F.3d 444, 450 (2d Cir. 2013) (quoting Fed. R. Civ. P. 37(b)(2)(A)(vi)). Despite the severity of default judgment, "when discovery orders are willfully breached, imposing a litigation-ending sanction may be appropriate." *Elsevier Inc. v. Memon*, 97 F. Supp. 3d 21, 38 (E.D.N.Y. 2015) (citing *Bambu Sales, Inc. v. Ozak Trading, Inc.*, 58 F.3d 849, 853 (2d. Cir. 1995)). Dismissal may be warranted where the "court finds willfulness, bad faith, or any fault on the part of" the noncompliant party. *Bobal v. Rensselaer Polytechnic Inst.*, 916 F.2d 759, 764 (2d Cir. 1990) (citation omitted); *see also Altschuler v. Samsonite Corp.*, 109 F.R.D. 353, 356 (E.D.N.Y. 1986).

In addition to, or in lieu of, case-ending sanctions, a court may levy monetary sanctions against a noncompliant party or award fees and costs to compensate the moving party for expenses associated with seeking sanctions. *See* Fed. R. Civ. P. 37(b)(2)(C), (c); *Nycomed US, Inc. v. Glenmark Generics Ltd.*, 2010 U.S. Dist. LEXIS 82014, at *12 (E.D.N.Y. Aug. 11, 2010); *see also Merck Eprova AG v. Gnosis S.P.A.*, 2010 U.S. Dist. LEXIS 38867, at *21–24 (S.D.N.Y. Apr. 20, 2010) (imposing substantial fines for a party's lack of "diligence" in searching for

responsive documents, failure to produce important documents, and misrepresentations made by the party and its counsel).

**ARGUMENT**

## I. THE INDIVIDUAL DEFENDANTS COMMITTED INTENTIONAL, PERVASIVE, AND EGREGIOUS FRAUD ON THIS COURT

The Individual Defendants' fraud on this Court is so pervasive and so multifaceted as to defy easy summarization. It has tainted every aspect of this litigation.

Each of the three Individual Defendants shares the blame for their fraud on this Court. Each of them had an individual responsibility to comply with this Court's orders and Gilead's discovery demands, and each of them had a responsibility to tell the truth to this Court through the filings and statements made by their shared counsel. Although each of the Individual Defendants lied at every turn and their malfeasance took many forms, the record is clear that their fraud on this Court was a coordinated effort that has benefitted all of the Individual Defendants by making it impossible for Gilead and this Court to learn the truth about core facts of this case.

Gilead first discusses below the four overarching areas in which all three of the Individual Defendants have defrauded this Court: (1) their lies and refusals to produce assets and financial records; (2) their lies about their ownership and control over the Pharmacy and refusal to produce Pharmacy records; (3) their lies about and refusal to produce emails from a family email account, which among other things they used to communicate with their lawyers during the course of this litigation; and (4) their series of lies about their individual cell phones, which they used to justify not searching for or producing a single document from any of their phones. Any one of these four areas would on its own be more than sufficient to justifying case-ending sanctions on the Individual Defendants.

Gilead then goes on to discuss additional instances of fraud on this Court that were accomplished primarily through the perjurious deposition testimony of a particular Individual Defendant (and in Hamza Chaudhary's case, direct witness tampering). These additional acts of litigation malfeasance leave no doubt that the Individual Defendants' fraud on this Court was a purposeful and willful attempt to frustrate the Court's truth-finding process.

A.  **All Three Individual Defendants Repeatedly Lie About Their Finances and Bank Records, Preventing Gilead from Tracing Their Counterfeiting**

Pharmaceutical counterfeiting is, ultimately, a crime of money: counterfeiters manufacture and sell fake medicine for the purpose of making illicit profit. Financial evidence is therefore key to prosecuting an anti-counterfeiting litigation. For example, in *Gilead Sciences, Inc. et al. v. Safe Chain Solutions LLC et al.*, No. 21-cv-4106 ("*Gilead I*"), Gilead used bank records and other financial evidence to both (1) uncover an HIV drug counterfeiting conspiracy worth hundreds of millions of dollars, (2) establish the flow of counterfeits and counterfeiting profits through various entities and money-laundering schemes; and (3) prove the liability and damages associated with numerous individual members of the conspiracy. *See, e.g.*, *Gilead I*, Dkt. No. 1610-2. For the same reasons – to uncover more information about the counterfeiting network and the Defendants' co-conspirators, to discover the flow of fake HIV medicine and the illicit profits therefrom, and to gather additional evidence for Gilead's claims for injunctive and monetary relief – Gilead has attempted to obtain similar discovery from the Defendants in this action. But, the Defendants have, through a series of willful discovery violations, gross contempt of numerous of Court orders, and a stream of out-and-out lies, run a successful campaign to prevent Gilead from obtaining that evidence to date.

1. **Each of the Defendants Responds to the Asset Freeze Order by Grossly Lying About Their Domestic Assets**

At the beginning of this case, on March 17, 2025, this Court entered an *ex parte* Asset Freeze Order that required each of the Defendants to "immediately upon receipt of this Order" disclose "a list of all assets held by, for, or on account of" him or her. ECF No. 18 ¶ 5. The Order specifically required each Defendant, for assets held within a financial institution, to disclose the "account title, account number, and balance," as well as a "a list of all real properties the Defendant owns or in which they presently had a legal interest," and a separate list of properties in which they previously had a legal interest in the past three years. *Id.* Gilead served that Order, along with the other orders and papers in this case, at the seizure executed at the Pharmacy on March 19, 2025, as well as by hand upon each of the Defendants the following day. Declaration of Timothy A. Waters, dated November 21, 2025 ("Waters Decl.") ¶ 5; Dkt. No. 29-1.

Weeks later, on April 4, 2025, each of the Individual Defendants, through counsel, emailed asset disclosures pursuant to the Asset Freeze Order. Together, the Individual Defendants claimed that they had a combined total of **$79,000** in liquid assets among the three of them; the only other assets disclosed were their family home in New York, two motor vehicles, and $10,000 in miscellaneous household goods. Dkt. No. 36-1 at 41–46. No accounts at any bank or other financial institution were disclosed, and no overseas assets were disclosed. *Id.* That disclosure was made in connection with correspondence from the Defendants in which they asserted that the total amount of the asset freeze should be no greater than approximately $83,000 – i.e., all of the Chaudharys' disclosed liquid assets. *Id.* at 3.

It is beyond dispute that Individual Defendants knew it was a lie when they represented that they had less than $80,000 combined to their names. Gilead eventually located over $2.4

million in liquid cash sitting in their various U.S. bank accounts, and pursuant to this Court's Orders those funds were transferred to the Clerk of this Court. Ex. 1[3]; *see also* Dkt. Nos. 67, 70.

On April 7, 2025, Gilead filed an order to show cause why the Defendants should not be held in contempt of several orders, including the Asset Freeze Order. On April 16, 2025, the Defendants served what they called an "updated Asset Chart," and stated by serving this information, the Order to Show Cause seeking contempt and sanctions should be withdrawn. Ex. 2. Qaiser Chaudhary and Hamza Chaudhary subsequently filed sworn affidavits where they repeated the same "updated" disclosures to the Court. Dkt. No. 37 at 15, 20.

But those "updated" financial disclosures were filled with more lies. For example, although they acknowledged they had an account with Schwab, they omitted that the account contained an additional one **million dollars**. Ex. 36. They also disclosed that Hamza Chaudhary had two bank accounts – one with Chase and one with Citibank, purportedly containing exactly $50,000 combined – but failed to reveal another of Hamza's accounts at Citibank, one which contained almost a quarter-million dollars, which Gilead identified on its own through third-party subpoenas. Dkt. No. 37 at 20; Ex. 3. And once again, all three of the Individual Defendants' asset disclosures did not mention any overseas assets or accounts, or any additional real estate in which they currently or previously had an interest.

In sum, on two occasions in the first 30 days of this case, each of the Defendants grossly and intentionally lied about their assets in response to the Asset Freeze Order. And each time the Defendants used that gross and intentional lie to attempt to gain a litigation advantage: first, to seek an early settlement of the case for a pittance based on the lie that they had less than

---

[3] Unless otherwise noted, all citations to numbered exhibits are to the exhibits attached to the Declaration of Timothy A. Waters, dated November 21, 2025, filed herewith.

$80,000 combined in the bank, and second, in an attempt to trick Gilead into voluntarily withdrawing its contempt motion by disclosing a handful of additional bank accounts while still concealing millions of dollars of U.S. liquid assets and an untold overseas fortune.

### 2. Gilead Discovers the Individual Defendants' Undisclosed Overseas Assets

In reviewing the limited U.S. bank records that Gilead was able to obtain through third-party discovery, Gilead learned that the Chaudharys were routinely depositing into their U.S. bank accounts large sums of money from bank accounts in Pakistan, including a total of $300,000 transferred between November 2024 and the issuance of the Asset Freeze Order in March 2025. Ex. 4 (records produced by TD Bank, showing wire transfers to Qaiser and Nabila Chaudhary's account). From the limited information available on the U.S. bank statements themselves, there appeared to be at least five Pakistani bank accounts owned by the Chaudharys, including one that belonged to Hamza and one that belonged to Nabila.[4] *Id.;* Ex. 5 (records produced by Standard Chartered Bank, showing transfers to an account held by Hamza Chaudhary at Faysal Bank in Pakistan). Again, the Individual Defendants did not disclose any of these accounts, or that they held any assets at all outside the United States; Gilead found them on its own.

