# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

GILEAD SCIENCES, INC. and GILEAD
SCIENCES IRELAND UC,

        Plaintiffs,

-against-

CITY PLUS CASE PHARMACY INC. D/B/A
HEAL THE WORLD PHARMACY, NABILA
CHAUDHARY, QAISER CHAUDHARY and
HAMZA CHAUDHARY,

        Defendants.

Case No.: 1:25-cv-01469-RER-RML

## MEMORANDUM OF LAW OF DEFENDANTS
## NABILA CHAUDHARY, QAISER CHAUDHARY, AND HAMZA CHAUDHARY
## IN OPPOSITION TO MOTION FOR CASE-ENDING SANCTIONS
## PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 37(B)(2)(A)(VI)

MARZEC LAW FIRM, P.C.
Darius A. Marzec, Esq.
Jerome Noll, Esq.
Joshua Neil Rubin, Esq.
Attorneys for Defendants Qaiser Chaudhary, Nabila
Chaudhary, and Hamza Chaudhary
776A Manhattan Avenue, Suite 104
Brooklyn, NY 11222
(718) 609-0303
dmarzec@marzeclaw.com
jnoll@marzeclaw.com
jrubin@marzeclaw.com

# **Table of Contents**

I.    LEGAL STANDARD..................................................................................... 5

    A.    Liability for Civil Contempt ................................................................. 5

    B.    Imposition of Case-Ending Sanctions.................................................. 8

II.    THE CHAUDHARYS ARE NOT IN CONTEMPT AND WERE
REASONABLY DILIGENT, ALBEIT LATE, IN COMPLYING WITH THE
COURT'S ORDERS AND THEIR DISCOVERY OBLIGATIONS ............................ 12

    A.    The Chaudharys conducted themselves in good faith after initially
receiving poor counsel .......................................................................... 16

    B.    The Chaudharys sold Heal the World Pharmacy in January 2022 and had
neither access nor control of HTW when counterfeit Biktarvy was sold
by HTW in January 2025 ..................................................................... 18

    C.    Disclosures about the Chaudharys' Assets ......................................... 23

    D.    Payments to the Chaudharys questioned by Gilead ............................... 26

    E.    The Chaudharys' inability to obtain HTW's records........................... 27

    F.    Martin Jacobs' screen shots ............................................................... 28

    G.    The City Plus emails ......................................................................... 31

III.    CONCLUSION......................................................................................... 31

# TABLE OF AUTHORITIES

**Cases**

Bourgal v. Lakewood Haulage,
    827 F. Supp. 126 (E.D.N.Y. 1993) ................................................................... 5

California Artificial Stone Paving Co. v. Molitor,
    113 U.S. 609 (1885) .................................................................................... 8

Castagna v. Luceno,
    558 Fed. Appx. 19 (2d Cir 2014) ............................................................. 10, 11

Chambers v. NASCO, Inc.,
    501 U.S. 32 (1991) .................................................................................. 8, 9

Chao v. Gotham Registry, Inc.,
    514 F.3d 280 (2d Cir. 2008) ........................................................................ 6

Daval Steel Prods. v. M/V Fakredine,
    951 F.2d 1357 (2d Cir. 1991) ..................................................................... 12

Gesualdi v. Eagle Insulation Distribs. Supply Inc.,
    2025 U.S. Dist. LEXIS 176021 (E.D.N.Y. Sept. 8, 2025) ................................... 5

Gucci Am. v. Bank of China,
    768 F.3d 122 (2d Cir 2014) .......................................................................... 5

Jones v. NFTA,
    836 F.2d 731 (2d Cir. 1987) ......................................................................... 8

King v. Allied Vision, Ltd.,
    65 F.3d 1051 (2d Cir. 1995) ......................................................................... 8

Kronisch v. United States,
    150 F.3d 112 (2d Cir. 1998) ........................................................................ 12

Mezzina v. Port Imperial Ferry Corp.,
    2024 U.S. Dist. LEXIS 28928 (S.D.N.Y. 2024) ............................................... 10

Mezzina v. Port Imperial Ferry Corp.,
    2025 U.S. App. LEXIS 26910 (2d Cir. October 16, 2025) ................................. 10

Next Invs., LLC v. Bank of China,
    12 F.4th 119 (2d Cir. 2021) ..................................................................... 5, 6, 7

O'Hearn v. Bodyonics, Ltd.,
    56 F. Supp. 2d 302 (E.D.N.Y. 1999) ......................................................... 15, 16

Radio Corp. of Am. v. Cable Radio Tube Corp.,
    66 F.2d 778 (2d Cir. 1933).................................................................. 7

Schoenberg v. Shapolsky Publrs., Inc.,
    971 F.2d 926 (2d Cir. 1992).............................................................. 8

Skarnulis v. Belmont,
    74 Fed. Appx. 92 (2d. Cir 2003) ..................................................... 15

West v. Goodyear Tire & Rubber Co.,
    167 F.3d 776 (2d Cir. 1999)................................................ 8, 9, 10, 12

**Rules**

F.R.C.P. 37(b)(2)(A)(vi) ........................................................... 1, 4, 5

F.R.C.P. 37(b)(2)(C) ...................................................................... 8

**Regulations**

45 CFR 160.103 ........................................................................... 21

45 CFR 162.410(a)(4) .................................................................. 21

## INTRODUCTION

Plaintiffs GILEAD SCIENCES, INC. and GILEAD SCIENCES IRELAND UC (collectively, "Gilead") seek a default judgment as a discovery sanction pursuant to F.R.C.P. 37(b)(2)(A)(vi) against the Chaudharys Nabila Chaudhary, Qaiser Chaudhary, and Hamza Chaudhary (referred to herein as "the Defendants" or "the Chaudharys") for alleged violations of this Court's Orders dated March 17, 2025 (ECF 18), March 28, 2025 (ECF 26) and June 12, 2025 (ECF 67) (the "Orders").

At the outset, the Court should note that Gilead's motion reads almost identically to a motion for summary judgment. The first 52 pages of Gilead's memorandum of law consists of a recitation of alleged "facts" that have not been subject to cross-examination by the Chaudharys or the benefit of any discovery at all from Gilead. The memorandum of law's headings are almost all factual assertions involving alleged "perjury" and "lies" by the Chaudharys *to Gilead* and not to this Court. Whether the Chaudharys have committed "perjury" is a serious allegation that should not be asserted lightly and certainly not prior to an adjudication on the merits. More importantly, whether any party "lied" to the other party is not at issue before this Court. The sole issue is whether the Chaudharys have substantially complied with this Court's Asset Freeze Orders by providing the requisite information for funds to be held in constructive trust by the U.S. District Court. Instead, Gilead asks this Court essentially to accept wholesale their version of the facts and find the Chaudharys *liable* without the benefit of any discovery at all from Gilead and without the opportunity to review and question any of the "evidence" placed on the record, almost none of which is authenticated.

Gilead is using the vehicle of contempt to obtain judgment on its claims and a finding of liability despite the fact that the Chaudharys' liability is not before this Court. The instant motion is not a summary judgment motion and this Court should not treat it as such by delving into the

1

merits of Gilead's claims or the Chaudharys' alleged "lies" and "perjury" to an opposing party. The sole issue before this Court is whether the alleged contempt of this Court's Orders and alleged noncompliance is so pervasive, willful and egregious that no other sanction would be appropriate but case ending sanctions.

The sanction of a default judgment is the most severe remedy available under the Federal Rules and is reserved for only the most egregious, willful and repeated violations of a party's discovery obligations. Under well-established Second Circuit precedent, a default judgment as a discovery sanction requires a showing of willfulness, bad faith, or fault; consideration of less drastic sanctions; a prolonged period of noncompliance; and prior warning of the consequences of noncompliance. Moreover, due process mandates that the defendant receive clear notice of the specific conduct at issue and the authority for the requested sanction, along with an opportunity to be heard, and that the violations must be shown by clear and convincing evidence.