Gilead confronted Qaiser Chaudhary about his Pakistani bank accounts at his May 15, 2025 deposition, showing him the appearance of those Pakistani accounts on his U.S. bank statements. Ex. 6 (Q. Chaudhary Dep. Tr.) at 313:25-314:10. Qaiser admitted that he had bank accounts in Pakistan, and that those accounts remained unfrozen. *Id.* (Gilead never served the Asset Freeze Order on any overseas banks, because those banks are outside the Court's

---

[4] Because the Individual Defendants all share the same last name, Gilead on occasion refers to them herein by their first name only. No disrespect is intended.

jurisdiction.  Waters Decl. ¶ 6.)  Qaiser testified that he was in the process of moving all his wealth from Pakistan to the United States, because his family was now based in the U.S., and admitted that in the three months before Gilead filed suit, he had transferred over $219,000 from Pakistani bank accounts to his U.S. bank accounts.  Ex. 6 at 314:14-23, 315:25-316:10.  Qaiser testified that he had accounts at two Pakistani banks, MCB and Silkbank, and that those were the only Pakistani banks at which he had accounts.  *Id.* at 316:18-317:2.  When asked where the funds in those Pakistani accounts originated, Qaiser testified that he currently owned property in Pakistan, and that the rents generated from that real estate went into his Pakistani accounts.  *Id.* 315:5-13.

### 3. The Individual Defendants Continue to Hide Their Overseas Assets and Continue to Lie About It

Even after Qaiser's deposition, the Individual Defendants failed to disclose their overseas accounts or overseas real estate holdings.  Gilead therefore sought, and this Court ordered, an amendment to the Asset Freeze Order requiring the Individual Defendants to immediately disclose their overseas accounts, including account numbers and account balances; produce bank statements for those accounts; and take immediate steps to deposit the contents of those accounts with the Clerk of this Court.  Dkt. No. 67.  In open contempt of that Order, the Individual Defendants made no such disclosures, produced no such documents, and deposited no overseas funds for months.  This Court has repeatedly ruled that the Individual Defendants continue to be in contempt of the Asset Freeze Order.  *Id.*; Ex. 39 (May 21, 205 Hrg. Tr.) at 8:16-20, 37:11-13; Ex. 40 (Sept. 25, 2025 Hrg. Tr.) at 3:15-4:4.

After this Court issued a preliminary injunction and plenary discovery began, Gilead also issued document demands and interrogatories to all of the Individual Defendants seeking information about their assets, including their overseas assets.  Dkt. No. 78-1-6.  The Individual

Defendants ignored those requests, and after their 30-day deadline to respond had passed, this Court granted Gilead's motion to compel. Order dated Aug. 6, 2025. On August 15, 2025, both Qaiser Chaudhary and Nabila Chaudhary provided sworn responses in which they each stated they could not provide their Pakistani bank account numbers and could not "access any other responsive documents because the relevant accounts are frozen." Ex. 14 at 6-8 (Nabila); Ex.15 at 6-8 (Qaiser). Those sworn responses were perjurious. As noted above, Qaiser Chaudhary testified that his Pakistani accounts were not frozen, and there is no reason why they would be, because Gilead did not serve the Asset Freeze Order on those banks. But even if those accounts had been frozen, the idea that the Chaudharys, who were moving hundreds of thousands of dollars from those accounts into their U.S. accounts just before this litigation commenced, would be completely powerless to disclose the account numbers of those banks is self-evidently false. Despite direct questioning from the Court on this point, Qaiser and Nabila have never attempted to explain why they falsely claimed their Pakistani accounts were frozen, or what steps they took to try to comply with the Court's orders, or why they could not provide even their account numbers. *See* Ex. 39 at 36:10-17; Ex. 40 at 3:15-4:4. After weeks of openly ignoring this Court's orders, Qaiser and Nabila's sworn responses that they could provide no information about their foreign banks because the accounts were frozen were obvious lies, told with the purpose of preventing Gilead from obtaining any information about those accounts – including tracing counterfeiting proceeds through those accounts.

In a letter to the Court dated August 18, 2025, Gilead pointed out that Nabila and Qaiser had lied in their sworn interrogatory responses. Dkt No. 87. Two days later, on August 20, 2025, the Individual Defendants served by e-mail account numbers for two Pakistani bank accounts. Ex. 7. Merely providing account numbers, without balances or bank statements, and

without depositing those funds with the Clerk of the Court, was a far cry from compliance with the Asset Freeze Order. It was a blatant attempt to dribble out information that, by itself, was useless to Gilead and the Court, but would allow the Individual Defendants to pretend that they were trying to comply.

But the Individual Defendants botched the execution of their plan. The account numbers they provided are with banks in Pakistan that are **different than the two banks in Pakistan – MCB and Silkbank – that Qaiser Chaudhary testified were his only Pakistani banks.** *Id.* (email from counsel listing accounts at National Bank of Pakistan and Standard Chartered Bank); Ex. 6 at 316:18-317:5. In a subsequent meet-and-confer conversation with defense counsel, it quickly became clear that counsel did not realize that their clients had disclosed different, additional Pakistani bank accounts than those about which Qaiser had already testified. Waters Decl. ¶ 9. Their supposed "disclosure" simply revealed more of their fraud on this Court.

On September 5, 2025, Gilead filed a brief in which it made the points above – that other than accidentally revealing two new Pakistani bank accounts, the Individual Defendants continued to willfully flout the Asset Freeze Order and the Court's order compelling them to respond to Gilead's discovery demands. The Individual Defendants did nothing to refute Gilead's arguments or otherwise supplement the record. At a subsequent hearing – the last hearing in this action as of the date of this motion – counsel for the Individual Defendants and the Court had the following exchange:

> THE COURT: They got a bunch of accounts overseas that still have money in them, right?
>
> MR. MARZEC: I'm happy to address that issue. We did identify several accounts that they've been diligently contacting Pakistan trying to get into, according to my clients, get into them so that they can send wires. They're saying that they're inactive accounts.
>
> **THE COURT: Have you seen any documentary proof of that?**

**MR. MARZEC: I have requested it.  They have not –**

**THE COURT: See, that's the problem.  Your clients are not trustworthy, none of them.**

MR. MARZEC: The explanation that was provided is that the bank will not even discuss the accounts with them because they have not been able to verify their identity…. and my understanding is that they have not been able to make any headway in getting into those accounts. Now, also my understanding is that these accounts don't have any significant value in them. **I don't have any documents, Judge.**

THE COURT: And all of this is based on what your clients are telling you?

MR. MARZEC: Yes.

Ex. 40 at 3:18-4:17 (emphasis added).  For weeks after this exchange, the Individual Defendants did nothing, continuing to hide their overseas assets and remaining in willful contempt of this Court's orders.

> ### 4.     Just Before the Instant Motion Was Due, the Individual Defendants Engage in More Blatant Gamesmanship

On November 7, 2025, shortly before Gilead's deadline to file the instant motion,[5] the Individual Defendants served by email what they called a supplemental production, consisting of a handful of documents related to Pakistani bank accounts.  Ex. 8.  It was the first time the Individual Defendants produced any documents at all about their overseas assets.  Counsel subsequently served an additional document relating to an overseas account on November 12. Ex. 9.

The documents produced by the Individual Defendants relate to a total of five accounts in Pakistan: two belonging to Nabila Chaudhary, and three belonging to Qaiser Chaudhary.  These documents appear show that these five accounts were either closed prior to this litigation, or that

---

[5] The Court granted Gilead's motion for a week's extension of the deadline in light of this last-minute production.  Order dated Nov. 12, 2025.

their contents had been transferred to the Clerk of this Court, with a total of $4,715 deposited. Exs. 8, 9. Thus, on their face, these documents support the narrative that the Individual Defendants proffered at the last conference: the Individual Defendants' Pakistani accounts are either inactive or contained very few assets.

But that narrative is simply another act of fraud on this Court. The Individual Defendants chose to disclose information *only* about their overseas accounts that were closed or nearly empty. The Individual Defendants still have not produced *any* documents about, or disclosed the assets held by, at least five additional Pakistani bank accounts that Gilead knows of. Two of those still-undisclosed Pakistani accounts are the ones from which hundreds of thousands of dollars were wired to Qaiser Chaudhary's U.S. bank accounts in the months before this lawsuit started. Ex. 4. Two additional accounts are the ones from the National Bank of Pakistan and Standard Chartered Bank that, as discussed above, the Individual Defendants accidentally provided the account numbers for but never disclosed. Ex. 7. And the fifth undisclosed account is a Faysal Bank account in Hamza Chaudhary's name that Gilead found referenced in subpoenaed U.S. bank records. Ex. 5.

In short, the Individual Defendants' eleventh-hour disclosure is just another act of gamesmanship: they gave up information on their empty or nearly-empty Pakistani accounts while continuing to be in blatant, willful, gross contempt of this Court's orders with regard to the accounts that, the available evidence suggests, actually hold the Chaudhary family fortune. Moreover, the Individual Defendants still have not disclosed their real-estate holdings in Pakistan, another act of contempt they have never attempted to either justify or rectify. Their latest "disclosure" only serves to emphasize the inescapable conclusion: all of the Individual Defendants have engaged throughout this case in a sustained, intentional campaign to hide from

Gilead and this Court their assets and their financial documents that would show the flow of their ill-gotten gains from the sale of counterfeit HIV medicine.

**B.     All Three Individual Defendants' Lies About Their Family's Ownership of and Control of the Pharmacy**

As the Court is well aware, the Individual Defendants also engaged in fraud on this Court by executing a mid-litigation about-face, when they switched from representing themselves as the current owners of the Pharmacy to claiming they sold the Pharmacy and cut all ties to it in 2021. While that stunning reversal is obviously problematic on its face, it is important to understand the context, purpose, and effect of the Individual Defendants' fraud on the Court, and so Gilead sets forth the record in detail below.

**1.     The Chaudharys Retain Counsel on Behalf of the Pharmacy and Represent They Have the Authority to Have Pharmacy Funds Transferred to Qaiser's Personal Bank Account**

Gilead initiated this action by alleging that the Defendants owned and operated the Pharmacy, and attached to its initial moving papers public records and social-media posts evidencing the same. Dkt. Nos. 1, 6. When this Court's Seizure Order was executed at the Pharmacy, Hamza Chaudhary was the only person working there, and remained the only person at the Pharmacy throughout the nearly day-long seizure. Declaration of Jamar Haywood, dated November 21, 2025 ("Haywood Decl.") ¶ 4.