Gilead has failed to meet this high burden. As shown herein, the Chaudharys have complied with all three (3) of the Court's Asset Freeze Orders and have done so in good faith and to the best of their ability given the short tenure of this litigation. Many of Gilead's contentions upon which the instant motion is based are simply not true or outdated because the Chaudharys have fulfilled most, if not all, of their Court ordered discovery obligations. The Chaudharys' past noncompliance, given the deficient representation by their prior counsel should not warrant the extreme remedy of short circuiting the merits-based resolution of this action by a default judgment. The Chaudharys have acted with reasonable diligence, remedied any late compliance with the Court's Asset Freeze Orders and Gilead has not been prejudiced in any way that cannot be remedied by a merits-based resolution or lesser sanctions that are available and appropriate to address any discovery concerns. This Court should not take the drastic action of denying the Chaudharys basic due process because

Gilead would like to end the litigation on their terms without having to address the many deficiencies with their case in chief. Accordingly, the Chaudharys respectfully request that the Court deny Gilead's motion for a default judgment on liability and allow this matter to proceed on the merits.

**FACTUAL BACKGROUND**

Gilead's underlying claim is that the Chaudharys should be liable for three bottles of counterfeit Biktarvy, one of which was allegedly dispensed by a pharmacy three years after Nabila Chaudhary had sold that pharmacy, and two of which were found, years later, on the shelves of the same pharmacy.

The individual Chaudharys have not knowingly had any connection to any counterfeit Biktarvy. Declaration of Qaiser Chaudhary ("Qaiser Dec.") ¶ 2, Declaration of Hamza Chaudhary ("Hamza Dec.") ¶ 2, Declaration of Nabila Chaudhary ("Nabila Dec.") ¶ 2. Nonetheless, Gilead claims the Chaudharys are liable by default for counterfeit Biktarvy that Gilead alleges was sold in January 2025 by a pharmacy that the Chaudharys had sold three (3) years earlier in January of 2022. The contemporaneous evidence from 2022, including the sale documents for Defendant City Plus Care Inc., dba Heal the World Pharmacy ("HTW"), New York State government filings by the buyer, the bank accounts that the buyer opened after her purchase, and the buyer's own sworn testimony on three separate occasions confirm the sale.

Meanwhile, Gilead subpoenaed the Supervising Pharmacist for HTW, Martin Jacob ("Martin"), who failed to provide any of the documentation that he was responsible for recording and maintaining, such as pharmaceutical "pedigrees", despite the fact that Gilead's subpoena demanded it. Instead, the Supervising Pharmacist produced only text messages, including what appear to be screen shots of WhatsApp messages that he alleges were from Hamza. Hamza

3

categorically denies sending those messages and points to evidence of chaos at HTW's pharmacy department and that the Supervising Pharmacist may be the source of any counterfeit Biktarvy.

The Chaudharys have provided extensive discovery; Gilead has provided none. Even if the Chaudharys had committed all of the alleged discovery violations that Gilead contends, there is zero evidence that Gilead has suffered the required substantial prejudice sufficient to deny the Chaudharys basic due process to litigate this case on the merits.

## SUMMARY OF ARGUMENT

Plaintiff's motion for case-ending sanctions should be denied for two principal reasons. First, the legal standard for imposing such severe sanctions under F.R.C.P. 37(b)(2)(A)(vi) has not been met. The Second Circuit has consistently characterized dismissal as a "drastic remedy" that should be imposed only in "extreme circumstances," after consideration of alternative, less drastic sanctions. Plaintiff has failed to demonstrate the willfulness, bad faith, or fault required to justify dismissal, and has not shown that less severe sanctions would be ineffective. Despite the fact that this Court has not imposed less severe sanctions at any point in this litigation, Gilead asks the Court to skip over a range of intermediate sanctions as required in this Circuit and end this case without any resolution on the merits.

Second, multiple recognized defenses preclude the imposition of case-ending sanctions in this case, including substantial compliance, inability to comply, lack of willfulness or bad faith, absence of meaningful prejudice, and due process considerations.

Third, Gilead's motion asks this Court to ignore the proportionality principle and impose the most severe sanction without first considering intermediate sanctions. Gilead's request for case-ending sanctions would be disproportionate to any alleged discovery violation.

# I.     LEGAL STANDARD

"In light of the Second Circuit's oft-stated preference for resolving disputes on the merits, default judgments are generally disfavored, and doubts should be resolved in favor of the defaulting party." Gesualdi v. Eagle Insulation Distribs. Supply Inc., 2025 U.S. Dist. LEXIS 176021, *9 (E.D.N.Y. Sept. 8, 2025) (denying a default judgment under F.R.C.P. 37(b)(2)(A)(vi)) (internal quotes and citations omitted).

## A.   Liability for Civil Contempt

A court's power to hold a party in civil contempt may be exercised only when (1) the order the party allegedly failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the party has not diligently attempted in a reasonable manner to comply. Next Invs., LLC v. Bank of China, 12 F.4th 119, 128 (2d Cir. 2021). District courts have "broad discretion in fashioning coercive remedies" and "sanctions must be reasonable in relation to the facts," a determination left "to the informed discretion of the district court." Id. (internal citations and quotations omitted).

"It is basic law that a civil contempt sanction must only be compensatory or coercive, and may not be punitive." Gucci Am. v. Bank of China, 768 F.3d 122, 144 (2d Cir 2014) ("The $75,000 sanction for past noncompliance provided no compensatory relief. Instead, it was punitive and therefore impermissible."). Even where the movant satisfies all three elements, sanctions for contempt are within the discretion of the District Court. Bourgal v. Lakewood Haulage, 827 F. Supp. 126, 130 (E.D.N.Y. 1993) (denying contempt sanctions where the alleged contemnor did not have the ability to pay the amounts required by the court's order).

In Next Invs., LLC v. Bank of China, a recent case with similar claims and factual allegations as the instant case, the plaintiff alleged violations of the Lanham Act and sought a finding of contempt of an asset freeze order that stated:

the Defendants, their officers, directors, agents, representatives, successors or assigns, and all persons acting in concert or in participation with any of them, including any third parties receiving actual notice of this Order by personal service or otherwise, are restrained and enjoined from transferring, withdrawing or disposing of any money or other assets of the Defendants, or otherwise paying or transferring any money or other assets into or out of any accounts held by, associated with, or utilized by the Defendants, regardless of whether such money or assets are held in the U.S. or abroad.

12 F.4th 119, 124 (2d Cir. 2021).

The plaintiff in <u>Next</u> filed a motion for contempt that sought a finding that defendants produced "just a small fraction of their relevant documents and thus failing to display reasonable diligence in complying with the discovery order." The contempt motion also sought a $150 million sanction as "compensatory contempt damages" resulting allegedly from thousands of prohibited transactions. <u>Id.</u> at 127.

In denying the contempt motion, the District Court noted that the motion "clashes with fundamental notions of due process." 2020 U.S. Dist. LEXIS 9102, [WL] at *24. The District Court also characterized the contempt motion as an "underhanded" or "gotcha" tactic and held that *monetary* sanctions in the sum of $150 million would "reward efforts by both Plaintiffs and Assignee to delay resolution of this issue and bolster their contempt arguments." <u>Id.</u> at *25. The District Court also denied contempt sanctions for violations of its discovery orders, finding that defendants had met the standard of reasonable diligence.

The Second Circuit affirmed the denial of the contempt motion finding that plaintiff had delayed in pursuing its remedies and that such a motion was "an improper vehicle" for addressing the legal defenses to various Court orders. <u>Next Invs., LLC v. Bank of China,</u> 12 F.4th 119, 129-30 (2d Cir. 2021) citing <u>Chao v. Gotham Registry, Inc.,</u> 514 F.3d 280, 292 (2d Cir. 2008) ("[I]t seems unreasonable that Gotham be required, on pain of contempt, to arrive at a correct answer to such a difficult question of first impression."); <u>Radio Corp. of Am. v. Cable Radio Tube Corp.,</u> 66

F.2d 778, 782-83 (2d Cir. 1933) (noting potential unfairness to defendant where contempt proceedings used to resolve "substantial dispute"). Another reason cited by the Second Circuit was that defendants "should have proceeded with a motion to compel compliance . . . before seeking contempt sanctions." Next Invs., LLC v. Bank of China, 12 F.4th 119, 130 (2d Cir. 2021).