After the seizure, defense counsel entered an appearance for both the Individual Defendants and the Pharmacy. Dkt No. 31-32. That counsel later confirmed in open Court that he was retained to represent both the Chaudharys and the Pharmacy by Qaiser Chaudhary. Ex. 38 (May 9, 2025 Hrg. Tr.) at 15:23-16:2.[6]

---

[6] After original counsel withdrew, the Pharmacy never retained successor counsel. Because business entities cannot proceed *pro se*, pursuant to this Court's order, the Pharmacy has defaulted and an entry of default has been entered. Dkt. Nos. 60, 72.

When defense counsel first contacted Gilead, counsel stated that all his clients' assets had been frozen, and they needed an immediate release of funds to pay for personal and living expenses. *See* Ex. 10 at 5. The Defendants asked for a release of $35,000 in funds, to which Gilead immediately agreed, without attempting to negotiate the number. *Id.* at 1-2. Gilead's counsel suggested those released funds should come from an account owned by Hamza Chaudhary. *Id.* at 2. But counsel for the Defendants stated that he had spoken to his clients, who wanted the released funds to come from the Pharmacy's bank account. Specifically, counsel wrote that his clients wanted the "unfreezing of one account (a personal account of Qaiser at Citi Bank) and then authorizing Citi Bank to transfer a specific sum from the Pharmacy's account at Citi Bank to Qaiser's unfrozen personal account." *Id.* at 1. Because Gilead understood Qaiser to own the Pharmacy, Gilead did not object to that change. The parties thus signed, and on March 29, 2025 this Court so-ordered, a stipulation pursuant to which tens of thousands of dollars belonging to the Pharmacy were transferred to Qaiser's personal account, for the express purpose of Qaiser using those "frozen funds for Defendants' respective personal and business expenses." Dkt No. 24. Qaiser Chaudhary later testified that after that stipulation was signed, he spent approximately $2,500 a week on miscellaneous family living expenses, but also spent $5,000 in a five-day period for his "personal use." Ex. 6 at 300:2-7, 301:6-17, 303:16-304:3.

> ### 2. Counsel Produces Pharmacy Documents and Affirmatively Represents that Qaiser Chaudhary Is the Owner of the Pharmacy and Nabila Is Not

On April 4, 2025, defense counsel sent to Gilead's counsel a set of disclosures, accompanied by a cover letter.[7] Dkt. No. 36-1. The letter enclosed a set of purported financial

---

[7] Defense counsel sent that letter to the wrong email address, and so it was not received by Gilead's counsel of record until that error was revealed some time later. *See* Dkt No. 34.

disclosures on behalf of each of the Chaudharys and the Pharmacy – which, as set forth above, turned out to be grossly false. The letter also enclosed what the cover letter described as "records presently available to the Pharmacy," which included a printout from the Pharmacy's database, copies of invoices from the Pharmacy's suppliers, spreadsheets showing the Pharmacy's purchases of Gilead-branded products, and a list of insurance payments that the Pharmacy had received for Gilead-branded medicines that the Pharmacy had dispensed to patients. *Id.* at 1.

In addition to making financial disclosures on behalf of the Pharmacy and producing the "records presently available to the Pharmacy," in the accompanying cover letter, counsel made several affirmative assertions about the ownership of the Pharmacy: "**The Pharmacy and Qaiser Chaudhary are the only proper defendants in this case.** The Individual Defendant **Nabila Chaudhary is not an owner** and has no liability. The Individual Defendant Hamza Chaudhary … is an employee of the Pharmacy. He is not an owner. The Yelp post [that Gilead cited in its opening papers] incorrectly identified [Hamza] as an owner." *Id.* at 4 (emphasis added). While counsel did not expressly state that Qaiser Chaudary was the current owner of the Pharmacy, that was the unmistakable import of a paragraph that said that Qaiser is the only individual who should be a defendant in this case, because nobody else is an owner.

**3.**      **In an Attempt to Avoid Contempt and Secure the Release of Additional Funds, the Individual Defendants Tell the Court Qaiser Is the Owner of Heal the World, and Nabila Was Never an Owner**

On April 7, 2025, Gilead moved to have the Defendants held in contempt for numerous failures to produce documents and information as required by this Court's Seizure Order and Asset Freeze Order, including, crucially, the legally mandated pedigrees that would allow Gilead to trace the source of the counterfeit BIKTARVY®. Dkt No. 28; *see also* Dkt. No. 35. On April

17, 2025, the Defendants filed what they styled as an opposition to Gilead's motion for contempt as well as an "emergency motion to modify the asset freeze." Dkt. No. 37. In their motion, all of the Individual Defendants, through their shared counsel, repeated to the Court the same representations as to ownership that defense counsel had made to Gilead: that "Hamza Chaudhary is not an owner of the Pharmacy and has never been an owner of the Pharmacy," and "Nabila is not and never has been an owner of the Pharmacy." *Id.* at 5, 9, 12. This time, however, those assertions about ownership were supported by sworn testimony provided by Qaiser Chaudhary. Specifically, Qaiser submitted a declaration that began with the admission that he was the "owner of City Plus Care Pharmacy, Inc. [d/b/a/ Heal the World Pharmacy]" and that "Nabila Chaudhary is my wife and she has no ownership interest in the Pharmacy." *Id.* at 14, ¶ 2. Qaiser went on to state: "The Pharmacy accounts, still frozen, do not have sufficient funds to pay past due and on-going obligations, such as suppliers, payroll, rent, utilities, insurance, and other business expenses. It is absolutely essential to the continuation of the Pharmacy's continued existence and for the livelihood of its employees that the [Pharmacy's] Citi Bank and T.D. Bank accounts be unfrozen and available as soon as possible." *Id.* at 16, ¶¶ 10-11.

> **4.** **The Court Orders the Chaudharys to Either Produce Documents or Submit a Sworn Affidavit Saying Why They Do Not Have Documents Required by Law**

On April 18, 2025, the day after Qaiser filed his declaration with the Court, the Court held the first in-person conference in this case. The Court noted that although some Pharmacy records had been produced, "there were at least 2,000 pills that were left out, that there's nothing that's been produced about, not where they came from, not where they went to, no pedigrees. And I don't think you even have pedigrees for the other pills…. So there's a lot that the pharmacy should have that it didn't produce." Ex. 38 (Apr. 18, 2025 Hrg. Tr.) at 13:10-17.

Defense counsel explained that while he had not personally gone into the pharmacy to collect the records, "we did, you know, go through with the client the specific type of documents we would need in order to put together a response that met the requirements of the [seizure] order." *Id.* at 17:24-18-2. The Court instructed Gilead's counsel to "send them a letter identifying everything you expect them to have and produce," and that the defendants "will make that production by the 30th of April or explain – so to say and/or explain in an affidavit… what search they performed and why they do not have what they are required to maintain under law." *Id.* at 24:5-13. The Court concluded: "And please, [defense counsel], explain to your clients that they really need to do the best they can to produce whatever they have. It's in their interest to do that." *Id.* at 24:21-23.

Gilead sent the letter requested by the Court, demanding, among other things, the pedigrees for all Gilead-branded medicines, which the Pharmacy was required to maintain by law. Ex. 11; *see* 21 U.S.C. § 360eee-1(d)(1)(A)(iii). The Defendants never produced any of those documents – including not a single pedigree. Waters Decl. ¶ 7.

> **5. On the Day of Reckoning, Qaiser Suddenly Testifies that He Never Owned the Pharmacy, that Nabila Used to Own the Pharmacy, and that Nobody Can Produce the Pharmacy's Records**

The Defendants requested and received a one-day extension of the Court's April 30 deadline. Dkt. No. 52, May 1, 2025 Dkt. Entry. On May 1, the day that the Chaudharys had been ordered to finally provide a sworn affidavit explaining they did not maintain the most basic legally required records about the prescription medicine – including counterfeits their Pharmacy sold – Qaiser did in fact file a declaration with the Court. But rather than explain why his Pharmacy could not provide documentation of where it bought fake HIV medicine, in his declaration Qaiser performed a flabbergasting reversal of every factual position the Individual

Defendants had taken before the Court to date.  After swearing for months that he was the owner of the Pharmacy and his wife was never an owner, Qaiser now testified that he was **never** an owner, and his wife was its **former** owner: "I never purchased or owned any shares associated with City Care Plus Pharmacy LLC d/b/a/ Heal the World Pharmacy"; "Nabila Chaudhary was the owner of the Pharmacy from 2019 through 2021"; "I assisted my wife, Nabila Chaudhary, in her ownership of the Pharmacy, but I was never an owner of the Pharmacy."  Dkt. No. 53-2 at ¶¶ 1-3.  By way of explanation for this stunning reversal, Qaiser flatly stated, "My prior Declaration … contained an error."  *Id.* at ¶ 5.

Since Qaiser filed that Declaration, the Individual Defendants have consistently refused to produce any further documents concerning the Pharmacy's business, including purchase and sales records and pedigrees for its purchases of Gilead-branded medicines (including the counterfeits), claiming they cannot do so because they have not owned or controlled the Pharmacy for several years before this suit was filed.  Exs. 12-19 (Individual Defendants' Discovery Responses); Ex. 39 at 30:1-12; Ex. 40 at 38:11-14.

> ### 6.     The Individual Defendants' Lies About Their Ownership of the Pharmacy Were Used for a Litigation Advantage and Constitute Fraud on this Court

Qaiser's assertion that his "prior Declaration … contained an error" is laughably insufficient to explain the Individual Defendants' jaw-dropping change in position.  The Individual Defendants ask this Court to accept that they simply forgot – and never bothered to look up – that they had sold the Pharmacy *years* before suit was filed, even after (1) the execution of a no-notice seizure at the Pharmacy; (2) the freezing of all the family assets; (3) Gilead's publicly filed Complaint accused the Chaudharys of being behind the Pharmacy's counterfeiting; (4) Gilead's filing of proof that the Pharmacy was indeed selling counterfeit HIV medicine; (5) the Chaudhary's retention of litigation counsel to advise them; and (6) a federal

judge warning the Chaudharys, directly from the bench, that they could be sanctioned and even potentially imprisoned if they continued to withhold Pharmacy records. Moreover, as discussed below, the Individual Defendants later claimed at deposition to have interacted with the supposed "new owner" of the Pharmacy in the last year: Qaiser testified at deposition that shortly before suit was filed he was hired and paid by the *new* owner of the Pharmacy to fix the Pharmacy's roof, and Hamza testified that he saw *new* owner came by the Pharmacy routinely to handle payroll. Ex. 6 at 80:14-25; Ex. 20 at 85:16-21. The notion that all three Individual Defendants just plain forgot that their family no longer owned Pharmacy is absurd, and an insult to the sanctity of the judicial system.