The Second Circuit affirmed the denial of the contempt motion and found that the requested imposition of $150 million in fines were essentially case ending sanctions and an attempt to circumvent the merits based resolution of the case. The Second Circuit pointed to "the gamesmanship" of the contempt motion as it would "reward gotcha' tactics and other efforts to delay resolution of key legal issues." Id. at 131 (internal citations and quotations omitted).

Similarly, Gilead's motion for case ending sanctions would short circuit any merits based resolution and by definition would clash with the Chaudharys' fundamental due process rights. Moreover, Gilead has not filed a motion to compel compliance[1] or sough intermediate sanctions such as monetary fines or identified exactly what additional documents and information it believes is outstanding as of the date of this opposition. Gilead has not done so because the Chaudharys have substantially complied with this Court's Asset Freeze Orders as well as their discovery obligations. Indeed, Gilead would be hard pressed to find any substantive noncompliance with this Court's Orders.

Gilead has filed what is essentially a summary judgment motion without having provided any discovery whatsoever. Rather than filing the instant motion, Gilead should have filed a motion to compel that identified all documents and information believed to be missing and that sought

---

[1] This Court converted one of the last letter motions filed by Gilead to a motion to compel and the Chaudharys complied with said Order. On 08/06/2025, the Court entered an ORDER stating that Plaintiffs' 78 letter is construed as a motion to compel and granted. The Chaudharys were ordered to respond to Plaintiffs' discovery requests by 8/17/25. The Chaudharys responded in full to all of Gilead's discovery demands by the deadline set by the Court.

intermediate *monetary* sanctions until the Chaudharys fulfilled their discovery obligations. Gilead did not do so because the Chaudharys substantially complied, albeit late, with all Orders and all outstanding discovery demands.

Contempt is a severe remedy, and should not be resorted to where there is fair ground of doubt as to the wrongfulness of the defendant's conduct. California Artificial Stone Paving Co. v. Molitor, 113 U.S. 609, 617-618 (1885) ("If the judges disagree there can be no judgment of contempt; and the defendant must be discharged."); King v. Allied Vision, Ltd., 65 F.3d 1051, 1058 (2d Cir. 1995). Civil contempt is appropriate only when obedience is within the power of the party being coerced by the order. "A classic application of the factual impossibility defense arises when a court orders an individual to produce documents that are not in his possession or control." Schoenberg v. Shapolsky Publrs., Inc., 971 F.2d 926, 935 (2d Cir. 1992) (counsel was not liable for contempt as he was no longer counsel to the defendants, and so he could not comply with the court's discovery order).

### B. <u>Imposition of Case-Ending Sanctions</u>

"Outright dismissal of a lawsuit . . . is within the court's discretion." Chambers v. NASCO, Inc., 501 U.S. 32, 45 (1991). See F.R.C.P. 37(b)(2)(C). Dismissal is appropriate if there is a showing of willfulness, bad faith, or fault on the part of the sanctioned party. Jones v. NFTA, 836 F.2d 731, 734 (2d Cir. 1987). "However, because dismissal is a drastic remedy, it should be imposed only in extreme circumstances, usually after consideration of alternative, less drastic sanctions." West v. Goodyear Tire & Rubber Co., 167 F.3d 776, 779-80 (2d Cir. 1999) (citations and internal quotations omitted).

The Supreme Court has allowed less drastic sanctions, such as the imposition of monetary sanctions, if a court finds:

that fraud has been practiced upon it, or that the very temple of
justice has been defiled as it may when a party shows bad faith by
delaying or disrupting the litigation or by hampering enforcement of
a court order. The imposition of sanctions in this instance transcends
a court's equitable power concerning relations between the parties
and reaches a court's inherent power to police itself, thus serving the
dual purpose of vindicating judicial authority without resort to the
more drastic sanctions available for contempt of court and making
the prevailing party whole for expenses caused by his opponent's
obstinacy.

Chambers v. NASCO, Inc., 501 U.S. 32, 46, 111 S. Ct. 2123, 2133 (1991).

Outright dismissal of an action or the imposition of case-ending sanctions are not viewed
favorably in the Second Circuit. Beginning in 1999 with West v. Goodyear Tire & Rubber Co.,
167 F.3d 776 (2d Cir. 1999), the Second Circuit has reversed dismissals of a complaint or the
imposition of case ending sanctions by a District Court. In West, the District Court's dismissal of
a complaint was vacated and remanded for consideration of a lesser sanction, finding that
"dismissal was a Draconian remedy for spoliation." 167 F.3d at 780 (2d Cir. 1999). The court in
West held that what was essentially case-ending sanctions against the plaintiff were inappropriate
where the District Court had failed to consider whether lesser sanctions would have fully protected
the defendants. The plaintiff was a worker in a bicycle tire and rim company who was injured
when a tire exploded. Despite a court order that permitted the defendants to inspect the plaintiff's
repair shop, including the tire mounting machine and air compressor, the plaintiff sold those items
before the inspection. Also, the plaintiff's counsel deflated another tire that the plaintiff had
successfully inflated without any explosion, before the defendant had had an opportunity to inspect
it while it was still inflated.

The District Court found that adverse inference instructions to the jury would be
insufficient to remedy the spoliation and dismissed the case. The Second Circuit held that the
District Court had abused its discretion because the District Court "could have combined

alternative sanctions in a way that would fully protect [defendants] from prejudice." <u>West</u>, 167 F.3d at 780. Proposed alternative sanctions included instructions to the jury to presume that the machines spoliated by the plaintiff had simply malfunctioned, that the second tire was overinflated, and an order barring the plaintiff from offering evidence on those issues. <u>Id.</u>

Likewise, in <u>Mezzina v. Port Imperial Ferry Corp.</u>, 2024 U.S. Dist. LEXIS 28928, *16 (S.D.N.Y. 2024) <u>aff'd</u> <u>in</u> <u>pertinent</u> <u>part</u> <u>Mezzina v. Port Imperial Ferry Corp.</u>, 2025 U.S. App. LEXIS 26910, *7-9 (2d Cir. October 16, 2025), the Second Circuit denied case-ending sanctions in a negligence case for injury on a New York City ferry, where the defendants failed to produce the complete accident report, photographs taken by the Captain, and video of the accident scene. The District Court held, and the Second Circuit affirmed, that case-ending sanctions were inappropriate where the material was not relevant to the underlying claim. "[A] case-dispositive sanction such as the one sought is generally disfavored and only available in extreme circumstances." <u>Mezzina</u>, 2024 U.S. Dist. LEXIS 28928 at *16 (internal quotes and cites excluded).

> The delay in production is immaterial, as this fact is undisputed and consequently not in bad faith. [W]here a party produced evidence in an untimely manner, that party should sustain liability for breaching its discovery obligations where such breach causes injury, but the moving party should not obtain a windfall for uncovering evidence that would have made little difference in the underlying case.

<u>Mezzina</u>, 2024 U.S. Dist. LEXIS 28928, at 17-19 (internal quotes and cites excluded).

Similarly, in <u>Castagna v. Luceno</u>, 558 Fed. Appx. 19 (2d Cir 2014), a sexual harassment case alleging a hostile work environment where the plaintiff destroyed relevant evidence, the Second Circuit held that:

> absent any finding by the district court that Castagna acted "with a culpable state of mind" in destroying any relevant evidence, *cf. Byrnie v. Town of Cromwell*, 243 F.3d 93, 109 (2d Cir. 2001), and because "outright dismissal of [a] lawsuit" as a sanction for

spoliation "should be imposed only in extreme circumstances, usually after consideration of alternative, less drastic sanctions," see *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 780 (2d Cir. 1999), we decline to impose that sanction in the first instance.