The Individual Defendants' fraud on the Court with regard to their control and ownership of the Pharmacy is not limited to Qaiser's contradictory declarations. All three of the Individual Defendants knew the truth about the ownership of the Pharmacy, and through their shared counsel all three of them repeatedly took the position that Qaiser was owned the pharmacy, and Nabila had never owned the pharmacy. All three Individual Defendants used that that factual representation to obtain or attempt to obtain litigation advantages– including an express bid to get Gilead to dismiss Nabila and Hamza from this litigation. Dkt. No. 36-1 at 4 (arguing that the "Pharmacy and Qaiser Chaudhary are the only proper defendants in this case" because Nabila and Hamza are not owners of the Pharmacy).

The Individual Defendants continued that narrative until the very day that this Court ordered all three Individual Defendants to provide a sworn testimony explaining why, among other things, the Pharmacy failed to maintain *any* pedigrees for the Gilead-branded medicines it sold, in gross violation of the law. *See* 21 U.S.C. § 360eee-1(d)(1)(A)(iii). Then all three Individual Defendants simultaneously adopted the "new" narrative that they, for years before this

suit was filed, had no ownership interest in, no information about, and no access to the records of the Pharmacy.

Whichever narrative is true about the family's past and present ownership of the Pharmacy is ultimately irrelevant for purposes of this motion. The record permits only one conclusion: the Individual Defendants knew what the truth was from the beginning, but intentionally and repeatedly lied to Gilead and the Court about core facts in the case. In so doing, they led Gilead by the nose for months before ultimately declaring that they would not produce any of the Pharmacy records, achieving the intended effect of concealing the origin of the counterfeit HIV medicine. This is a quintessential example of fraud upon the Court.

### C. All Three Individual Defendants Repeatedly Lie About and Refuse to Produce the Family Email Address They Shared with the Pharmacy

From the beginning of this case, Gilead has sought production of the email records used by both the Individual Defendants and the Pharmacy: citypluscare@gmail.com (the "Gmail Account"). The Individual Defendants have consistently refused to produce those emails, despite direct Court orders to do so, and have told a series of obvious lies to pretend they do not have access to this email address. Not a single email has been produced in this case to date. Waters Decl. ¶ 8.

### 1. The Individual Defendants Maintain They Never Used the Gmail Account for Personal Reasons and Have No Way to Access the Account

From seized hard-copy records, Gilead knows that the Pharmacy at least sometimes used the Gmail Account to conduct Pharmacy business, including purchasing medicines. *E.g.*, Exs. 21, 22. In sworn deposition testimony and in direct representations to this Court, the Individual Defendants have consistently claimed that the Gmail Account is only accessible via a single computer located in the Pharmacy, where the Gmail Account was left open and could be

accessed by anyone who happened to be working in the Pharmacy that day.  Ex. 20 at 17:12-20;

24:21-25:14, 112:24-113:5, 116:23-117:4, 154:16- 155:8; Ex. 40 at 22:23-23:4.  The Individual

Defendants have insisted that they never used the Gmail Account for personal purposes, that they

do not have access to the Gmail Account from any of their personal devices, and – now that they

claim to have sold the Pharmacy years ago – have no means of accessing the Gmail Account.

*Id.*; *see also* Ex. 6 at 16:7-12; 24:24-25:4, 28:22-25, 29:7-10.  Gilead requested, and this Court

issued, an Order requiring the Individual Defendants to provide access to the Gmail Account so

that Gilead could forensically copy its contents, but the Individual Defendants refused, saying

they had no access and could provide no access.  Dkt. No. 66; *see also* Ex. 40 at 22:25-23:2

(counsel for the Individual Defendants representing that the terminal at the Pharmacy is "the only

possible way to access the trove of e-mails from that account.").  Instead, the Individual

Defendants claimed that access to the Gmail Account was controlled by a man named Abdul

Sheikh, whom they claim had purchased the Pharmacy from the Chaudharys,  using his

daughter-in-law (sometimes referred to as his daughter), a young woman named  Shumaila

Arslan, as the  on-paper owner.  Ex. 6 at 80:25-81:25; Ex. 20 at 16:16-17:2, 79:9-16.  They

further claimed that access to the Gmail account was lost when Mr. Sheikh died in August 2024.

Ex. 40 at 22:23-23:4; Ex. 23; *see also* Ex. 20 at 16:16-17:2, 79:9-16; Ex. 24 at 28:9-13.

      **2.**      **Seized Records and the Testimony of the Individual Defendants' Own Counsel Prove that the Individual Defendants Are Lying**

The Individual Defendants' representation that they did not use the Gmail Account for

anything other than Pharmacy business, and that they only accessed it from a single computer

sitting in the Pharmacy, is a blatant lie.  The Individual Defendants have told that lie over and

over to prevent Gilead and the Court from accessing those emails.  The blame for this fraud falls

equally on all three Individual Defendants: each of them had an individual obligation to produce

the emails under this Court's orders (and Gilead's discovery demands); each of them knew the family used the Gmail Account for personal business from their own devices, not just the Pharmacy computer; and each of them, through their shared counsel, has maintained the same lie about the family not using and not having access to the Gmail Account.

In fact, it was Defendants' original counsel that first alerted Gilead and the Court that the Individual Defendants were lying about the Gmail Account. Counsel stated in a sworn declaration filed with this Court: "All of our written communications have been through e-mail with the Defendants, using the e-mail address of citypluscare@gmail.com. We write to them at that e-mail address, and they respond to us using this e-mail address." Ex. 25 at ¶ 10. Counsel also included brief quotations from such email communications counsel with the Individual Defendants. *Id.* at ¶¶ 7-8. Obviously, if the Individual Defendants were in routine, direct communication with their lawyers using the Gmail Account **during the pendency of this lawsuit**, their repeated representations that they had no access to those emails after they supposedly sold the Pharmacy are lies.

The Individual Defendants have never attempted to explain this sworn statement from their counsel, or to disprove it. Instead, consistent with their behavior throughout this lawsuit, the Individual Defendants simply kept their heads down and kept repeating the lie that they had no access to the Gmail Account after they supposedly sold the Pharmacy, even after their own counsel told the Court that was untrue based on his personal experience.

Additional evidence seized from Hamza Chaudhary's cell phone confirms that the Individual Defendants in fact had access to the Gmail Account and used it for their personal purposes. Because the cloud-based Gmail Account was not locally saved on Hamza's phone, no emails were copied from Hamza's phone (from the Gmail Account or any other email account).

Haywood Decl. ¶ 8.  But Hamza did save screenshots to his phone that evidence his use of the Gmail Account from his phone.  For example, Hamza Chaudhary's phone contained the following screenshot of the email settings page from his phone:



*Id.* at ¶ 11& Ex. C.  This screenshot shows that Hamza was signed into the Gmail Account on his phone (note that it gives him the option to "sign out"); lists "Hamza Ch" as the "first and last

name" that Hamza associated with the account; and lists options for Hamza to set the password and two-factor security for the account. The metadata from this image shows that Hamza took this screenshot and saved it to his phone in late March 2024 – less than a year before this lawsuit was filed. *Id.* at ¶ 11 & Ex. D.

Another screenshot from Hamza's phone shows a flight confirmation email he received for travel to Pakistan, sent to "CITYPLUSCARE," and beginning with the salutation: "Hello Chaudhary." Haywood Decl. ¶ 10 & Ex. A. Although the date is not shown in the screenshot – it just lists the time the email was sent, indicating the screenshot was taken the same day the email was received – the metadata from the screenshot shows it was taken in **November 2024**, just a few months before this lawsuit was filed, and *after* Mr. Sheikh, the man who supposed controlled access to the account, had died. *Id.*; *see also* Ex. 24 at 28:9-13. And because Heal the World is a small retail pharmacy in Queens, it is clear that this trip to Pakistan was for personal reasons, not Pharmacy business.

Other examples abound. For example, in November 2023, Hamza texted his brother, Awais Chaudhary, asking him to provide the password for the Gmail Account, which Awais provided.[8] Ex. 26. Notably, (1) this text was sent *after* the Chaudhary family supposedly sold the Pharmacy; and (2) both Qaiser and Hamza were adamant at their depositions that Awais had nothing at all to do with any of the family's pharmacy businesses. Ex. 6 at 104:10-12; Ex. 20 at 91:13-17. The plain conclusion is that Awais knew the Gmail Account password because it was routinely accessed by and used by the Chaudhary family for personal business as well as Pharmacy business.

---

[8] Even if that password were still valid, Gilead could not access the Gmail Account today because it has two-factor authentication enabled. Waters Decl. ¶ 8.

Discovery is over, and the Defendants have not produced a single email. This far more than a routine discovery violation: it is a series of lies told for the undisguised purpose of preventing Gilead and the Court from accessing the email account that the Individual Defendants have identified as being used to conduct Pharmacy business. The Individual Defendants' malfeasance fits perfectly within the definition of fraud on the Court: one who "lies to the court and [its] adversary intentionally, repeatedly, and about issues that are central to the truth-finding process." *McMunn*, 191 F. Supp. 2d at 445.