558 Fed. Appx. 19, 22 (2d Cir 2014).

Here, the Chaudharys have not been accused, let alone found, to have destroyed any evidence. Gilead seeks the most drastic remedy possible under relevant case law and the Federal Rules of Civil Procedure based on nothing more than late compliance with this Court's Orders and allegations of "perjury" that have not been adjudicated. Gilead also seeks case ending sanctions because Defendant Qaiser Chaudhary "consistently evaded answering basic questions about the extent of the *other* pharmacies he owned and operated." Gilead Memo of Law, p. 45 (emphasis added). Nowhere does Gilead explain the relevancy of "other" pharmacies that the Chaudharys may or may not have owned to its case in chief that the Chaudharys violated the Lanham Act by allegedly selling counterfeit Biktarvy from Heal the World, *the sole pharmacy that is a party to this action*. Gilead's Complaint does not allege that the Chaudharys sold counterfeit Biktarvy from "other" pharmacies and all of the assertions of fact in Gilead's memorandum of law do not form a basis for such an allegation. Yet, Gilead asks this Court to end this case against three (3) individuals and one (1) pharmacy because of insufficient answers to irrelevant questions regarding other possible pharmacies that may have been owned by one of the individual defendants.

Regardless, Gilead can utilize any inconsistencies in the Chaudharys' testimony to undermine the Chaudharys' credibility at trial or upon a proper summary judgment motion. Instead, Gilead asks this Court to trample upon the Chaudharys' substantive due process rights and short circuit any possible resolution on the merits by imposing case ending sanctions upon a party that has substantially complied with all outstanding discovery obligations and this Court's Asset Freeze Orders. Gilead bases its entire motion upon factual assertions that have not been cross

examined or subject to any Court scrutiny or hearing. Gilead asks this Court to accept wholesale its version of the facts and find liability in its favor. Gilead does so without ever filing a motion to compel compliance with discovery demands or identifying any noncompliance that has not been remedied as of this Court's deadline to comply with all outstanding discovery by August 17, 2025. See Order entered 08/06/25.

It is not necessary to impose case ending sanctions in order to vindicate the aims of: (1) protecting Gilead's interests; and (2) remedying the prejudice (if any) that Gilead suffered as a result of the Chaudharys' actions taken at the outset of this litigation. See West v. Goodyear Tire & Rubber Co., 167 F.3d 776, 780 (2d Cir. 1999). In fact, Gilead has not suffered any prejudice, let alone substantial prejudice, and has not identified or specified any prejudice to their case. Even if Gilead were to do so (which it has not), the Court could impose "alternative sanctions" that would suffice to protect Gilead from any presumed prejudice. See Kronisch v. United States, 150 F.3d 112, 126 (2d Cir. 1998) (adverse presumption instruction); Daval Steel Prods. v. M/V Fakredine, 951 F.2d 1357, 1366 (2d Cir. 1991) (barring party from presenting evidence opposing claim).

Significantly, case-ending sanctions would place Gilead in a much better position than any other possible scenario and it would do so despite the fact that the Chaudharys substantially complied with their discovery obligations and the Court's Asset Freeze Orders.

## II. THE CHAUDHARYS ARE NOT IN CONTEMPT AND WERE REASONABLY DILIGENT, ALBEIT LATE, IN COMPLYING WITH THE COURT'S ORDERS AND THEIR DISCOVERY OBLIGATIONS

On July 29, 2025, the Marzec Law Firm, P.C. ("MLF") appeared in this action on behalf of the Chaudharys. Immediately upon MLF's retention, MLF and the Chaudharys diligently sought to ensure substantial compliance with the Orders of the Court and the Chaudharys' discovery obligations. The Chaudharys were severely handicapped in their defense of the case because of the

relevant procedural history of this case involving the Chaudharys' two (2) prior changes of counsel as well as the expedited fact discovery schedule and the short time the Chaudharys had to complete their responses to Gilead's discovery demands. While the Chaudharys were diligently responding to all discovery demands, Gilead did not serve any responses to the Chaudharys' written discovery demands and refused to appear for a duly noticed 30(b)(6) deposition on August 18, 2025.[2] Specifically, Gilead refused to respond to the Chaudharys' First Set of Interrogatories, First Request for the Production of Documents, and First Request for Admissions, all served on July 31, 2025. The Chaudharys' discovery demands were served almost three (3) weeks prior to the Court's fact discovery deadline on 8/17/25.

The overarching basis of Gilead's motion to end this case is nonexistent because Gilead has not suffered substantial prejudice. This Court set 08/17/25 as the deadline to complete fact discovery. The Chaudharys complied (albeit late) but Gilead did not. It is undisputed that the Chaudharys served responses to Gilead's interrogatories after, among other things, undersigned counsel met each individual defendant in person in our office over a course of two days, followed by additional conferences by telephone. The Chaudharys provided the available documents and the specific explanation as to their search and attempted retrieval of documents responsive to demands. For example, Mr. Hamza Chaudhary maintains that he has had no access to the pharmacy email address after he ceased working for the pharmacy and cannot now obtain these emails.

On August 19, 2025, the Chaudharys deposed subpoenaed witness Shumaila Arslan, the sole owner of the pharmacy since January 22, 2022. Ms. Arslan was subject to the Chaudharys' duces tecum subpoena seeking documents, including emails. Gilead's counsel are not without remedies and presumably should have subpoenaed the sole owner of the pharmacy since 2022

---

[2] Defendants admit that their discovery notices were served a few days late, although their deposition notices were timely.

rather than litigating this action as if the Chaudharys owned the pharmacy, which they do not. Gilead had an opportunity to cross-examine the true owner of the pharmacy yet decided not to do so.

While it is clear that Gilead disagrees with the extent of the appropriate document production and interrogatory responses, the Chaudharys appear to have gone to great lengths to provide a good faith response, as complete as possible under the circumstances. Some of the alleged inconsistencies between the alleged text messages with the third party as well as any deposition testimony is more appropriate for the cross-examination at trial and for the finder of fact's determination. At minimum, there is a factual dispute concerning Mr. Hamza Chaudhary's access to the phone or email records. While Gilead would like to skip over the due process rights of the Chaudharys in pursuing the claims against them, the process afforded by the FRCP and Second Circuit law is essential in this David and Goliath conflict.

The Chaudharys also did not produce documents that are in Gilead's possession, custody or control and it would be inappropriate to do so. The Chaudharys did not produce account numbers for certain Pakistani accounts, as they maintain that they did not have that information available here and actively sought throughout this litigation and date of this opposition to obtain the account information. When the Chaudharys received additional account information, interrogatory responses were amended. Not disclosing a rarely used foreign account number due to not having the account number readily available does not necessarily equal "concealment of overseas assets". Accusing the Chaudharys of "engaging in destruction of documents and witness tampering" is a serious allegation that is not taken lightly. However, Gilead had the opportunity to question the Chaudharys concerning certain messages and to obtain an explanation as to their authenticity, context and substance. Gilead could have requested an adverse presumption

instruction or one of a host of appropriate alternative sanctions, such as striking certain defenses. If Gilead did not obtain the subject emails and text messages before the Chaudharys' depositions, Gilead could have sought to reopen those depositions. Alternatively, Gilead can cross-examine the Chaudharys on the stand during the trial of this action. Disagreements concerning the sufficiency of the response on the merits and possible alleged "witness impeachment material" referred to in Gilead's motion do not undermine the fact that the Chaudharys have been reasonably diligent in complying with their discovery obligations and Court Order to complete fact discovery by 8/17/25.