### D. Each of the Individual Defendants Tells Obvious, Easily Disprovable Lies About Their Cell Phones in Order to Justify Their Refusal to Search for or Produce a Single Document

As part of their campaign to prevent Gilead and the Court from seeing any relevant documents in this case – despite the serious risk to public health posed by the counterfeit HIV medicine at issue – each of the Individual Defendants have told a series of bizarre, easily disprovable lies about their cell phones. Hamza lied repeatedly about the texts he sent from his cell phone that Gilead copied at the seizure, and Qaiser and Nabila Chaudhary lied and said that their phones were unavailable because Gilead took them away from them at the seizure – despite the fact that neither Qaiser nor Nabila, nor their cell phones, were present at the seizure. This constitutes yet another fraud on this Court.

### 1. Hamza Chaudhary's Openly Perjurious Testimony that His Seized Texts Were Not, In Fact, His

As noted above, Hamza Chaudhary was the only person at the Pharmacy during the execution of this Court's seizure order in March 2025. Hamza had a cell phone in his hand when the seizure began; investigators questioned whether it was his phone, and he confirmed it was. Haywood Decl. ¶ 5. Hamza was then shown the relevant provision of the Seizure Order permitting the forensic copying of his cell phone, and he unlocked his phone and relinquished it

for copying. *Id.* Gilead's forensic experts took Hamza's phone, hooked it up to equipment to forensically copy its contents, and returned it to Hamza when the copying was complete a few hours later. *Id.* ¶ 6.

On April 18, 2025, Gilead included some of the text messages it had copied from Hamza's phone, which showed Hamza to be involved in the Pharmacy's sourcing of Gilead-branded medicines, as exhibits to a publicly filed motion in this case. Dkt. Nos. 38-6 – 38-10. A few weeks later, on May 16, 2025, Hamza Chaudhary sat for his deposition. It took him all of five minutes before getting entangled in a series of obvious and foolish perjury.

The first substantive question Mr. Chaudhary faced at his deposition was simple one: "What's your phone number?" Ex. 20 at 10:10. Hamza initially asked: "I can still answer? If I don't want to, how does that work?" *Id.* at 10:14-15. When told he had to respond, Hamza then readily recited his phone number, giving a number that ended in -9698. *Id.* at 10:18. That -9698 number was, in fact, Hamza's cell phone number: it matched the number of the incriminating texts, seized from Hamza's cell phone, that Gilead had filed with its motion. Dkt Nos. 38-6 – 38-10.

Hamza was then asked if he also used a different phone number, ending in -9661. Ex. 20 at 10:24-25. In response, Hamza tried to claim that the -9661 number was his *only* phone number, and **attempted to retract his own testimony** from moments before where he recited **his own phone number, from memory**, as the -9698 number. *Id.* at 11:6-7 ("The [-]9661, that's my only number…[t]hat's, that's my only number. That's my only number."). To be clear, Gilead did *not* mention the -9698 number to Hamza. Hamza was asked to state his phone number, and he rattled off the -9698 number on his own.

When asked why he had testified that the -9698 was his phone number and then retracted it, Hamza responded: "It was that -- it was -- I'm not sure. The document I saw from, from your guys' ends. I saw that was stuck in my mind." *Id.* at 11:21-24. Hamza claimed not to remember the specific Gilead-filed documents on which he saw the -9698 number, but testified "[i]t was just stuck in my mind, and I ended up saying it by accident." *Id.* at 11:25-12:3.

Later in the deposition, Gilead showed Hamza some of the texts sent from the -9698 number that Gilead had copied directly from Hamza's cell phone. Hamza was adamant that those were not his texts, because that was not his phone number, although he vacillated between saying it was not his phone number and he could not remember if it was his phone number. *Id.* at 66:11-67:21, 68:9-25, 69:4-20, 72:10-73:12, 74:16-25, 138:16-25, 140:11-22, 142:10-16, 143:7-16.

Hamza gave that testimony despite the fact that these were texts copied from the cell phone that Hamza held in his hand at the seizure, and that Hamza personally unlocked and gave to Gilead's forensic technicians. Haywood Decl. ¶ 5. Moreover, the copied texts identify the author as "Hamza," and they are unmistakably about Hamza Chaudary's work at the Pharmacy. *E.g.*, Exs. 27, 28. The notion that these are not Hamza's text messages is ludicrous.

The record leaves no room for doubt as to what happened at Hamza's deposition. Hamza clearly came to his deposition with a plan to fraudulently address the damning texts that he had seen in Gilead's filings: he would deny those texts were his, and claim he never used the phone number from which those texts were sent. That planned perjury was foolish from the beginning, because under the circumstances it could hardly be more clear those were, in fact, his texts. But Hamza bungled the execution of his plan oath by accidentally giving truthful testimony when asked to recite his phone number. But that did not dissuade Hamza from his plan to commit

perjury. Instead, he stammered his way through the painfully obvious lie that he accidentally gave an unknown stranger's number instead of his own phone number, and the phone that he unlocked and handed over at the seizure was not his.

### 2. Hamza Invents a New, Equally Obvious Series of Lies About His Cell Phone in His Discovery Responses

Hamza's lies regarding his phone did not end with his deposition. Gilead subsequently issued discovery requests to Hamza, including a request that he identify and provide contact information for persons who had knowledge about "Heal the World's purchasing or dispensing of Gilead-Branded Medicines." Ex. 16 at 5. In his response, Hamza identified Martin Jacob, the former supervising pharmacist of the Pharmacy, and stated, "I had his telephone number but **I no longer have it because my phone was seized from me during the seizure in this case.**" *Id.* (emphasis added). Hamza made this statement under the penalty of perjury. *Id.* at 8. It was, of course, a lie. Gilead did not seize and keep Hamza's phone: after the copying was complete, Gilead returned Hamza's phone to him at the seizure, in front of Gilead's counsel and officers from the New York County Sheriff's Office. Haywood Decl. ¶ 7. Hamza was using that phone for the latter half of the seizure. *Id.*

In a subsequent Court filing, Gilead pointed out that Hamza's representation that Gilead had permanently taken his phone away from him was an easily disprovable lie. Dkt. No. 87. In response, Hamza amended his discovery responses: he dropped the lie that Gilead had stolen his phone, and now claimed that he had *lost* his phone in mid-July 2025. Ex. 18 at 5. Of course, if Hamza had actually lost his phone, he would have said so from the beginning – he would not have first claimed the phone was not his, and then claimed that Gilead stole it from him, before finally arriving at the "truth" that his phone was lost.

Moreover, Hamza has continued to insist, in his sworn interrogatory responses, that he cannot provide Gilead with the phone number for Martin Jacob, the supervising pharmacist of the Pharmacy, because his only source for that number was his now supposedly "lost" phone. But as set forth in more detail below, Jacob produced in third-party discovery a series of text messages he received from Hamza *after the seizure* from *two different phone numbers*. Hamza begins one of those post-seizure text chains with Jacob by saying, "New # number text here" – i.e., Hamza had a new phone number and Jacob should text him at this new number. Ex. 30 at -73. Hamza clearly has access to Jacob's contact information. He also clearly has another cell phone – one that he has used to discuss this case with a third-party material witness – from which he has produced no discovery whatsoever.

> **3.** **In Their Verified Individual Discovery Responses, Qaiser and Nabila Also Tell Obvious Lies About Their Cell Phones (and Hamza's)**

The other Individual Defendants also lied to Gilead about their cell phones. In their verified document responses, Qaiser and Nabila Chaudhary each separately claimed that they could not produce their communications concerning Gilead-branded medicines because Gilead seized their cell phones as well. Ex. 14 at 6 ("The only source of such information would be Respondent's cell phone, but that cell phone was seized, and so Respondent does not have access to any such communications."); Ex. 12 at 6 (same). But neither Nabila nor Qaiser Chaudhary were even present at Gilead's seizure at Heal the World Pharmacy, and their phones were never seized. Haywood Decl. ¶ 4. Hamza's lie that Gilead seized and kept his cell phone was foolish, but the lie was at least premised in the reality that his phone was temporarily taken from him for copying at the seizure. Qaiser's and Nabila's separate repetition of that lie when Gilead has never even seen their respective cell phones is absurd. It demonstrates their total lack of respect

for this Court and the judicial process: they will tell any lie, no matter how outlandish, to justify their refusal to produce documents in this case.

Moreover, in their verified interrogatory responses, bother Qaiser and Nabila doubled down on Hamza's lie that his phone had been seized, falsely testifying that, upon their personal knowledge, "Hamza had [Martin Jacob's] telephone number but he no longer has it because his phone was seized from him during the seizure in this case." Ex. 15 at 5; Ex. 17 at 5. Both Qaiser and Nabila declared under oath that the interrogatory responses they provided were "true and correct to the best of my knowledge, information, and belief" and that they had "first-hand knowledge of the responses set forth herein[.]" Ex. 15 at 10; Ex. 17 at 10. Those sworn declarations are perjurious for the obvious reason that Hamza's phone was returned during the seizure. Qaiser and Nabila's decision to add their own perjurious statements to support Hamza's obvious lie is yet another act of fraud upon this Court, and demonstrates the degree to which this fraud is a joint family affair.

The result of the Individual Defendants' series of lies about their cell phones is that they, collectively, have not searched for or produced a single document from any of their cell phones, have not provided contact information for a key witness, and have left Gilead with a fraud-tainted record in which Hamza disclaims that texts copied directly from his cell phone are, in fact, his. The record leaves no room for doubt that this was a coordinated effort by the Individual Defendants to prevent Gilead and the Court from obtaining key documents and information in this litigation.

### E. Hamza's Additional Acts of Fraud Upon this Court: His Lies at Deposition and Witness Tampering

Hamza Chaudhary's lies at his deposition were in no way limited to his absurd attempt to claim his cell phone and text messages were not his own. Hamza evinced an utter disregard for

his oath to tell the truth during his entire deposition, and his perjury permeates the entire transcript. Some of the more salient examples of his lies at deposition are set forth below.