In <u>Skarnulis v. Belmont</u>, 74 Fed. Appx. 92, 94 (2d. Cir 2003), the Second Circuit affirmed the District Court's finding that the defendant, a facility for the care of cognitively challenged persons, had been reasonably diligent in complying with a consent order. The consent order required, among other measures, increased staffing, appointment of advocates, and compliance with certain regulations concerning activities available to two inhabitants at the facility. Although the defendants had failed to fully comply with the staffing requirements, they had made substantial efforts to do so and had cooperated to the best of their ability with the defendants. Moreover, although the defendants had not fully complied with the applicable regulations concerning available activities, they had been frustrated by conditions beyond their control, in particular a high turnover of staff. Accordingly, the Second Circuit upheld the denial of a finding of contempt. <u>Skarnulis</u>, 74 Fed. Appx. at 95-96.

Likewise, in <u>O'Hearn v. Bodyonics, Ltd.</u>, 56 F. Supp. 2d 302 (E.D.N.Y. 1999), the District Court issued a preliminary injunction requiring the defendants to stop any further use of the plaintiff's likeness. Despite the fact that the defendants failed to stop the use of an advertisement using the likeness, the court found that the defendants had made a reasonable effort to stop all

further use, and that the failure in one instance was due to inadvertence, and therefore it denied the request for a finding of contempt. O'Hearn, 56 F. Supp. 2d at 312-313.

## A. **The Chaudharys conducted themselves in good faith after initially receiving poor counsel**

On July 29, 2025, MLF appeared in this action and a total of four (4) attorneys were assigned to this matter with a combined 90+ years of litigation and trial experience. MLF was the third firm to represent the individual the Chaudharys in this litigation after the first two firms had withdrawn within the first five months. Dkt. ## 75, 76.

As of August 19, 2025, more than 150 hours in attorney time was expended to ensure the Chaudharys' compliance with all Court Orders and discovery obligations. In light of the Court imposed discovery deadline of August 17, 2025 and expedited discovery schedule, MLF's attorneys had less than three (3) weeks to properly investigate and defend case allegations, complete fact discovery and prepare for dispositive motion practice and trial. Within 48 hours of appearing, MLF served requests for admissions, document demands and interrogatories. MLF's diligent work resulted in the production of more than 500 pages of documents and full and complete responses without objections by the Chaudharys to Plaintiffs' interrogatories and document requests. MLF also filed the Chaudharys' Verified Answer with Affirmative Defenses (Dkt. # 77), letter in reply to Plaintiffs' letter motion to compel responses to discovery demands (Dkt. # 78), Verified Amended Answer with Crossclaims and Counterclaim (Dkt. # 81), letter in opposition to Plaintiffs' motion to quash (Dkt. # 86) and reply letter in support of the Chaudharys' request for a short extension of discovery (Dkt. # 88). In addition, MLF served third-party subpoenas upon NYS Department of Education, Shumaila Arslan, the owner of HTW for the past three (3) years as well as Mohammed Ali and reviewed responses thereto. On August 19, 2025, MLF took the deposition of Shumaila Arslan and then reached out to Mr. Arslan, who had

operational control over the pharmacy, regarding the pharmacy's computer terminal. In accordance with the Court's Seizure Order (Dkt. # 66), MLF obtained Arslan's consent for Gilead to access the pharmacy's cloud-based email accounts such as Gmail, Outlook 365 and other email providers. On August 18, 2025, MLF appeared for Gilead's noticed deposition but Gilead's representative and Plaintiffs' counsel did not. Moreover, in compliance with the Asset Freeze Order (Dkt. # 67), MLF identified two additional bank accounts in Pakistan that were previously unknown to Plaintiffs and the account information was immediately turned over to Gilead's counsel.

MLF held one extended in-person conference with all three Chaudhary family members at MLF's offices on August 11, 2025, and then, as Nabila Chaudhary speaks almost no English, with Qaiser and Hamza on November 19, 2025, November 25, 2025, and January 13, 2025

On July 31, 2025, MLF filed the Chaudharys' Verified Answer. Dkt. # 77.

On August 14, 2025, MLF served the Chaudharys' Interrogatory Responses and on August 15, 2025, MLF served their Responses to Gilead's Document Requests and responsive documents. Rubin Dec. ¶¶ 11.e and f.

On August 19, 2025, MLF served Hamza's Amended Responses to the Document Demands and Interrogatories. Rubin Dec. ¶ 11.g.

On November 7, 2025, MLF served the Chaudharys' Supplemental Responses to Document Demands. Rubin Dec. ¶¶ 11.i.

On November 20, 2025, MLF served the Chaudharys' Amended and Supplemental Responses to Interrogatory No. 6. Rubin Dec. ¶¶ 11.j.

MLF served additional documents from the Chaudharys on November 12, November 20, November 26, December 2, and December 11, 2025, and on January 12 and January 15, 2026. Rubin Dec. ¶¶ 11.i.

On November 26, 2025, MLF also provided Gilead with the details of a property in Pakistan owned by Qaiser. Rubin Dec. ¶¶ 11.k.

Attached to the Rubin Dec. as **Exhibit M** is a table setting forth all of the bank accounts for which the Chaudharys have produced documents. Rubin Dec ¶ 9.

Included in the Declaration of Qaiser Chaudhary at ¶ 15 is a table setting forth all of the Pakistani bank accounts for which the Chaudharys have produced documents, including the amount in each account as of March 1, 2025, and the uses to which those funds have been put.

Gilead ignores the very real language barrier with the individual the Chaudharys. Gilead would like this Court to believe that the Chaudharys have demonstrated fluency in written English or that the appearance of the Chaudharys before the Court demonstrated an adequate command of spoken English. See Agiwal v. Mid Island Mortg. Corp., 555 F.3d 298, 299 (2d Cir. 2009). As discussed below, nothing could be further from the truth.

**B. The Chaudharys sold Heal the World Pharmacy in January 2022 and had neither access nor control of HTW when counterfeit Biktarvy was sold by HTW in January 2025**

In its Complaint, Gilead asserts that that the Chaudharys own or control City Plus Care Inc., dba Heal the World Pharmacy ("HTW"). Gilead's Complaint states that the Chaudharys are "principals of", and own, HTW. See, e.g., Complaint ¶ 2 ("the Defendants, a retail pharmacy and its principals …"); ¶ 11 ("Defendant Qaiser Chaudhary is … a principal and corporate officer of Heal the World."); ¶ 16 ("the Defendants Nabila Chaudhary, Qaiser Chaudhary, and Hamza Chaudhary sold counterfeit Gilead medicines out of their pharmacy location, Defendant Heal the World, in Queens, New York City.").

Gilead bases its allegation that the Chaudharys controlled HTW in 2025 on obsolete data from the National Provider Index about Nabila, an unknown source for a purported Certificate of Assumed Name as to Qaiser naming him as "an officer", and a Yelp web page about the pharmacy

that names Hamza as the "Business Owner." Complaint ¶¶ 29, 30, 32. Gilead concedes that it has no public filings supporting its claim that Hamza owns or controls HTW. Complaint ¶ 32.

Gilead's argument about the Chaudhary's purported ownership takes up seven (7) pages (pp. 16-23) of Gilead's 57-page Memorandum of Law in Support of Motion for Case-Ending Sanctions Against the Individual Defendants ("Gilead Mem."). Gilead continues to ignore the many documents produced in discovery, as well as documents in Gilead's own possession, which prove that the Chaudharys sold HTW on January 24, 2022. Gilead also continues to rely on an outdated listing in the National Provider Index as to Nabila, an unknown source as to Qaiser, and Yelp as to Hamza.

On December 20, 2021, Nabila Chaudhary, entered into an agreement to sell HTW to Shumaila Arslan ("Shumaila"). **Exhibit A** (Asset Purchase Agreement). Although Nabila nominally owned HTW until January 24, 2022, she actually had no involvement at all, and Qaiser controlled HTW until January 24, 2022. Nabila Dec. at ¶ 4.