### 1. Hamza's Perjurious Testimony Regarding His Role at the Pharmacy

At deposition, Hamza repeatedly claimed he was only a "cashier" at the Pharmacy, disclaiming any knowledge about how medicines were obtained and dispensed. E.g., Ex. 20 at 87:8-14; 91:11-18; 105:5-106:17. When pressed specifically, he claimed he had never ordered or supplied medicines to the Pharmacy, *id.* at 51:5-7, and that it would be inconsistent with his job duties for him to do so, *id.* at 141:2-17. But Hamza's text messages show that he in fact not only repeatedly supplied medicines to the Pharmacy, but that he was specifically involved in procuring BIKTARVY®, the Gilead-branded HIV medicine of which the Pharmacy sold counterfeit versions. Ex. 27 at 2 (Hamza texting a Pharmacy employee on January 10, 2023 that he will provide BIKTARVY®: "I got biktar. 2 total."); Ex. 28 at 2-3 (Pharmacy employee requesting BIKTARVY® from Hamza on December 14, 2022, "Biktarvy can you bring," and Hamza responding: "Tomorrow. Biktarvy."); Ex. 31 at 5 (Heal the World pharmacist asking Hamza, "U got … Biktarvy?" and Hamza confirming he has "Biktarvy"). The texts show that Hamza continued to supply BIKTARVY® for the Pharmacy *after* its supposed sale in 2021. *Compare* Exs. 27-28 *with* Dkt. 53-1 ¶¶ 3-4 (Nabila Chaudhary testifying she sold the Pharmacy in 2021).

### 2. Hamza's Perjurious Testimony Regarding Others at the Pharmacy

In his eagerness to disclaim all knowledge and responsibility for the Pharmacy's acquisition of Gilead-branded medicines, Hamza insisted at his deposition that all pharmaceutical sourcing and ordering was performed solely by the licensed pharmacists working at the Pharmacy. Ex. 20 at 47:9-15; 51:14-16. But in a transparent bid to prevent Gilead from

actually speaking to any of those pharmacists, Hamza concocted the story that there were **no** regular pharmacists at the Pharmacy, only "floater" pharmacists who would show up, somehow know what medicine to order and where to order it from (and have the budget to do so) despite having no prior involvement in the business, and then disappear forever. *See* Ex. 20 at 47:7-24, 49:21-50:7, 80:13-16, 83:12-21, 91:7-96:11. Hamza claimed not to know the full names of any of these "floating" pharmacists or how to contact them. *Id.* at 48:4-22. Unsurprisingly, this highly implausible story did not stand up to scrutiny. Hamza could not explain how any of these "floating" pharmacists were identified and hired. *Id.* at 96:12-18. Hamza initially testified that the "floating" pharmacists worked according to a schedule made by Abdul Sheikh before his death. *Id.* at 80:20-81:4 (testifying that "Abdul already had the days planned out which pharmacist… Before he passed, he already had like the days planned out which pharmacist for them to come."). But when pressed, Hamza admitted that he in fact had no knowledge of any such schedule put together by Mr. Sheikh. *Id.* at 98:19-99:2. In reality, documents seized from Hamza's phone showed Hamza coordinating directly with pharmacists, scheduling which days they would work in the Pharmacy. *E.g.*, Ex. 32. Unsurprisingly, Hamza denied all this at his deposition, claiming he had never been involved in pharmacist hiring or scheduling. Ex. 20 at 50:5-23.

Hamza also claimed he did not know the names of any of the pharmacy technicians that worked at the Pharmacy. *Id.* at 87:2-16. He also specifically and repeatedly denied under oath knowing who "Devi" was – a name that appeared frequently in his text messages. *Id.* at 87:21-88:4; 140:9-10. And yet Gilead now knows from third-party discovery that **four days** before his deposition, Hamza was texting with Martin Jacob, the supervising pharmacy of the Pharmacy. Ex. 30. In those texts, Hamza gave Jacob a list of a half-dozen pharmacy technicians, starting

with Devi, instructing Mr. Jacob to delete all his chat messages with them: "Make sure you delete our chat and Devi's. Any other techs chats delete also Brianna[,] Jancie[,] Rebecca[,] Gem[,] Essence." *Id.* at -72.

Hamza further claimed that Shumaila Arslan, one of the alleged new owners of the Pharmacy, was responsible for paying Pharmacy employees and wholesalers, but that he would "help her" by actually transferring the money to the wholesalers or employees. Ex. 20 at 94:5-20; 96:19-24. His deposition testimony was a string of contradictions. First, he claimed that he would speak to Ms. Arslan "once a week." *Id.* at 84:10-12. Then, he could not decide how often Ms. Arslan allegedly came to the pharmacy, testifying that she "rarely came," so he would sometimes speak to her by phone, *id.* at 84:13-17. Then, he testified that she came to the pharmacy once a week, *id.* at 84:18-21, and that he had only spoken to her once on the phone and did not remember what they had discussed, *id.* at 85:5-10. Next, he claimed that he would not discuss anything with Ms. Arslan, but that she would just "get the mail, payments and leave from the pharmacy, and pay the employees." *Id.* at 85:18-21. For her part, Ms. Arslan claimed that she had never been to the Pharmacy, and had never spoken with Hamza Chaudhary. Ex. 24 at 23:20-22, 29:16-22.

### 3. Hamza's Perjurious Testimony About the New Mercedes that the Pharmacy Decided to Buy for Him in His Role as "Cashier"

At Hamza's deposition, Gilead confronted him with the fact that the Pharmacy had been paying the lease on his brand-new Mercedes luxury SUV, despite the fact that he now claimed the Pharmacy was not owned by his family and his role was limited to "cashier." Ex. 20 at 37:5-16, 82:16-83:25. Here too Hamza tripped himself up in his lies. He initially claimed that the supposedly new owner's father, Abdul Sheikh, offered to lease the Mercedes for him, and that he "made a deal with Abdul" when "he [Abdul] took over" the Pharmacy in 2021, but then he

immediately changed his story to say that the idea was all Mr. Sheikh's, and that Mr. Sheikh

"was generous" and simply told Hamza he would pay for a new Mercedes out of the blue,

without further explanation. *Id.* at 199:4-9, 200:4-201:3. When asked who paid for the lease

after Mr. Sheikh's death in August 2024, Hamza initially said he was currently paying for the

Mercedes himself, then changed his testimony to say that his father, Qaiser Chaudhary, currently

"helps" him pay for the Mercedes, and then changed his testimony to claim his father was paying

the entirety of the lease. *Id.* at 202:3-11. But when Gilead's counsel reminded Hamza that both

his own and his father's bank accounts had been frozen by this Court for months, Hamza

changed his testimony again, now asserting astonishing memory loss:

> Q. Your accounts have been frozen, your dad's accounts have been frozen, and you never checked how your car is still being paid for?
>
> A. I don't remember. Yeah, I don't remember.
>
> Q. Is that a 'I never checked'?
>
> A. No, that's not that. I don't remember.
>
> Q. In the time since the accounts were frozen, have you ever checked how your Mercedes lease is getting paid?
>
> A. I don't remember.
>
> Q. You don't remember whether or not you've ever checked?
>
> A. Yeah. I've -- yeah, I don't remember.
>
> Q. It wasn't important to you to make sure that your car was continuing to be paid for?
>
> A. No, it is. I'm going to check after.
>
> Q. After this deposition you're going to check?
>
> A. I'll see.

*Id.* at 203:8-204:8. It is worth noting that while Hamza had no memory of even trying to

ascertain who was paying for his Mercedes SUV, he and the other Individual Defendants

repeatedly told this Court that they were on the brink of starvation because of the Asset Freeze Order.  Ex. 38 at 48:8-9.

> **4.      Hamza's Perjurious Testimony Regarding His Involvement With Other Pharmacies – Including a Pharmacy Transferring Large Numbers of Patients with Prescriptions for BIKTARVY**

At the seizure, Gilead found hard copies of records showing large numbers of patients with prescriptions for BIKTARVY® being transferred to Heal the World Pharmacy from another pharmacy called Marga Pharmacy.  When asked about that pharmacy, Hamza repeatedly testified that he had never even heard of Marga Pharmacy before the deposition.  Ex. 20 at 146:9-19, 151:19-21.

And so Gilead's counsel asked Hamza why, during the seizure, there was hanging on the wall a Certificate of Completion for Medicare/Medicaid Fraud Waste and Abuse Training made out to "Hamza Chaudhary (Marga Pharmacy)." Ex. 33.  Hamza initially admitted he recognized the document as, "a certificate of completion… a training certificate for fraud, waste, and abuse." Ex. 20 at 147:10-16.  He further admitted that he in fact completed that training.  *Id.* at 147:19. Then, when asked why he completed such a training if he was only a "cashier," Hamza immediately recanted and testified: "Oh no…. I didn't do this." *Id.* at 147:20-24.  He then claimed that this was a training that "Abdul did," *id.* at 147:25-148:5, and professed that he knew about it because Abdul gave him the certificate, *id.* at 147:25-148:9.  But then, upon realizing that the certificate was issued in early 2021 – before Abdul allegedly purchased Heal the World – Hamza claimed "[a]ctually, I don't remember this.  I don't know this." *Id.* at 148:10-14. He claimed he "realized this [was] something else" and then claimed that he didn't "remember exactly" what that something else was.  *Id.* at 148:15-148:25; *see also id.* at 149:2-10 ("Q. You don't remember what you thought this was? A. Yeah. Q. Just a second ago when you said, 'I recognized this'? A. Yeah.  Q. You have no idea what you thought his was? A. Correct.").

38

Gilead's counsel then confronted Hamza with bank statements it had subpoenaed from TD Bank, which showed that Hamza had received, in a personal account held under his own name, three payments totaling ***over a hundred thousand dollars*** from Marga Pharmacy and its owner in 2022. Ex. 34; *see* Ex. 6 at 53:9-16 (identifying the owner of Marga Pharmacy). Despite the documentary proof that he had received this six-figure sum from Marga Pharmacy, Hamza claimed that he could not remember receiving any of those payments, and in fact could not even remember if he ever had a TD bank account. Ex. 20 at 191:2-196:25.

Hamza Chaudhary's testimony repeats this pattern over and over and over: he perjures himself when a topic is raised, quickly trips himself up on his own series of lies as the questioning continues, and eventually falls back on the (equally perjurious) claim that he simply cannot remember anything. His perjury-riddled deposition transcript is a quintessential example of fraud on the Court.