On January 24, 2022, Nabila and Shumaila consummated the sale, and Nabila transferred her ownership to Shumaila. **Exhibit B** (Bill of Sale). In exchange, Shumaila made her initial payment to Nabila of $100,000. **Exhibit C** (cancelled check). Then, Shumaila, referring to herself as the "President" of HTW, formally transferred ownership of all of HTW's 200 outstanding shares of stock to herself. **Exhibit D** (Minutes of Special Meeting of HTW, dated January 24, 2022); **Exhibit E** (Stock Certificate and stub dated January 24, 2022, showing Nabila as transferor and Shumaila as transferee).

Before Nabila sold HTW to Shumaila, Qaiser managed HTW. After the sale, Qaiser had no ability to control HTW, to pay money from any HTW bank account, or to access any records of HTW. Qaiser Dec. at ¶ 6; Nabila Dec. ¶ 6.

On February 15, 2022, Shumaila applied to Citibank for an account for HTW, listing herself as "Owner" and "President". **Exhibit F,** Shumaila's Citibank application, excerpted from APPLICATION-6551.pdf from Citibank's response to Gilead's subpoena.

On or about March 1, 2022, Shumaila, signing as President and Owner of HTW, filed a Notice of Change in Officers And/Or Ownership with the New York State Department of Education. **Exhibit G,** Response to the Chaudharys' Subpoena to the New York State Department of Education ("DOE"), at CHAUD2544 - CHAUD2546.

On January 17, 2023, Shumaila, again as HTW's President, applied to TD Bank to open another account for HTW. **Exhibit H** (Application).

After Gilead commenced this action, Shumaila made three unambiguous sworn statements asserting that she, and she alone, has been the owner of HTW since January 24, 2022. The first was her Declaration dated May 1, 2025, **Exhibit I**. The next was her deposition of August 19, 2025, **Exhibit J** ("Shumaila Dep."), at 21:11-13:25. The last was her statement under penalty of perjury dated January 12, 2025, in support of HTW's Motion to Vacate Default,[3] **Exhibit K** ("Shumaila Aff.").

Although the purchase was made in Shumaila's name, Shumaila's father-in-law, Abdul Sheikh (Shumaila Dep. At 28:6-8), was the actual purchaser. Shumaila Aff. ¶ 7. Shumaila's father-in-law "handled the day-to-day business of the pharmacy," apparently until "he passed away in August of 2024." Shumaila Aff. ¶¶ 8-9. When her husband, Arslan Sheikh (Shumaila Dep. at 20:12-15) returned on September 1, 2024, he "worked to sort out [Abdul Sheikh's] affairs including the business affairs of the pharmacy." Shumaila Aff. ¶ 11.

---

[3] On January 12, 2026, Defendant City Plus Care Pharmacy Inc. appeared by Shumaila Arslan and moved to lift the default entered on July 7, 2025. ECF # 102-104.

After the Chaudharys sold HTW to Shumaila, it was not the Chaudharys' duty to change the National Provider Index information that Gilead mistakenly relied on in suing the Chaudharys; it was HTW's. 45 CFR 162.410(a)(4) provides: "A covered entity that is a covered health care provider must … (4) Communicate to the NPS [National Provider System] any changes in its required data elements in the NPS within 30 days of the change." 45 CFR 160.103 defines a "covered entity" to include "A health care provider who transmits any health information in electronic form in connection with a transaction covered by this subchapter."

Gilead's argument that the Chaudharys own or control HTW (Gilead Mem. at pp. 16-20) also relies on a misstatement by Qaiser's former counsel, likely based on the erroneous Complaint itself, that Qaiser owns HTW - a misstatement that Qaiser, with a poor command of written English, who relied on his formal counsel under time pressure and duress, signed, despite the fact that, as shown below, doing so provided him no benefit whatsoever. Qaiser Dec. at ¶¶ 19, 20, 23-29.

After Gilead filed its Complaint, it succeeded in freezing both the Chaudharys' assets and HTW's assets. Arslan Singh, who was abroad at the time, told Hamza to try to help unfreeze some of its frozen assets, and Hamza asked his father, Qaiser, to help.  Hamza Dec. ¶ 37; Qaiser Dec. ¶ 23. Hamza did not mean to retain their former counsel on behalf of HTW; he simply asked them if they could help HTW because Arslan Singh was out of the country and could not manage the situation himself. Hamza Dec. ¶ 37.

In trying to help Arslan Singh and HTW, Qaiser had a miscommunication with his former counsel. On April 17, 2025, Qaiser submitted a declaration in which he erroneously stated that he was the current owner of HTW. Dkt. Doc. # 37, starting at p. 14. He withdrew that misstatement in a court filing two weeks later on May 1, 2025, and clarified that he had not owned HTW since

January of 2022 and that he had no access to the documents sought by Gilead. Dkt. No. 53-2 at ¶¶ 1-3.

In drafting Qaiser's declaration, his former counsel may have been unduly influenced by Gilead's confident but mistaken assertions, based on Gilead's obsolete information in the National Providers Index, an unnamed source that it asserts listed Qaiser, and Yelp, that the Chaudharys controlled and owned HTW. <u>See</u> Complaint ¶¶ 10, 11, 28-30. Former counsel may have also misunderstood what Hamza meant when he asked former counsel to help unfreeze HTW's funds.

Qaiser is not fluent in written English. Qaiser Dec at ¶ 12. As he points out in his accompanying Declaration, the error in his April 17, 2025 declaration was obviously innocent since that declaration stated at Paragraph 9 that he had no signing authority over HTW's bank accounts (and therefore he could not be deemed to "control" HTW). Qaiser Dec. ¶ 28. His mistake arose under time pressure from, and a misunderstanding and a miscommunication with, his former lawyer. Qaiser Dec. at ¶¶ 19, 20, 23-29. Qaiser read the draft declaration quickly and relied on his former lawyer. Qaiser Dec. ¶ 29. His former lawyer rushed him to sign. <u>Id.</u>

Paragraph 7 of Qaiser's April 17, 2025 declaration lists two HTW accounts and implies that Qaiser controlled them. However, as shown by Gilead's bank documents that it obtained by subpoenas, the HTW accounts listed in that declaration (the Citibank account ending in 6551 and the TD Bank Account ending in 3504) were both opened by Shumaila, as Owner and President of HTW, after she bought HTW on January 24, 2022. **Exhibit F**, **Exhibit H**. Qaiser believes that his former lawyer simply assumed that, because he thought that Qaiser still had an interest in HTW, all of the frozen accounts, including HTW's accounts, belonged to him. Qaiser Dec. ¶ 26.

The Chaudharys did not obtain any "litigation advantage" from helping HTW. Qaiser Chaudhary paid to HTW and Shumaila every cent of the $32,700 that the Court agreed to unfreeze.

Qaiser Dec ¶ 31 and **Exhibit L**. **Exhibit L** shows four payments on April 3-10, 2025 on behalf of HTW or to Shumaila from Qaiser's Citibank account ending in 4859: two wire transfers to Cardinal Health ($11,230.64 and $10,711.13), one check to HTW's landlord for $3,661.93, and one check for $7,026.30 to Shumaila. Including the two wire transfer fees totaling $70 shown in the transfers to Cardinal Health, those amounts add up to exactly $32,700.

As stated in each of the accompanying Chaudhary Declarations, the Chaudharys did not own or control HTW at any time after January 24, 2022. Thus, there is no current basis for Gilead to assert that the Chaudharys had any connection to any alleged counterfeit Biktarvy sold by HTW in 2025. For the same reason, the Chaudharys had no reason to "lie", "commit perjury", or "obstruct justice", despite Gilead's repeated remonstrations that the Chaudharys did so.

### C. Disclosures about the Chaudharys' Assets

Gilead asserts that the Chaudharys did not fully disclose their assets at the outset of the litigation. Gilead Mem. at pp. 8-10.

The Chaudharys did not receive adequate counsel from their two prior counsel. Qaiser Dec. ¶ 9. Prior counsel did not make clear to them the scope of their obligations. Id. For example, Qaiser was unaware that he needed to disclose any brokerage accounts. Qaiser Dec. ¶ 18.