### 5. Hamza's Witness Tampering and Spoliation

As noted above, through third-party discovery Gilead obtained texts from April and early May 2025 (after the execution of the Seizure Order but before the Individual Defendants' depositions) between Hamza Chaudhary and Martin Jacob, the former supervising pharmacist of the Pharmacy. In those texts, Hamza Chaudhary directly instructs Jacob to delete relevant documents, and instructs Jacob to lie about the facts of the case – even to the Chaudharys' own lawyer.

Hamza's texts unsubtly instruct Jacob to tell the same lies that the Individual Defendants have repeated in this action regarding the ownership and management of the Pharmacy. For example, Hamza states "Shumaila Arslan [i]s the owner [of the] pharm[acy.] Remember I'm just the manager." Ex. 30 at -73. Hamza even texted Jacob a photo of Shumaila's driver's license,

saying "that's her," *id.* at -74 – a clear indication that Jacob would not otherwise recognize Ms. Arslan.

Hamza also instructed Jacob to say, "[i]f lawyer calls you" that "Abdoul Asslam[9] was the boss/main guy… Came every day to pharmacy those years[.]  Died end of 2024."  *Id.* at -77. Because this was plainly a lie, Hamza also texted Jacob a photo of Abdul Sheikh with the note "main boss. Year Jan 2022.  He hired you," – since apparently Jacob would not recognize his own boss, a man who supposedly came "every day" to the Pharmacy for which he hired Jacob to be the supervising pharmacist.  *Id.* at -78.

Hamza likewise exhorted Jacob to lie about Hamza's role, and how the pharmacy obtained medicines.  He instructed Jacob to say that Hamza "only managed the front."  *Id.* Likewise, Hamza told Jacob to say that he doesn't know the names of "other pharmacist[s]" that work at Heal the World, and that Jacob should say that they are "floaters" – the same language Hamza used at his deposition – who ordered medications from major authorized distributors.  *Id.* at -75.  Hamza instructed that if "[t]hey ask anything else don't know.  Say 'idk' [i.e. 'I don't know']" *Id.*  at -76.

Hamza also instructed Jacob keep the lawyers in the dark about the involvement of other pharmacies in the counterfeiting scheme: "Don't mention other pharmacies[.] Shumaila only owns heal the[] world[.] Not the others[.] Don't know who owns the other[s]."  *Id.*   Finally, Hamza wrote, "my parents never came to the pharmacy," noting that this statement – unlike the preceding lies that Hamza had been instructing Jacob to regurgitate – "is true."  *Id.* -78.  Hamza's texts instruct Jacob to tell these lies not only to Gilead, but also to the Chaudharys' own lawyers:

---

[9] Hamza occasionally used the name "Abdoul Asslam" to refer to Abdul Sheikh.  Ex. 20 at 90:18-24.

"If my lawyer calls you… anything they show you [,] old email, say it's old don't remember." *Id.* at -75.

In addition to suborning perjury, Hamza also told Jacob to spoliate documents. On May 12, Hamza texted Jacob to "make sure delete our chat and Devi's[.] Any other tech chats delete also." *Id.* at -72. After Hamza's message requesting that Jacob delete the chats, the remaining texts from that number appear to be deleted. *Id.*

### F. Qaiser's Additional Acts of Fraud Upon this Court: His Lies at Deposition and Refusal to Answer Questions

Qaiser Chaudhary's deposition transcript is similarly full of false and evasive testimony on issues that go to the heart of this litigation.

#### 1. Qaiser's Lies to Cover Up Additional Payments from Heal the World

From third-party discovery, Gilead learned that Qaiser Chaudhary continued to receive hundreds of thousands of dollars from Heal the World Pharmacy well after his family supposedly sold the Pharmacy, cashing checks from the Pharmacy into his personal bank account as recently as late February 2025. Ex. 35; *see id.* at 12. These payments are, of course, inconsistent with the Individual Defendants' newfound narrative that they sold the Pharmacy in 2021 and had nothing further to do with the business. Even more suspiciously, some of these checks from the Pharmacy that Qaiser deposited were made out to cash. *E.g.*, Ex. 41 at 4. One of those checks stated in the memo line: "Repair the Roof." *Id.* at 2. Qaiser's attempt to explain why he cashed that check from the Pharmacy led to him providing an ever-expanding web of lies under oath.

Qaiser Chaudhary initially claimed that he owned a construction business, and that he was "doing construction beginning mid 2024." Ex. 6 at 77:24-78:2. He originally claimed that he would receive construction work because people would "just call" him to do construction jobs, but under questioning Qaiser admitted that this supposed construction business had in fact

only done one supposed project: renovation work on Heal the World Pharmacy in 2024, years after he sold it. *Id.* at 115:8-17. When asked to describe the details of his supposed construction business, Qaiser fell into a familiar pattern: making up the story on the spot, telling lie after lie until the narrative became absurd.

Qaiser claimed that for the supposed construction work, he hired day laborers – in Qaiser's words, "people I got from the street." *Id.* at 78:14. He claimed to have paid these people in cash, that he did not remember any of their names, and that he did not hire the same individuals more than once. *Id.* at 78:23-24, 79:9-14, 139:20-25. He further claimed he gave these unknown people off the street vast amounts of cash to go buy supplies for the roofing project. *Id.* at 139:15-140:8. Qaiser claimed he did not keep track of his expenses and threw out any receipts, but that he spent somewhere between $10,000 and $50,000, all through cash payments that he gave to strangers that "he got from the streets," on supplies to fix Heal the World Pharmacy. *Id.* at 187:10-21. He further claimed he kept no receipts, kept no record of how much he was paid for this work, and had no memory of it. *Id.* at 119:4-10; 144:20-145:5.

Qaiser's story about how the repairs were conducted was self-contradictory. He initially claimed that he had personally done the construction repairs at the Pharmacy. *Id.* at 78:10-12 ("me with my people" were "personally … doing the repairs"); *see also id.* at 80:3-4 ("Q. Are you doing the repairs yourself? A. Yes."). But later in his testimony, when Qaiser decided it was in his interest to distance himself from the Pharmacy, Qaiser testified he had a heart attack five years prior, and that his resulting physical condition kept him from even setting foot in the Pharmacy after 2020. *Id.* at 111:16-112:8. He went on to claim that he had only been to the Pharmacy "[m]aybe one or two times maximum" in his life. *Id.* at 116:17. In other words, Qaiser's testimony changed from him personally working to repair the Pharmacy's roof to him

hiring an always-changing set of people he did not know off the street, paying them large sums of cash to purchase supplies and to do renovation work for him, and simply trusting them to complete the repairs, never going on site to supervise their work or even view the completed job.

Qaiser was then asked how he accounted for his "construction business" income on his taxes. He initially made up a story about how he remembered, in connection with his accountant completing his 2024 tax returns, answering his accountant's questions about a check related to his construction work – a clear effort to convey he had a legitimate construction business and explain away the "repair the roof" check. *Id.* at 120:14-16. But minutes later, Qaiser admitted that he had not submitted or paid his 2024 taxes, *id.* at 125:5-21, and that he had not given his accountant any of his bank statements or checks for 2024 to prepare his return. *Id.* at 126:4-12. Caught in the lie, Qaiser simply tried to erase his prior testimony, saying that he had never given his accountant a check from the year 2024 and his accountant never had a question about it. *Id.* at 126:13-23. When Gilead's counsel asked Qaiser if his recollection of a conversation with his accountant about a 2024 check was a lie, Qaiser said, "I [was] just guessing," and that he subsequently realized he had not given the check to the accountant yet. *Id.* at 127:6-20. Under further questioning, Qaiser then flip-flopped again: he claimed he had given his accountant his 2024 documents for the first half of the year, but not the second half of the year. *Id.* at 129:18-24. When counsel asked him, "Isn't it a fact that I caught you in a lie and you are now making up new lies?" Qaiser responded, "not really," and offered no further explanations. *Id.* at 131:7-11.

Qaiser's clearly perjurious, self-contradictory testimony about the checks he deposited from the Pharmacy went far afield as he continued to make up lies about his supposed construction business. Certainly, there are no allegations in Gilead's Complaint about hiring day

laborers or showing checks to accountants. But Qaiser's false testimony was all in service of explaining away key factual issues in this case: why he was depositing Pharmacy checks made out to cash around the time the Pharmacy was selling counterfeit HIV medicine, and why the Pharmacy was paying him anything at all, given that he supposedly sold the business and cut all ties with it several years earlier. Those questions go to the very core of this case, and Qaiser's series of lies under oath on that topic constitute fraud on the Court.

### 2. Qaiser's Refusal to Testify as to Basic Facts About the Case

According to the latest version of Qaiser's narrative, it was his wife, Nabila, who owned the Pharmacy before its supposed sale in 2021, although Qaiser in fact ran the Pharmacy as its owner. At his deposition, Qaiser explained that he owned the Pharmacy, "[a]t one time in my wife's name." Ex. 6 at 69:25-70:9.

But Qaiser refused to testify as to why he put Heal the World – and only Heal the World, out of several other pharmacies he has owned – under his wife's name. The closest he came was to testify that he wanted "to make her happy," but could not articulate any reason why having pharmacy shares owned under her name would make Nabila happy. *Id.* at 70:7-71:13. Upon further questioning, he testified that this effort to "make his wife happy" involved him having no conversations with her about the Pharmacy, other than "just told her to -- I just buy the pharmacy, and we have to sign the document, so – 'Let's go with me.'" *Id.* at 72:23-25. He further testified that his wife signed the paperwork making her the owner of the Pharmacy, which she could not read because it was in English, without asking any questions and without him giving any explanation to her. *See id.* at 72:22-73:6, 76:23-77:13; *see also id.* at 76:12-14 ("I didn't tell her anything. She – she signed the document. That's it.") Whatever the reason Qaiser decided to put this counterfeit-selling Pharmacy under his wife's name, the idea that he did so "to make her happy" is clearly false, and Qaiser refused to say what the real reason was.