Since that time, MLF has worked diligently with the Chaudharys to gather all available asset information from them. E.g., Rubin Dec. ¶¶ 3, 4. Attached hereto as **Exhibit M** is a list of all of the 32 bank and brokerage accounts for which the Chaudharys provided records. After receiving said account information from the Chaudharys, MLF stamped it and provided it to Gilead as soon as possible. Rubin Dec. ¶ 4.

With respect to the Chaudharys' Pakistani assets, Qaiser states that he was not able to obtain information from certain Pakistani bank accounts without physically appearing there and

had to travel to Pakistan to retrieve the missing information. Accordingly, Qaiser traveled to Pakistan in October of 2025 for the purpose of obtaining account information. Qaiser Dec. ¶ 13.

At the time of Qaiser's deposition mere months after Gilead filed its Complaint, some of the Pakistani bank accounts were dormant because the Chaudharys had not used them in a long time. Those are the accounts Qaiser was referring to in his deposition when he said certain Pakistani accounts were "frozen". Qaiser Dec. ¶ 34.

By the end of 2024, Qaiser had transferred most of his family's assets to the United States. Qaiser Dec. at ¶ 14. As of March 1, 2025, they only had $62,839.36 in Pakistani banks. Qaiser Dec. at ¶ 15. Now, all Pakistani bank accounts are closed. Qaiser Dec. at ¶ 14. Below is a list of all of Qaiser's and Nabila's former bank accounts in Pakistan since 2019, the amount of funds in each account as of March 1, 2025, and what happened to the remaining funds (Qaiser Dec. at ¶ 15). Gilead is aware of the following bank accounts:

| **Bank** | **Acct # End** | **Owner** | **As of 3/1/2025** | **Currency** | **Notes** |
| --- | --- | --- | --- | --- | --- |
| Dubai Bank | 5001 | Qaiser | 39,681.00 | PKR | Approx. $141.66, paid into Qaiser's Citibank account ending in 4859 and from there into court. |
| MCB | 1563 | Qaiser | 50,832.07 | USD | Repayment of a loan: $50,832.07 paid to Muhammad Umer Farooq 6/24/2025 |
| MCB | 6511 | Nabila | 4,611.84 | USD | Paid it into Qaiser's Citibank account ending in 4859 and from there into court. |
| National Bank of Pakistan | 5190 | Nabila | 0.00 | | Old account. |

| Silk Bank | 0037 | Qaiser | 5,296.99 | USD | Used to pay for trip to Pakistan to get bank account information |
|---|---|---|---|---|---|
| Silk Bank | 0015 or 0018 | Qaiser | 547,922.00 | PKR | PKR 547,922 (approx. $1,956.08) withdrawn 8/30/2025 to pay for Pakistan trip |
| Standard Chartered Bank (Pakistan) Ltd. | 7301 | Qaiser | 0.00 | USD | |

As shown above, by traveling to Pakistan, in addition to obtaining the information that Gilead sought, Qaiser was able to pay approximately $4,753 to the Clerk of the Court.

As of March 1, 2025, Qaiser only had one piece of real property in Pakistan, and he has not acquired any real property since that date. Qaiser Dec. ¶ 17. That property produced $200 per month in rent. Id. A family friend collected the rent and used it all to pay charges on the property, erasing any income. Id. The property has not been rented for the past six months. Id. Apart from the Chaudharys' home in Roslyn Heights, they do not have any other real property in Pakistan or the United States or anywhere else. Id.

Based on wire transfers reflected in Gilead's Exhibit 5, Gilead asserts incorrectly that Hamza has an undisclosed Faysal Bank account. As Gilead can see, the name on that Faysal bank account is Hamza **Shahzad** Chaudhary. Hamza's name is Hamza **Mahmud** Chaudhary. **Exhibit N** is a redacted but otherwise true copy of Hamza's New York State Driver's License. Hamza Dec. ¶ 5.

According to Gilead's Exhibit 5, the sender of those wires to Hamza Shahzad Chaudhary was a company called Unity Technologies in San Francisco. Gilead's Exhibit 5 at second to last

page. Hamza has no connection to Unity Technologies and never received any money from them. Hamza Dec. ¶ 6. The first name Hamza and the last name Chaudhary are both common in Pakistan. Qaiser Dec. ¶ 44. Here is the LinkedIn profile of a Unity Technologies developer whose name is Hamza Chaudhary who lives in Pakistan: https://www.linkedin.com/in/hamza-chaudhary-024447107/?originalSubdomain=pk. Hamza Dec. ¶ 6.

At Gilead Mem. at p. 15, Gilead cites to its Exhibit 7, asserting that Qaiser accidentally revealed bank account numbers of accounts for which he has not provided information. That was due to a simple mistake by Qaiser, according to him. He looked at checks from Pakistan and erroneously understood a check number to be a bank account number. **Exhibit O** demonstrates this mistake. It shows that the check number for one of Qaiser's National Bank of Pakistan checks is 13468781. As reflected in Exhibit 7, Qaiser erroneously asserted that his National Bank of Pakistan account number was 134-68-782. Qaiser Dec. ¶ 33.

### D. <u>Payments to the Chaudharys questioned by Gilead</u>

The Chaudharys are accused of obtaining payments Gilead deems questionable. Gilead Mem. at pp. 41-44.

Qaiser sold two pharmacies to Shumaila Arslan: Smith Pharmacy, 102A Belmont Ave Brooklyn, for $225,000 plus $277,300 for inventory, for a total price of $502,300, and City Plus Care for $350,000 plus $259,000 for inventory. In total, Shumaila was supposed to pay Qaiser $1,111,300. The HTW checks in Gilead's Exhibit 35 reflect these payments. Qaiser Dec. ¶ 39.

Qaiser and/or Nabila had owned several pharmacies that they then sold in return for payments over time. These included Total Plus Pharmacy, Marga Pharmacy, Casa Pharmacy, Smith Pharmacy, and HTW. Qaiser Dec. ¶ 42. The payments from those pharmacies that Gilead questioned Qaiser about, as set forth at page 45 of their Memorandum, were payments owed to him by the buyers. Qaiser Dec. ¶ 43.

On pages 36-38 of the Gilead Mem., Gilead challenges HTW's payments for the lease of Hamza's car. Hamza used his leased car for pickups and deliveries. It was more efficient for Abdul Sheikh (Shumaila's father and manager of HTW) to pay Hamza's car lease than to hire and pay for somebody else to do the pickups and deliveries. Instead of hiring new employees for delivery at $700 per week or $2,800 per month, the pharmacy's manager, Abdul, gave Hamza delivery responsibility and paid for Hamza's car installments, which were about $1,000 per month. Doing so saved the pharmacy $1,800 per month. Hamza Dec. ¶ 35.

Gilead also asserts that Hamza received over $100,000 from Marga Pharmacy. Gilead Mem. at p. 39. Hamza received only $55,000 from Marga Pharmacy. Qaiser had sold Belis Pharmacy Inc., dba Marga Pharmacy, around 2017 or 2018, for about $250,000. The buyer was not paying Qaiser on time, so Qaiser made the excuse that his son, Hamza, needed the money, and Qaiser begged the buyer to pay. That is why the buyer put two checks totaling $55,000 in Hamza's name. Qaiser deposited those two checks into Hamza's account. Qaiser Dec. ¶ 38.

### E. **The Chaudharys' inability to obtain HTW's records**

Although Shumaila obtained invoices from HTW's distributors as of January 12, 2026, she admitted that she would be unable to locate pedigree information even if she tried. Shumaila Aff. ¶ 25. Qaiser has had no way to access any pedigree documents since the pharmacy was sold on January 24, 2022. Qaiser Aff. ¶ 6.

On the other hand, the Supervising Pharmacist from January 24, 2022, through after the March 19, 2025 seizure, Martin Jacob, should have had access to all of those records. Yet, despite the fact that Gilead's subpoena to him specifically sought those records (**Exhibit Q**, Martin's Responses), the only thing that Martin produced were text messages with Hamza, including screen shot of messages that Hamza categorically denies sending. Hamza Dec. ¶ 16; Rubin Dec. ¶ 13.