Similarly, Qaiser Chaudhary consistently evaded answering basic questions about the extent of the other pharmacies he owned and operated. For example, he claimed he could not answer the question whether or not he had owned "more than 100 pharmacies." *Id.* at 47:19-21. When counsel tried to push on this point, Qaiser responded with, "I don't remember. I don't remember. I don't want to tell you. Whatever I told you one time was good enough." *Id.* at 48:8-10. When confronted with the checks he had received from pharmacies other than Heal the World, Qaiser admitted that he was "taking in tens of thousands of dollars from pharmacies," but claimed he couldn't remember why. *Id.* at 235:14-236:6. He refused to provide any details whatsoever about how he made or received payments from other pharmacies. *Id.* at 227:12-230:21, 236:10-237:21 (refusing to provide any information about payments of $74,000 and $95,000 from Total Care Pharmacy, other than claiming it was also purchased by Abdul Sheikh), 233:22–235:11 (claiming no memory as to why he and Nabila deposited a $60,000 check from Ravensview Pharmacy), 238:6-239:15 (claiming he did not know why check from Marga Pharmacy for $60,000 was made out to cash); 245:13-246:9 (claiming he did not know why he received check for $15,000 from Casa Pharmacy Inc.); 260:3-17 (claiming not to remember why he received a $50,000 from the supervising pharmacist of Smith Pharmacy). Qaiser's purported memory loss regarding these checks is not credible. It is an obvious effort to avoid testifying regarding his relationship to other pharmacies, and it comports with the instruction Hamza gave to Heal the World's pharmacist in charge just days before his and his father's depositions: "Don't mention the other pharmacies," and claim complete ignorance if asked any questions about them. Ex. 30 at -76.

## II.    THE COURT SHOULD ENTER CASE-ENDING SANCTIONS

In light of the evidence set forth above, the Individual Defendants' repeated and widespread fraud on this Court cannot be denied. The question thus becomes what sanction is

appropriate. As noted above, the Court should consider, at minimum, five factors in making that determination:

> (i) whether the misconduct was the product of intentional bad faith; (ii) whether and to what extent the misconduct prejudiced the injured party; (iii) whether there is a pattern of misbehavior rather than an isolated instance; (iv) whether and when the misconduct was corrected; and (v) whether further misconduct is likely to occur in the future.

*Almeciga*, 185 F. Supp. 3d at 435. All five factors strongly favor the entry of case-ending sanctions of the striking the Individual Defendants' pleadings and entering a default judgment against them. First, the evidence is overwhelming that the Individual Defendants acted intentionally and willfully. Their serial perjury, constant shifting of self-contradictory positions, and ongoing contempt of this Court's orders is not and cannot be the result of anything less than intentional bad faith.

Second, the prejudice to Gilead, and the risk to patients, is plain and severe. The Pharmacy's source for the counterfeit products, because of Defendants' lies, remains unknown. Gilead has received essentially no documents in discovery and no information that would allow it to track down the dangerous counterfeits at the heart of this case. Moreover, the Individual Defendants remain in willful contempt of multiple orders that this Court issued expressly in order to prevent irreparable harm to Gilead.

Third, the Individual Defendants' fraud on this Court has occurred literally throughout the entire course of this litigation, through three sets of defense counsel, and across all domains of the action. Their litigation malfeasance is the opposite of "an isolated instance."

Fourth, the Individual Defendants were given the opportunity to attempt to correct some of their malfeasance after several warnings by this Court and the entry of a preliminary injunction, but they doubled down on their fraud throughout the discovery period. And as set

forth above, the minimal, eleventh-hour disclosures the Individual Defendants have made were pure gamesmanship, giving up information they knew would not help Gilead while continuing to intentionally conceal information they were ordered to produce at the beginning of the case.

Fifth, the Individual Defendants will continue to engage in egregious litigation misconduct if allowed to move forward, as evidenced by the widespread nature of their discovery fraud, the fact that it has occurred across the representations of three different law firms, and the fact that the Individual Defendants remain in willful contempt of direct orders of this Court despite multiple warnings of the consequences.

Courts have entered case-ending sanctions for fraud on the Court in similar, albeit less extreme, circumstances. For example, dismissal was warranted in *Skywark v. Isaacson*, 1999 U.S. Dist. LEXIS 23184, (S.D.N.Y. Oct. 14, 1999) (Buchwald, M.J.), *R. & R. adopted by* Keenan, J. (Feb. 8, 2000). There, the plaintiff filed a claim for legal malpractice arising out of the defendants' representation of the plaintiff in a personal injury lawsuit. *Id.* at *4-7. The defendants and the court discovered that the plaintiff committed a series of fraudulent acts throughout discovery, including: selectively withholding medical records and other documents; lying at deposition and in court; and participating in a subsequent settlement conference predicated on a "false and misleading record." *See, e.g.*, *id.* at *7-22, 29. Importantly, the plaintiff misrepresented facts and withheld information related to the extent of his injuries, his ability to work since sustaining his injuries, and, once his lies were uncovered, the reasons for his deception. In other words, as the court emphasized, the plaintiff "concealed his history selectively" to withhold information that could undermine his claims for damages –"matters of extreme significance" to the case. *Id.* at *9, 23.

The *Skywalk* court considered, but rejected, lesser sanctions. The plaintiff's selective withholding of information and continued lying at the court conference constituted misconduct that was "willful and in bad faith," and his attempted cover-up evidenced a propensity to continue the deception. *See id.* at *55–56, 62. Although the fraud was uncovered, the record was "distorted" and defendants had incurred significant burden exposing the deceit and preparing the sanctions motion. *See id.* at *58, 62–63. Accordingly, "no sanction short of dismissal [was] appropriate." *Id.* at *62.

Persistent, material misconduct similarly merited dismissal in *Cerruti 1881 S.A. v. Cerruti, Inc.*, which involved plaintiffs who filed trademark-abandonment claims. 169 F.R.D. 573, 574 (S.D.N.Y. 1996). During discovery, the defendants produced records which they claimed demonstrated their continued use of the challenged marks. But the documents contained discrepancies and missing information; the plaintiffs' investigations demonstrated that certain information was falsified; and the defendants' principal gave inconsistent, contradictory, and deflective testimony about the records, the reasons for the discrepancies (mostly attributing them to "computer error"), and the defendants' operations. *See id.* at 575–82. Because the defendants engaged in "repeated rather than … isolated or discrete" misconduct which was not "peripheral … [but went] to the heart of the case," resulting in a record that was "permeated with fraud," dismissing the case was "entirely appropriate," and the court entered judgment for plaintiffs on their claims. *Id.* at 583.

Other illustrative examples abound, demonstrating that deceit, evasion, and withholding pertinent information constitute grounds for dismissal sanctions. *See, e.g.*, *Hargove v. Riley*, 2007 U.S. Dist. LEXIS 6899, at *38–39 (E.D.N.Y. Jan. 31, 2007) (finding dismissal appropriate where plaintiff fabricated dates and notary stamps on documents, submitted them to the court

multiple times, and continued to insist on their veracity even in the face of conclusive contrary evidence); *Shangold v. Walt Disney Co.*, 2006 U.S. Dist. LEXIS 748, at *14–15 (S.D.N.Y. Jan. 12, 2006) (dismissing complaint where plaintiffs fabricated timeline of submission to defendant of proposal which underlied their misappropriation claims), *aff'd*, 275 F. App'x 72, 73–74 (2d Cir. 2008); *Ford v. Am. Broad. Co.*, 101 F.R.D. 664, 666 (S.D.N.Y. 1983) (dismissing case pursuant to Federal Rule of Civil Procedure 37 where plaintiff's selective withholding of material damaging to his claims demonstrated his willfulness and bad faith), *aff'd*, 742 F.2d 1434 (2d Cir. 1984); *Miller v. Time-Warner Commc'ns, Inc.*, 1999 U.S. Dist. LEXIS 14512, at *7–8 (S.D.N.Y. Sept. 22, 1999) (dismissing claims after uncovering plaintiff's fraud because her misconduct evinced a "total disregard for her obligation to tell the truth . . . [and her] total disrespect for the Court and the process by which justice is administered").

This Court has warned the Individual Defendants about their litigation misconduct time and time again, both in face-to-face conversations and through counsel, and both on the public record and in *ex parte* conversations in connection with motions to withdraw. At some point, enough must be enough. Our civil justice system assumes and depends upon litigants' good-faith compliance with discovery. The case law makes clear that where, as here, litigants engage in consistent, open defiance of the Rules of Civil Procedure, this Court's orders, and their oaths to tell the truth in their testimony, considerations of both punishment and deterrence cry out for the severest sanctions. To do otherwise would pose a moral hazard, and would communicate to the Individual Defendants and future litigants that even grossly bad-faith behavior will be met only with moderate punishment.

There can be no question that the Individual Defendants' fraud went directly to issues of vital importance to this case. Lesser remedies will not and cannot adequately address the

Individual Defendants' wanton undermining of the entire civil discovery process. Gilead respectfully submits that the only proper response is to hold that they have sacrificed their ability to defend this case.

## CONCLUSION

For the reasons stated above, the Court should find that the Individual Defendants have perpetrated a fraud on this Court, and issue an order entering the sanctions of (1) striking their pleadings and entering a default judgment against each of them; (2) ordering them, on a joint and several liability basis, to pay Gilead's fees and costs, including attorneys' fees, in bringing this motion for sanctions; and (3) ordering such additional and further relief the Court deems appropriate.

Dated: New York, New York
November 21, 2025

Respectfully submitted,

PATTERSON BELKNAP WEBB & TYLER LLP

By: _/s/ Timothy A. Waters_
Geoffrey Potter
gpotter@pbwt.com
Timothy A. Waters
twaters@pbwt.com
Anna Blum
ablum@pbwt.com

1133 Avenue of the Americas
New York, NY 10036-6710
Tel: (212) 336-2000
Fax: (212) 336-2222

_Attorneys for Plaintiffs Gilead Sciences, Inc. and Gilead Sciences Ireland UC_