### F. Martin Jacobs' screen shots

Hamza completely disavows the purported text messages presented by HTW's Supervising Pharmacist, Martin Jacob, in the form of screenshots. Hamza Dec. ¶ 16.

Qaiser and Hamza believe that it was Martin's responsibility, as the Supervising Pharmacist, to ensure that all medications dispensed by HTW had the required paperwork, and to maintain all required records, that Martin may have failed to record any alleged counterfeit Biktarvy, or to detect any bottles of counterfeit Biktarvy if HTW received any, or that he may have been the source of any counterfeit bottles. Qaiser Dec. at ¶ 7; Hamza Dec. ¶ 15.

According to Martin's filings with the New York State DOE, Martin was the Supervising Pharmacist at HTW at all times from January of 2022, when Nabila Chaudhary sold HTW to Shumaila Arslan, until April 25, 2025, a month after Gilead's seizure in March of 2025. **Exhibit G** at CHAUD2535 and CHAUD2554.

Hamza had no responsibilities in connection with any records for any pharmaceuticals that HTW was required to maintain and he never possessed any such records. Hamza Dec. ¶¶ 7, 9, 11. Hamza does not know anything about how he could obtain them and never heard the term "pedigree" in connection with pharmacy business until the day of the seizure, March 19, 2025. Hamza Dec. ¶ 7. On the day of the seizure, Hamza was at the pharmacy and somebody asked him if he knew where the pedigrees were. He thought the person must be talking about dog food or baby food. They explained to him that it was a kind of invoice. Id.

After the sale of HTW to Shumaila in January of 2022 until about April of 2025, when Hamza left HTW, Hamza's only responsibilities at HTW were running the over-the-counter ("OTC") register, pricing OTC items, stocking OTC shelves, and pharmacy pickups and deliveries. The pickups and deliveries sometimes included pharmacy items. Hamza Dec. ¶¶ 9-11.

When HTW needed a pharmaceutical medicine that it did not have in stock, a pharmacist would arrange to borrow some of the medicine from another pharmacy and they would have Hamza pick it up. On those occasions, Hamza simply picked up the medicine and brought it back to HTW. His understanding is that that is a standard practice among pharmacies. Hamza Dec. ¶ 10. Also, Hamza would bring medicine back from a patient if the patient had too much, in which case the pharmacist would reverse the claim. Hamza Dec. ¶ 11. It was possible for a patient to return a counterfeit. Hamza Dec. ¶ 12. Hamza had no responsibility to determine whether any Biktarvy was counterfeit and no reason to believe that any Biktarvy was counterfeit. Hamza Dec. ¶ 13.

It was Hamza's understanding that Supervising Pharmacists are required to be at the pharmacy they are supervising for at least 30 hours each week. Hamza Dec. ¶ 18. Martin was almost never at HTW. Most weeks he was not there at all. There were entire months when Martin did not appear at HTW. Hamza Dec. ¶ 19. At the same time that Martin was the Supervising Pharmacist at HTW, he simultaneously held positions with hospitals and other pharmacies, and he had his own business placing vending machines that sold OTC pharmacy items. Hamza Dec. ¶ 20.

Other hospitals that Martin worked for included Elmhurst Hospital, Jamaica Hospital, Hackensack Hospital, Good Samaritan Hospital, Lenox Hill Hospital, and Jersey City Medical Center. Hamza Dec. ¶ 20.

Hamza believes that Martin worked at all of those hospitals at points in time between the time Shumaila Arslan bought HTW from Nabila and the time of the seizure in March of 2025. Hamza Dec. ¶ 20. Hamza believes that Martin's time sheets from those hospitals would prove that Martin could not possibly have even remotely fulfilled the time requirements of being the Supervising Pharmacist at HTW. Hamza Dec. ¶ 21.

Martin told Hamza and other employees of HTW that if one of those hospitals called asking about whether he was there at HTW at the time, they should respond that Martin was there even if he was not, and that they should tell the caller that Martin was the Supervising Pharmacist at HTW. Hamza Dec. ¶ 22.

Every day that Martin showed up to work at HTW, he would go down into HTW's basement to vape cannabis during working hours, sometimes more than once a day. Hamza would smell it when he went down to the basement afterwards. Sometimes Martin smoked cannabis down there as well. Hamza Dec. ¶ 23. Hamza often had to go through the pharmacy to use the bathroom or to get supplies from the basement. He could see that, when Martin was there, the pharmacy area looked very disorganized. Hamza Dec. ¶ 24.

Martin was also often very nervous and panicky. Whenever a client had a complaint, for example if they did not receive their medicine when they expected to, Martin got nervous and went to vape some nicotine before returning to the conversation. Hamza Dec. ¶ 25. Martin once got so panicky that he actually cried in front of Hamza. Martin explained that while he was working at another pharmacy, he had a friend who needed oxycodone without a prescription, that Martin took some expired oxycodone from that pharmacy, that he gave it to his friend, and that his friend then overdosed and died. Martin was terrified that the police might find out and arrest him. Hamza Dec. ¶ 26.

Martin asked Hamza if he could have some of Hamza's urine to use at a drug screening test. Hamza refused. Martin told Hamza that on at least three occasions he had bought synthetic urine online in order to pass drug tests. Hamza Dec. ¶ 27.

Martin never dressed professionally at HTW. He usually wore shorts and a tee shirt. He rarely wore a name tag. Whenever a pharmacy inspector came, Martin would quickly put a name

tag on. Hamza Dec. ¶ 28. Customers were actually surprised to learn that Martin was the pharmacist in charge. Hamza Dec. ¶ 29.

Martin was technically proficient with computers. He brought his own laptop to HTW. He also watched YouTube videos about computer technology while he was at work at HTW. Hamza Dec. ¶ 30.

Based on what Hamza knows about Martin, he has no doubt that Martin could have created those screen shots defensively, perhaps using another phone along with his own, to distract Gilead from focusing on Martin himself. Hamza Dec. ¶ 31.

### G.  **The City Plus emails**

Gilead asserts that it has been unable to access the citypluscare@gmail.com email account. Starting in late August of 2025, MLF told Gilead that there was a potential solution to the dual authentication problem and that MLF had made arrangements for Gilead to bring its forensic expert to HTW to collect any available emails. Rubin Dec. ¶ 11.h. and **Exhibit P** (chronology of selected emails from MLF) on August 21, 2025, two emails of August 22, 2025, September 18, 2025, October 1, 2025, and October 15, 2025. Gilead did not pursue that solution but instead stated that there might be some risk in doing so. Nor did Gilead subpoena Google, which would have obviated any of Gilead's objections about deleted emails. Rubin Dec. ¶ 11.h.

## III.     CONCLUSION

Plaintiffs are seeking a drastic remedy from this Court in a matter where key facts are disputed and where, at best, Defendants are guilty of late compliance due to inadequate legal counsel, miscommunication, and lack of understanding. Given the high burden that Gilead must overcome, and given that case-ending sanctions are disfavored in this Circuit, the Court should deny the motion.

**WHEREFORE**, for the foregoing reasons, Nabila Chaudhary, Qaiser Chaudhary, and

Hamza Chaudhary ask the Court to deny Gilead's motion in its entirety.

Date:  January 19, 2026
       Brooklyn, New York

Respectfully submitted,

**Marzec Law Firm, P.C.**

By:    */s/ Darius Marzec*
     Darius A. Marzec, Esq.
     Jerome Noll, Esq.
     Joshua Neil Rubin, Esq.
     *Attorneys for Qaiser Chaudhary, Nabila Chaudhary, and Hamza Chaudhary*
     776A Manhattan Avenue, Suite 104
     Brooklyn, NY 11222
     (718) 609-0303
     dmarzec@marzeclaw.com
     jnoll@marzeclaw.com
     jrubin@marzeclaw.com
